No. 25-50481

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

———————————

TEXAS ASSOCIATION OF MONEY SERVICES BUSINESSES, TAMSB;
NYDIA REGALADO, doing business as BEST RATE EXCHANGE; SAN
ISIDRO MULTI SERVICES, INCORPORATED; MARIO REGALADO, doing
business as BORDER INTERNATIONAL SERVICES; REYNOSA CASA DE
CAMBIO, INCORPORATED; LAREDO INSURANCE SERVICES, L.L.C.;
ESPRO INVESTMENT, L.L.C., doing business as LONESTAR MONEY
EXCHANGE; CRIS WIN, INCORPORATED, doing business as BROWNSVILLE
CASA DE CAMBIO; HIGH VALUE, INCORPORATED; R & C,
INCORPORATED, doing business as TEMEX MONEY EXCHANGE;
ARNOLDO GONZALEZ, JR.; E.MEX. FINANCIAL SERVICES,
INCORPORATED,

Plaintiffs-Appellees/Cross-Appellants,

*(caption continued on inside cover)*

———————————

On Appeal from the United States District Court
for the Western District of Texas

———————————

## BRIEF FOR DEFENDANTS-APPELLANTS

———————————

BRETT A. SHUMATE
*Assistant Attorney General*

JUSTIN R. SIMMONS
*United States Attorney*

SHARON SWINGLE
SIMON G. JEROME
*Attorneys, Appellate Staff*
*Civil Division, Room 7209*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-1673*

v.

PAMELA BONDI, U.S. Attorney General; SCOTT BESSENT, Secretary, U.S. Department of Treasury; UNITED STATES DEPARTMENT OF TREASURY; ANDREA GACKI, Director of the Financial Crimes Enforcement Network; FINANCIAL CRIMES ENFORCEMENT NETWORK,

Defendants-Appellants/Cross-Appellees,

_____

**STATEMENT REGARDING ORAL ARGUMENT**

The district court entered a preliminary injunction improperly barring the government from exercising its statutory authority to gather information supportive of anti-money-laundering efforts.  Oral argument would be helpful to assist the Court in apprehending the legal issues underlying this appeal.

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ................................................................................. i

TABLE OF AUTHORITIES ........................................................................ iii

STATEMENT OF JURISDICTION ............................................................ 1

STATEMENT OF THE ISSUE ................................................................... 1

STATEMENT OF THE CASE ..................................................................... 1

    A.    The Bank Secrecy Act and Its Implementing Regulations ......................... 1

    B.    The Southwest Border Geographic Targeting Order ................................ 5

    C.    Prior Proceedings ............................................................................ 8

SUMMARY OF ARGUMENT .................................................................... 9

STANDARD OF REVIEW ........................................................................ 11

ARGUMENT ............................................................................................... 11

I.    Plaintiffs Have Not Shown a Likelihood of Success on Their Claims .............. 11

    A.    Plaintiffs' Fourth Amendment claims are meritless. ................................ 11

        1.    The Order does not violate the businesses' Fourth Amendment rights. ............................................................ 11

        2.    The Order does not violate plaintiff Gonzalez's Fourth Amendment rights. ............................................................ 21

    B.    Plaintiffs' APA claims are meritless. ................................................... 24

        1.    The Order did not require notice and comment. .......................... 24

        2.    The Order is not arbitrary or capricious. ...................................... 31

II.    The Remaining Equitable Factors Favor Vacatur ................................. 37

CONCLUSION .............................................................................................................. 41

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Arizona v. Biden,*
40 F.4th 375 (6th Cir. 2022) ....................................... 40

*Barry v. City of New York,*
712 F.2d 1554 (2d Cir. 1983) .................................... 19

*Bond v. United States,*
572 U.S. 844 (2014) ................................................. 26

*Bowen v. Georgetown Univ. Hosp.,*
488 U.S. 204 (1988) ................................................. 30

*Brigham City v. Stuart,*
547 U.S. 398 (2006) ................................................. 11

*Brock v. Emerson Elec. Co., Elec. & Space Div.,*
834 F.2d 994 (11th Cir. 1987) ................................. 18

*Califano v. Yamasaki,*
442 U.S. 682 (1979) ................................................. 39

*California Bankers Ass'n v. Shultz,*
416 U.S. 21 (1974) ............................................. *passim*

*Camara v. Municipal Ct. of the City & Cnty. of S.F.,*
387 U.S. 523 (1967) ................................................. 18

*Cargill v. Garland,*
57 F.4th 447 (5th Cir. 2023) .................................... 39

*Carpenter v. United States,*
585 U.S. 296 (2018) ............................................ 18, 23

*Chacon v. Granata,*
515 F.2d 922 (5th Cir. 1975) ................................... 38

*City of Arlington v. FCC,*
668 F.3d 229 (5th Cir. 2012) ........................... 24, 29, 30

*Data Mktg. P'ship, LP v. U.S. Department of Labor,*
  45 F.4th 846 (5th Cir. 2022) ...................................................... 39

*Delaware v. Prouse,*
  440 U.S. 648 (1979) .................................................................. 12

*Dennis Melancon, Inc. v. City of New Orleans,*
  703 F.3d 262 (5th Cir. 2012) ................................................... 11

*Department of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz,*
  601 U.S. 42 (2024) ................................................................... 26

*Department of Comm. v. New York,*
  588 U.S. 752 (2019) .................................................................. 33

*Donovan v. Lone Steer, Inc.,*
  464 U.S. 408 (1984) .................................................................. 14

*FCC v. Fox Television Stations, Inc.,*
  556 U.S. 502 (2009) .................................................................. 35

*FCC v. Prometheus Radio Project,*
  592 U.S. 414 (2021) .................................................................. 35

*FDA v. Wages & White Lion Invs.,*
  145 S. Ct. 898 (2025) ........................................................... 31, 33

*Feliciano v. Department of Transp.,*
  145 S. Ct. 1284 (2025) ............................................................. 26

*FERC v. Electric Power Supply Ass'n,*
  577 U.S. 260 (2016) .................................................................. 33

*George v. McDonough,*
  596 U.S. 740 (2022) .............................................................25, 26

*Genuine Parts Co. v. FTC,*
  445 F.2d 1382 (5th Cir. 1971) ...............................................25, 28

*Gill v. Whitford,*
  585 U.S. 48 (2018) .................................................................... 38

*Hannah v. Larche,*
  363 U.S. 420 (1960) ................................................................................ 28

*Hanson v. District of Columbia,*
  120 F.4th 223 (D.C. Cir. 2024) ............................................................... 38

*Hecht Co. v. Bowles,*
  321 U.S. 321 (1944) ................................................................................ 40

*Henson v. Santander Consumer USA Inc.,*
  582 U.S. 79 (2017) .................................................................................. 25

*ITServe All., Inc. v. U.S. Dep't of Homeland Sec.,*
  71 F.4th 1028 (D.C. Cir. 2023) ............................................................... 31

*Janvey v. Alguire,*
  647 F.3d 585 (5th Cir. 2011) .................................................................. 11

*Lange v. California,*
  594 U.S. 295 (2021) ........................................................................... 11, 21

*La Union del Pueblo Entero v. FEMA,*
  608 F.3d 217 (5th Cir. 2010) .................................................................. 37

*Lewis v. Casey,*
  518 U.S. 343 (1996) ................................................................................ 38

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania,*
  591 U.S. 657 (2020) ................................................................................ 33

*Marshall v. Barlow's, Inc.,*
  436 U.S. 307 (1978) ................................................................................ 12

*Motor Vehicle Mfrs. Assn. of the U.S., Inc. v. State Farm Mut. Automobile Ins. Co.,*
  463 U.S. 29 (1983) ......................................................................... 31, 32, 34

*National Lifeline Ass'n v. FCC,*
  921 F.3d 1102 (D.C. Cir. 2019) ............................................................... 27

*Neustar, Inc. v. FCC,*
  857 F.3d 886 (D.C. Cir. 2017) ........................................................... 30, 31

*New York v. Burger,*
  482 U.S. 691 (1987) ................................................................................ 13

*NLRB v. Bell Aerospace Co.,*
  416 U.S. 267 (1974) ................................................................................ 30

*Novedades y Servicios, Inc. v. FinCEN,*
  No. 25-cv-886, --- F. Supp. 3d ----, 2025 WL 1501936
  (S.D. Cal. May 21, 2025) ........................................................................ 9

*Oklahoma Press Pub. Co. v. Walling,*
  327 U.S. 186 (1946) .......................................................................... 15, 17

*Overstreet v. Lexington-Fayette Urban Cnty. Gov't,*
  305 F.3d 566 (6th Cir. 2002) .................................................................. 19

*Perez v. Mortgage Bankers Ass'n,*
  575 U.S. 92 (2015) ............................................................................ 24, 33

*Pharmaceutical Care Mgmt. Ass'n v. Rowe,*
  429 F.3d 294 (1st Cir. 2005) .................................................................. 19

*Ratzlaf v. United States,*
  510 U.S. 135 (1994) ............................................................................ 1, 2

*Riley v. California,*
  573 U.S. 373 (2014) ................................................................................ 21

*Rudisill v. McDonough,*
  601 U.S. 294 (2024) ................................................................................ 25

*Safari Club Int'l v. Zinke,*
  878 F.3d 316 (D.C. Cir. 2017) ................................................................ 30

*Starbucks Corp. v. McKinney,*
  602 U.S. 339 (2024) ................................................................................ 39

*Steagald v. United States,*
  451 U.S. 204 (1981) ................................................................................ 18

*Taggart v. Lorenzen,*
  587 U.S. 554 (2019) ................................................................................ 26

*Texas Med. Ass'n v. U.S. Dep't of Health & Human Servs.*,
   120 F.4th 494 (5th Cir. 2024) ....................................................... 40

*Touby v. United States*,
   500 U.S. 160 (1991) ...................................................................... 28

*Trump v. CASA, Inc.*,
   145 S. Ct. 2540 (2025) ................................................................. 39

*United States v. Chuang*,
   897 F.2d 646 (2d Cir. 1990) ......................................................... 14

*United States v. Emerson*,
   846 F.2d 541 (9th Cir. 1988) ........................................................ 28

*United States v. Florida E. Coast Ry. Co.*,
   410 U.S. 224 (1973) ...................................................................... 30

*United States v. Gratkowski*,
   964 F.3d 307 (5th Cir. 2020) .................................................... 22, 23

*United States v. Miller*,
   425 U.S. 435 (1976) .................................................................. 22, 23

*United States v. Morton Salt Co.*,
   338 U.S. 632 (1950) ............................................................... *passim*

*United States v. Oreira*,
   29 F.3d 185 (5th Cir. 1994) ............................................................ 5

*United States v. Smith*,
   110 F.4th 817 (5th Cir. 2024) ............................................ 18, 20, 21

*United States v. Texas*,
   599 U.S. 670 (2023) ...................................................................... 40

*United States v. W.H. Hodges & Co.*,
   533 F.2d 276 (5th Cir. 1976) ................................................ 24, 27, 28

*Valuta Corporation v. FinCEN*,
   No. 3:25-cv-191 (W.D. Tex. July 22, 2025) ................................... 9

*Vernonia Sch. Dist. 47J v. Acton,*
515 U.S. 646 (1995) ................................................................................. 21

*Weinberger v. Romero-Barcelo,*
456 U.S. 305 (1982) ................................................................................. 40

*Winter v. Natural Res. Def. Council,*
555 U.S. 7 (2008) ................................................................................. 38, 39

*Yesler Terrace Cmty. Council v. Cisneros,*
37 F.3d 442 (9th Cir. 1994) ...................................................................... 30

**U.S. Constitution:**

U.S. Const., amend. IV ............................................................................. 11

**Statutes:**

Annunzio-Wylie Anti-Money Laundering Act,
Pub. L. No. 102–550, 106 Stat. 4044 ......................................................... 4

Anti-Drug Abuse Act of 1988,
Pub. L. No. 100–690, 102 Stat. 4181 ...................................................... 2, 3

Countering America's Adversaries Through Sanctions Act,
Pub. L. No. 115–44, 131 Stat. 886 ............................................................. 4

Combating Russian Money Laundering Act,
Pub. L. 116-283 ....................................................................................... 28

USA PATRIOT Act of 2001,
Pub. L. No. 107–56, 115 Stat. 272 ............................................................. 3

5 U.S.C. § 551 ............................................................................ 24, 25, 29, 30

5 U.S.C. § 553 ........................................................................................... 24

5 U.S.C. § 702 ........................................................................................... 40

5 U.S.C. § 706 ...................................................................................... 31, 40

8 U.S.C. § 1189 .................................................................................................. 6

8 U.S.C. § 1324a .............................................................................................. 19

21 U.S.C. § 811 ................................................................................................ 28

21 U.S.C. § 2313a ............................................................................................ 28

26 U.S.C. § 6012 .............................................................................................. 19

26 U.S.C. §§ 6031-6060 .................................................................................. 19

31 U.S.C. § 5311 ........................................................................................ 16, 28

31 U.S.C. § 5312 ................................................................................................ 2

31 U.S.C. § 5313 .......................................................................................... 2, 26

31 U.S.C. § 5326 ........................................................................................ *passim*

52 U.S.C. § 30104 ...................................................................................... *passim*

**Regulations:**

Treasury Order 180–01 ...................................................................................... 4

31 C.F.R. § 1010.100 .......................................................................................... 5

31 C.F.R. § 1010.306 .......................................................................................... 2

31 C.F.R. § 1010.311 .......................................................................................... 2

31 C.F.R. § 1010.312 .......................................................................................... 5

31 C.F.R. § 1010.370 .......................................................................................... 3

**Federal Rules of Appellate Procedure:**

Fed. R. App. P. 4 ............................................................................................... 1

**Executive Orders:**

*Blocking Property and Prohibiting Transactions with Persons who Commit, Threaten to Commit, or Support Terrorism,*
Exec. Order No. 13,224, 66 Fed. Reg. 49,079 (Sept. 25, 2001) ................................... 5

*Designating Cartels and Other Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists,*
Exec. Order No. 14,268, 90 Fed. Reg. 8439 (Jan. 29, 2025) ........................................ 6

**Federal Register Publications:**

*Amendment to the Bank Secrecy Act Regulations Relating to Geographic Reporting of Certain Domestic Currency Transactions,*
54 Fed. Reg. 33,675 (Aug. 16, 1989) .............................................................. 3

*Issuance of a Geographic Targeting Order Imposing Additional Recordkeeping and Reporting Requirements on Certain Money Services Businesses Along the Southwest Border,*
90 Fed. Reg. 12,106 (Mar. 14, 2025) .............................................................. 5

**Congressional Materials:**

134 Cong. Rec. H7074–02 (daily ed. Sept. 7, 1988) ......................................... 2

**Academic Publications:**

Samuel L. Bray, *The Mischief Rule*, 109 Geo. L.J. 967, 968 (2021) .................................. 26

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1331.  *Accord* ROA.203.

The district court granted plaintiffs' motion for a preliminary injunction in an oral

ruling on May 12, 2025, ROA.1959, supplemented by a written order on May 19,

2025, ROA.1503-42.  The government filed a timely notice of appeal on June 13,

2025.  ROA.1606-07; *see* Fed. R. App. P. 4(a)(1)(B).  This Court has jurisdiction under

28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUE

The issue presented is whether the district court erred in entering a preliminary

injunction based on its conclusions that the geographic targeting order at issue likely

(1) violates the Fourth Amendment, (2) is a "rule" subject to notice-and-comment

requirements under the Administrative Procedure Act, and (3) was promulgated in an

arbitrary and capricious manner.

## STATEMENT OF THE CASE

### A.    The Bank Secrecy Act and Its Implementing Regulations

**1.**  "Congress enacted the Currency and Foreign Transactions Reporting Act

(Bank Secrecy Act) in 1970, in response to increasing use of banks and other

institutions as financial intermediaries by persons engaged in criminal activity."

*Ratzlaf v. United States*, 510 U.S. 135, 138 (1994) (citation omitted).  The Act establishes

a baseline requirement for all "domestic financial institution[s]," as defined in the

statute, to report any cash transaction "in an amount, denomination, or amount and

1

denomination, or under circumstances the Secretary [of the Treasury] prescribes by regulation." 31 U.S.C. § 5313(a); *see id.* § 5312(a)(2) (defining "financial institution"). The threshold for the baseline reporting requirement has long been set at $10,000. *See* 31 C.F.R. § 1010.311; *Ratzlaf*, 510 U.S. at 136.

Reports must be filed with the Financial Crimes Enforcement Network (FinCEN), 31 C.F.R. § 1010.306(a)(3), a component of the Treasury Department, using FinCEN's standard form, *id.* § 1010.306(e). The current version of the report requests the name, address, Social Security number, and occupation of the transacting party, as well as the number of any document used to verify identity (*i.e.*, a driver's license, passport, or equivalent). ROA.875. The report form also solicits basic details about the transaction and the financial institution itself. ROA.874, ROA.876.

**2.** Congress amended the Bank Secrecy Act in 1988, adding a provision permitting the Secretary of the Treasury to impose additional, targeted reporting requirements, in response to concerns about "epidemic drug money laundering in certain locations" "where launderers are dealing in transactions below the $10,000 reporting amount." 134 Cong. Rec. H7074–02 (daily ed. Sept. 7, 1988) (statement of Rep. St. Germain); Anti-Drug Abuse Act of 1988, Pub. L. No. 100–690, sec. 6185(c), § 5326(a), 102 Stat. 4181, 4355-56. In its present form, that provision (codified at 31 U.S.C. § 5326(a)) authorizes the Secretary to "issue an order requiring any domestic financial institution or nonfinancial trade or business or group of domestic financial institutions or nonfinancial trades or businesses in a geographic area . . . to obtain

2

such information as the Secretary may describe . . . concerning . . . any transaction in which such financial institution or nonfinancial trade or business is involved for the payment, receipt, or transfer of funds" when the Secretary "finds . . . that reasonable grounds exist for concluding that additional recordkeeping and reporting requirements are necessary to carry out the purposes of [the Act] or to prevent evasions thereof." 31 U.S.C. § 5326(a). The Secretary has discretion to choose the threshold above which transactions must be reported. *Id.* § 5326(a)(1)(A). Orders issued under § 5326(a) are limited to a maximum duration of 180 days, unless renewed. *Id.* § 5326(d). The Treasury Department has interpreted the statute's use of the phrase "geographic area" to mean "any area in one or more States of the United States, the District of Columbia," or a U.S. territory or possession. *Amendment to the Bank Secrecy Act Regulations Relating to Geographic Reporting of Certain Domestic Currency Transactions*, 54 Fed. Reg. 33,675, 33,679 (Aug. 16, 1989) (codified at 31 C.F.R. § 1010.370(d)(4)).

The present version of § 5326(a) reflects four amendments since its 1988 enactment—two made in 2001, and two in 2017—each of which broadened the Secretary's authority. The statute originally permitted an order to apply only to "domestic financial institution[s]," Anti-Drug Abuse Act of 1988, sec. 6185(c), § 5326(a), 102 Stat. at 4355, but now extends to "nonfinancial trade[s and] business[es]" as a result of the Patriot Act. USA PATRIOT Act of 2001, Pub. L. No. 107–56, § 365, 115 Stat. 272, 333-35. In addition, the Patriot Act extended the

3

maximum period of an order to 180 days, from the original 60.  *Id.* § 353(d), 115 Stat. at 323.  In 2017, Congress expanded the transactions on which a reporting obligation could be imposed from those involving "United States coins or currency []or other such monetary instruments as the Secretary may describe" to simply transactions in "funds," regardless of their origin.  Countering America's Adversaries Through Sanctions Act, Pub. L. No. 115–44, § 275(a)(2)(B), 131 Stat. 886, 938 (2017).  The 2017 legislation also authorized the Secretary to issue an order where he deemed it "necessary to carry out the purposes of this subtitle *or* to prevent evasions thereof"— previously, the conjunction had been "and."  *See id.*

In addition to the above-described changes in § 5326(a) itself, Congress in 1992 added two neighboring subsections that bolster the Secretary's authority.  The Secretary may now "by regulation or order" require "any depository institution" to obtain certain reports from customers.  Annunzio-Wylie Anti-Money Laundering Act, Pub. L. No. 102–550, tit. XV, § 1562, 106 Stat. 4044, 4072 (codified at 31 U.S.C. § 5326(b)).  The same legislation bars financial institutions subject to a geographic targeting order from disclosing the existence of the order, except with the Secretary's permission.  *Id.* § 1514, 106 Stat. at 4058 (codified at 31 U.S.C. § 5326(c)).

Exercising the Secretary's delegated authority, Treasury Order 180–01 (July 1, 2014, reaffirmed Jan. 14, 2020), FinCEN has promulgated various geographic targeting orders.  In the late 1990s, for example, FinCEN issued orders requiring "certain money transmitters and over 3,000 of their agents to obtain and report

4

identifying information about the sender and recipient of all cash-purchased remittances to Colombia and the Dominican Republic in the amount of $750 or more." ROA.965. In 2014, the agency issued an order "requiring over 2,000 businesses in the Los Angeles fashion district . . . to report cash transactions of $3,000 or more." ROA.965. And in 2015, FinCEN "issued a[n order] requiring about 700 businesses (primarily electronics exporters) in the Miami, Florida area . . . to report cash transactions of $3,000 or more." ROA.965; *see also United States v. Oreira*, 29 F.3d 185, 187 (5th Cir. 1994) (describing a targeting order issued in the Houston area, with a $100 threshold).

## B.    The Southwest Border Geographic Targeting Order

In March 2025, FinCEN promulgated a geographic targeting order applicable to "certain money services businesses along the southwest border of the United States." *Issuance of a Geographic Targeting Order Imposing Additional Recordkeeping and Reporting Requirements on Certain Money Services Businesses Along the Southwest Border*, 90 Fed. Reg. 12,106, 12,106 (Mar. 14, 2025). Specifically, the Order requires all money services businesses (as that term is defined at 31 C.F.R. § 1010.100(ff)) located in 30 specified ZIP codes within five Texas counties and two California counties to file currency transaction reports for any transaction of more than $200 and less than $10,000. *Id.* at 12,107. As part of collecting the information the business is required to report, it must "comply with the identification requirements set forth at 31 C.F.R. 1010.312," *id.*, which requires collection of the name, address, and Social Security (or

5

taxpayer identification) number of the transacting party.  The Order took effect on

April 14, and expires on September 9, unless renewed.  *Id.*

The Order was issued in recognition of the fact that drug cartels in Mexico,

several of which had been designated Foreign Terrorist Organizations and Specially

Designated Global Terrorists, *see* 8 U.S.C. § 1189; *Blocking Property and Prohibiting*

*Transactions with Persons who Commit, Threaten to Commit, or Support Terrorism*, Exec. Order

No. 13,224, 66 Fed. Reg. 49,079 (Sept. 25, 2001), put border-area money services

businesses at "particular[] . . . risk of abuse" of being enlisted (wittingly or unwittingly)

in money laundering.  ROA.374-75; *see also Designating Cartels and Other Organizations as*

*Foreign Terrorist Organizations and Specially Designated Global Terrorists*, Exec. Order No.

14,157, 90 Fed. Reg. 8439 (Jan. 29, 2025).  That risk was pronounced in light of the

cartels' influence and authority in the area.  ROA.374-75.  Additionally, certain

features of the money services businesses' operations, including their cash-intensive

nature and their patrons' ability to commingle licit and illicit funds, increased the

likelihood that cartels would use their services to move illicitly obtained value over the

border.  ROA.375.  FinCEN concluded that the Order would likely yield

"information highly useful in money laundering investigations, especially in the

context of the fentanyl crisis," thus furthering the purposes of the Bank Secrecy Act.

ROA.377.  Beyond the general importance of combating money laundering, the

agency perceived a particular need to interdict laundering of proceeds from the

cartels' involvement in the fentanyl trade, the sale of which had killed nearly 38,000 Americans in the first six months of 2023.  ROA.377.

The agency selected the ZIP codes covered by the Order with reference to "risk factors that include their proximity to the border and to a border crossing, and, based on a FinCEN analysis of [currency transaction report] filings in 2024, whether the number of [reports] filed in the ZIP code is high relative to the population, in comparison to other ZIP codes."  ROA.378-79.  FinCEN recognized that money services businesses in other border States like Arizona and New Mexico were also vulnerable to abuse, but "chose to keep this [Order] limited in scope, focusing on states containing the major U.S.-Mexico border crossings, both to limit burden and to be able to assess trends and effectiveness."  ROA.379.  The agency chose the $200 threshold on the rationale that "it would include nearly all cash transactions vulnerable to abuse by drug cartels through structuring payments to avoid [currency transaction reports], while excluding clearly de minimis amounts that are more likely to be legitimate."  ROA.382.  FinCEN estimated that a $200 reporting requirement "would also provide FinCEN with a snapshot in time of a significant sample of cash transactions in the Covered Geographic Areas, allowing FinCEN to more fully understand the money laundering risks related to [money services businesses] and cross-border cash remittances."  ROA.382-83.

Before issuing the Order, FinCEN acknowledged certain potential downsides to putting it in place.  The agency recognized that a $200 reporting threshold "would

7

place a higher burden on Covered Businesses due to the increased volume of" reports they would be required to file, albeit only for a temporary period. ROA.383. The agency also contemplated that the Order might "encourage illicit actors to adopt new methods or patterns of activity" in order to avoid detection. ROA.383. Nevertheless, the agency concluded that it could account for any such subterfuge by "monitor[ing] shifts in activity, including any decreases in the flow of funds through Covered Businesses and any increases in activity at [money services businesses] in areas near to the counties covered by" the Order. ROA.383.

### C.    Prior Proceedings

Plaintiffs filed their complaint on April 1, 2025, alleging that the Order violated the Administrative Procedure Act (APA) and the Fifth Amendment to the U.S. Constitution and seeking declaratory and injunctive relief. ROA.19-35. The district court granted a temporary restraining order (later extended, ROA.354-55), enjoining the government from enforcing the Order as to the plaintiffs. ROA.194-96; *see* ROA.1625-1714. Plaintiffs subsequently amended their complaint, adding counts under the Fourth Amendment and the nondelegation doctrine, as well as new theories of Fifth Amendment violations, ROA.197-229, and moved for a preliminary injunction based on their Fourth Amendment, APA, and ultra vires claims, ROA.272-98.

The district court entered a preliminary injunction in an oral ruling on May 12, 2025, ROA.1959, supplemented by a written order on May 19, 2025, ROA.1503-42.

8

The court held that plaintiffs would likely succeed on their claim that the Order violated the Fourth Amendment rights of the plaintiff businesses and the individual customer plaintiff. ROA.1521-25. The court also found likely success on plaintiffs' claims that the Order was a rule subject to notice and comment, ROA.1527-30, and that it was adopted in an arbitrary and capricious manner, ROA.1530-35.[1]

## SUMMARY OF ARGUMENT

**I.** The preliminary injunction should be vacated because the district court erred in holding that plaintiffs are likely to succeed on the merits of their Fourth Amendment and Administrative Procedure Act claims.

**A.** Invoking the Fourth Amendment's protection against "unreasonable" searches, the district court concluded that the Order unduly burdens the constitutional rights of the plaintiff businesses. But the Supreme Court has already evaluated that argument as applied to the general $10,000 reporting requirement and found it to survive scrutiny. The Order's reporting requirement, like the $10,000 requirement, seeks limited and relevant information in a manner that is not overly

---

[1] Two other lawsuits challenging the Order are pending in district courts in the Southern District of California and the Western District of Texas. In *Novedades y Servicios, Inc. v. FinCEN*, the district court enjoined the government from enforcing the Order throughout the Southern District of California, *i.e.*, in the two California counties in which it applies. No. 25-cv-886, --- F. Supp. 3d ----, 2025 WL 1501936 (S.D. Cal. May 21, 2025). The government has appealed that injunction, and the Ninth Circuit has ordered expedited briefing. *Novedades y Servicios, Inc. v. FinCEN*, No. 25-4238 (9th Cir. July 9, 2025). In *Valuta Corporation v. FinCEN*, the district court entered a plaintiff-specific preliminary injunction against the Order's enforcement on July 22. No. 3:25-cv-191 (W.D. Tex. July 22, 2025).

burdensome, considering the weighty government interests at stake and the character of the plaintiff businesses' interests.  The Order does not violate the Fourth Amendment rights of the individual customer plaintiff, either.  Again, Supreme Court and circuit precedent make plain that an individual like that plaintiff forfeits his reasonable expectation of privacy in information upon surrendering it to a financial institution.

**B.**  The Order does not run afoul of the APA.  A geographic targeting order promulgated pursuant to the Bank Secrecy Act is, just as the statutory text states (and context confirms), an "order" within the meaning of the APA.  The same conclusion obtains under binding Fifth Circuit precedent.  As such, the Order did not require notice and comment before it could be put into effect.  And the Order is not arbitrary or capricious, because the agency duly considered all relevant factors and reasonably explained its decisions.  The district court's contrary conclusions rest largely on its views of the policy merits of the Order, which are not left under the APA to its determination.

**II.**  Because plaintiffs have not shown a likelihood of success, the preliminary injunction should be vacated.  But the balance of the equities, too, tilts in the government's favor.  Plaintiffs offered speculation as to the effects the Order would have on their businesses, but fell well short of showing any certain and great irreparable harm.  In contrast, the preliminary injunction impinges severely on the government's interest in collecting data useful to the interdiction of international

10

financial crime, and by extension the fentanyl crisis.  Even if the Court did not reverse the preliminary injunction, it should vacate and remand for more specific tailoring to only individual plaintiffs that can show imminent irreparable injury.

The preliminary injunction should be vacated or, at a minimum, narrowed.

## STANDARD OF REVIEW

This Court "review[s] a district court's ultimate decision to grant or deny a preliminary injunction for abuse of discretion."  *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 267 (5th Cir. 2012) (citing *Janvey v. Alguire*, 647 F.3d 585, 591-92, 595 (5th Cir. 2011).  The district court's "conclusions of law," however, "are subject to broad review and will be reversed if incorrect."  *Id.* (quoting *Janvey*, 647 F.3d at 592).

## ARGUMENT

I.     **Plaintiffs Have Not Shown a Likelihood of Success on Their Claims**

A.     **Plaintiffs' Fourth Amendment claims are meritless.**

1.     **The Order does not violate the businesses' Fourth Amendment rights.**

**a.**  The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  "As that text makes clear, 'the ultimate touchstone of the Fourth Amendment is "reasonableness."'"  *Lange v. California*, 594 U.S. 295, 301 (2021) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)).  The reasonableness

standard "safeguard[s] the privacy and security of individuals against arbitrary invasions." *Delaware v. Prouse*, 440 U.S. 648, 654 (1979) (quoting *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 312 (1978)). "Thus, the permissibility of a particular law enforcement practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Id.*

In *California Bankers Ass'n v. Shultz*, 416 U.S. 21 (1974), the Supreme Court upheld the Bank Secrecy Act's $10,000 reporting requirement as reasonable under the Fourth Amendment. The reporting requirement challenged in *Shultz* required "(1) the name, address, business or profession and social security number of the person conducting the transaction"; "(2) similar information as to the person or organization for whom it was conducted"; "(3) a summary description of the nature of the transaction, the type, amount, and denomination of the currency involved and a description of any check involved in the transaction"; "(4) the type of identification presented"; and "(5) the identity of the reporting financial institution." *Id.* at 39 n.15.

*Shultz* began from the premise that "reporting requirements are by no means per se violations of the Fourth Amendment." 416 U.S. at 59-60. To the contrary, it had long been clear under the Supreme Court's precedent that "organizations engaged in commerce could be required by the Government to file reports dealing with particular phases of their activities." *Id.* at 65. The $10,000 reporting requirement served a valid government interest, namely, a "tenable congressional determination as to improper use of [abnormally large transactions] in interstate commerce." *Id.* at 67;

12

*see id.* ("The inquiry is within the authority of the agency . . . ." (alteration omitted) (quoting *United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950))); *id.* at 26-27 (describing the legislative history leading up to the Act's enactment).  That interest existed and was cognizable "[e]ven if one were to regard the request for information in this case as caused by nothing more than official curiosity," because "law-enforcing agencies have a legitimate right to satisfy themselves that corporate behavior is consistent with the law and the public interest."  *Id.* at 66 (quoting *Morton Salt*, 338 U.S. at 651-52).  And the information sought by the reporting requirement was "sufficiently related" to the government's interest.  *Id.* at 67.

On the other side of the ledger, the plaintiff banks'[2] interests were not unduly infringed.  As an initial matter, the banks possessed more limited privacy interests than those held by individuals, by dint of their status as corporations created under U.S. law, a status that "endowed [them] with public attributes" and from which they derived from the federal government "the privilege of engaging in interstate commerce."  *Shultz*, 416 U.S. at 65-66.  As a consequence, the banks could not "plead an unqualified right to conduct their affairs in secret."  *Id.* at 67 (quoting *Morton Salt*, 338 U.S. at 652); *cf. New York v. Burger*, 482 U.S. 691, 700 (1987) (the "expectation [of privacy] is particularly attenuated in commercial property employed in 'closely

_____

[2] *Shultz* also presented a Fourth Amendment challenge by depositor plaintiffs, whose claims the Supreme Court did not reach for lack of standing.  *Shultz*, 416 U.S. at 67-68.

13

regulated' industries"); *United States v. Chuang*, 897 F.2d 646, 650 (2d Cir. 1990)
(holding banking to be heavily regulated for Fourth Amendment purposes).

Against the backdrop of the banks' diminished privacy interests, the Supreme
Court held the requirement to collect and report information about transactions
exceeding $10,000 not to be overly intrusive.  Moreover, the reporting requirement
was not overly burdensome to comply with.  As "part[ies] to the transaction," the
Supreme Court deemed it likely that the banks would likely collect much of the
information of their own accord.  *Shultz*, 416 U.S. at 66.  But even if they would not,
the fact that the banks would be required to collect the information was held to be a
necessary incident of a valid regulation because the information was "sufficiently
described and limited in nature."  *Id.* at 67.  All told, under the circumstances, the
requirement was reasonable and thus constitutional.  *Id.*  That conclusion is consistent
with the well-established principle that where the government does not seek to make
"non-consensual entries into areas not open to the public," and instead merely
requires regulated entities to divulge certain records, the Fourth Amendment is more
readily satisfied.  *Donovan v. Lone Steer, Inc.*, 464 U.S. 408, 414 (1984).

*Shultz* relied heavily on the Supreme Court's prior decision in *Morton Salt*.
There, the Supreme Court upheld against a Fourth Amendment challenge the Federal
Trade Commission's order requiring several businesses to file reports "showing how
they have complied with a decree of the Court of Appeals enforcing the
Commission's cease and desist order."  *Morton Salt*, 338 U.S. at 634.  As in *Shultz*, the

14

Supreme Court began from the premise that the government possesses legitimate authority to ensure the lawfulness of corporate dealings.  Noting that in a hypothetical circumstance, a "governmental investigation into corporate matters may be of such a sweeping nature and so unrelated to the matter properly under inquiry as to exceed the investigatory power," it was nevertheless "sufficient if the inquiry [wa]s within the authority of the agency, the demand [wa]s not too indefinite and the information sought [wa]s reasonably relevant."  *Id.* at 652; *see Oklahoma Press Pub. Co. v. Walling*, 327 U.S. 186, 208 (1946) ("[T]he Fourth [Amendment], if applicable, at the most guards against abuse only by way of too much indefiniteness or breadth in the things required to be 'particularly described,' if also the inquiry is one the demanding agency is authorized by law to make and the materials specified are relevant.").  Because the Commission's order met these criteria, it did not run afoul of the Fourth Amendment.  *Morton Salt*, 338 U.S. at 653.

**b.**  Under the principles announced and applied in *Shultz* and *Morton Salt*, the Order does not violate the Fourth Amendment rights of these plaintiff businesses.  As a general matter, the interest the government seeks to vindicate here—prevention of money laundering—is precisely the same interest that *Shultz* recognized as legitimate.  *Shultz*, 416 U.S. at 67; *id.* at 66 (affirming the government's "legitimate right to satisfy [itself] that corporate behavior is consistent with the law and the public interest," even if particular information were sought for "nothing more than official curiosity" (quotation omitted)); *see also id.* at 30 (recognizing that the Act was enacted in response

to the "heavy utilization of our domestic banking system by the minions of organized crime"); *see* 31 U.S.C. § 5311(1) ("It is the purpose of this subchapter . . . to . . . require certain reports or records that are highly useful in . . . criminal, tax, or regulatory investigations, risk assessments, or proceedings; or . . . intelligence or counterintelligence activities, including analysis, to protect against terrorism").  And this Order seeks to remediate a uniquely pernicious example of money laundering, related to the financing of fentanyl trafficking by powerful and influential cartels on the southern border (a phenomenon resulting in thousands of Americans' deaths annually, ROA.377), a national interest of the highest order.  ROA.377; ROA.374 ("Mexico-based drug cartels, including the Sinaloa and Jalisco New Generation cartels, are the dominant producers and suppliers of fentanyl and other illicit drugs destined for the U.S. market.").  Just as in *Shultz*, undertaking that inquiry for these purposes is "within the authority" of the Treasury Department.  And in contrast, the plaintiff businesses' interests in avoiding the requirement are comparatively diminished, given their status as heavily regulated corporations created under U.S. law. *See Shultz*, 416 U.S. at 65-66.

There can be no question, moreover, that the information the government seeks to obtain by means of the Order—the same categories of information that were at issue in *Shultz*, *see supra* p. 12—is "reasonably relevant" to the government's interest in curtailing illicit international finance streams.  *See Shultz*, 416 U.S. at 67 (quoting *Morton Salt*, 338 U.S. at 652-53).  In particular, as the evidentiary memo supporting the

16

Order explains, money services businesses in border regions are uniquely vulnerable to abuse by cartels because of the cash-based nature of their trade and their location. ROA.373-76.  By temporarily setting a $200 reporting threshold, the government reasonably anticipated it would obtain information that would assist it to identify patterns of, and individuals involved in, cartel-related money laundering along the border.  ROA.377-78.

Finally, the information sought by the Order "is not too indefinite."  *Morton Salt*, 338 U.S. at 652.  The data a business must provide for each covered transaction is equivalent to what the plaintiff businesses in *Shultz* were required to provide, *see supra* p. 12, and so here, like there, is "sufficiently described and limited in nature." *Shultz*, 416 U.S. at 67.  To be sure, a lower dollar threshold means the Order applies to a greater number of transactions than the $10,000 reporting requirement.  But that does not change the fact that the information to be obtained is limited and defined, satisfying the chief concerns of the Fourth Amendment.  *See Oklahoma Press Pub. Co.*, 327 U.S. at 208.

**c.**  The district court erred in holding that plaintiffs had likely established a violation of the money services businesses' Fourth Amendment rights.  The Order bears no resemblance to the "general warrants" the Fourth Amendment was enacted to prohibit, *see* ROA.1521-22; ROA.285; ROA.287-88, because the Order does not permit arbitrary abuse of citizens at the whim of an investigator—to the contrary, it applies generally to all businesses within certain ZIP codes chosen for their

17

relationship to neutral criteria.  ROA.378-82; *see Carpenter v. United States*, 585 U.S. 296, 303 (2018) ("The 'basic purpose of [the Fourth] Amendment,' our cases have recognized, 'is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials.'" (quoting *Camara v. Municipal Ct. of the City & Cnty. of S.F.*, 387 U.S. 523, 528 (1967))); *Brock v. Emerson Elec. Co., Elec. & Space Div.*, 834 F.2d 994, 996 n.2 (11th Cir. 1987) ("Because this case involves discretionary and potentially arbitrary requests for document inspection, it is not governed by cases in which businesses or individuals are required to report particular information to the government on a regular basis.  In such cases, a uniform statutory or regulatory reporting requirement satisfies the Fourth Amendment concern regarding the potential for arbitrary invasions of privacy." (citing *Shultz*, 416 U.S. at 21)); *Steagald v. United States*, 451 U.S. 204, 220 (1981) ("The general warrant specified only an offense—typically seditious libel—and left to the discretion of the executing officials the decision as to which persons should be arrested and which places should be searched.").  That is true even if the Order does not apply uniformly across the entire country, ROA.1522-23, because it applies uniformly within the particular ZIP codes that were chosen.  Moreover, the Order does not "authorize the search of everything or everyone in sight," *United States v. Smith*, 110 F.4th 817, 836 (5th Cir. 2024) (quotation omitted), it requires businesses (whose Fourth Amendment interests are heavily diminished, *Shultz*, 416 U.S. at 65-66) to submit specific, limited information.

18

Notably, the Order is materially identical to the many reporting requirements Congress has enacted into law without apparent Fourth Amendment implications (including the $10,000 requirement at issue in *Shultz*).  For example, federal law requires taxpayers to file tax returns and various entities to file tax information returns, 26 U.S.C. §§ 6012, 6031-6060; employers to collect and make available information about new employees' eligibility to work, *see* 8 U.S.C. § 1324a; and political campaigns to report contributions and expenditures, *see* 52 U.S.C. § 30104. And at the state and local level, lawmakers have implemented many other reporting requirements. *See, e.g., Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 577 (6th Cir. 2002) (recognizing that a public employee was unlikely to succeed on a Fourth Amendment challenge to financial disclosure requirements); *Barry v. City of New York*, 712 F.2d 1554, 1564 (2d Cir. 1983) (similar).

The government is unaware of any case from this or any other Circuit casting doubt on the constitutionality of such requirements—of which there are "thousands," *Pharmaceutical Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 316 (1st Cir. 2005) (per curiam) (Boudin, J., concurring)—and plaintiffs identified none below.  As the Supreme Court has explained, "reporting requirements are by no means per se violations of the Fourth Amendment," and "a contrary holding might well fly in the face of the settled . . . history of self-assessment of individual and corporate income taxes in the United States." *Shultz*, 416 U.S. at 59-60.  *United States v. Smith*, which plaintiffs cited below,

19

ROA.287-88, is not to the contrary, as it addressed law enforcement's use of

"geofence" warrants, not a reporting requirement. 110 F.4th at 821-26.

The district court also erred in distinguishing the Order from *Morton Salt* and

*Shultz*. ROA.1522-23. The court's reasoning turned on its perception of the

proportion of transactions to which the Order could apply. *See* ROA.1523 (referring

to "intru[sion] on most transactions"). But that analysis misunderstands the test

applied in *Morton Salt* and *Shultz*. Under those decisions, the chief considerations for a

reviewing court are the relevance and specificity of the demand—not the burden that

compliance might impose on a business. *Morton Salt*, 338 U.S. at 652 ("[I]t is

sufficient if the inquiry is within the authority of the agency, the demand is not too

indefinite and the information sought is reasonably relevant."). Such a reading makes

sense, because the Fourth Amendment is concerned foremost with intrusion into

private matters. *See Shultz*, 416 U.S. at 78-79 (Powell, J., concurring) ("In their full

reach, the reports apparently authorized by the open-ended language of the Act touch

upon intimate areas of an individual's personal affairs. Financial transactions can

reveal much about a person's activities, associations, and beliefs. At some point,

governmental intrusion upon these areas would implicate legitimate expectations of

privacy."). Burden may figure into the overall question of reasonableness, *see Shultz*,

416 U.S. at 67, but *Shultz* and *Morton Salt* make clear that it is a secondary

consideration to definiteness and relevance.

In any event, to the extent burden is relevant to the Fourth Amendment inquiry, the burden imposed here is reasonable in light of the strength of the governmental interest and the limited duration of the Order. The evidentiary memo explains that the Order is meant to produce a "snapshot" of the status quo in the border areas selected. ROA.382-83. The Order has the potential to yield significant amounts of useful information in a geographically limited zone for a period of only six months, justifying the expenditures of resources necessary to generate and submit that information.

Plaintiffs are wrong to assert that a warrant based on probable cause was required. ROA.287 (citing *Smith*, 110 F.4th at 836); *see also* ROA.1521; ROA.1522 (describing the warrant requirement). True, the Fourth Amendment's reasonableness standard "generally requires the obtaining of a judicial warrant" before a search may take place. *Riley v. California*, 573 U.S. 373, 382 (2014) (quoting *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 653 (1995)). "But not always[.]" *Lange*, 594 U.S. at 301. As *Shultz* itself makes plain in this very context, there is no warrant requirement where an agency acts pursuant to legislation to implement a reporting requirement generally applicable to a category of financial institutions.

### 2. The Order does not violate plaintiff Gonzalez's Fourth Amendment rights.

The district court erred in holding that the Order also likely infringes the Fourth Amendment rights of Arnoldo Gonzalez, the individual plaintiff who uses the

services of one of the plaintiff businesses.  ROA.1524-25; *see* ROA.199-200;

ROA.204.  In its seminal case on the third-party doctrine, the Supreme Court held

that a bank depositor had no reasonable expectation of privacy in information he

voluntarily disclosed to his bank, and which the bank retained and tendered to the

government pursuant to the Bank Secrecy Act.  *United States v. Miller*, 425 U.S. 435,

442 (1976).  "The depositor takes the risk, in revealing his affairs to another, that the

information will be conveyed by that person to the Government."  *Id.* at 443 (citation

omitted).  That logic applies with equal force here—plaintiff Gonzalez willingly cedes

a limited subset of his personal information to a regulated business as a condition of

his transactions with it, thereby surrendering any Fourth Amendment right to privacy

in the information provided.

A recent decision of this Court reaffirms *Miller*'s continuing validity as applied

to transaction-related records created and maintained by financial institutions in the

course of business.  *United States v. Gratkowski*, 964 F.3d 307 (5th Cir. 2020).  In

*Gratkowski*, this Court held that an individual had no reasonable expectation of

privacy in records of "virtual currency transactions" related to Bitcoin (a virtual

currency) created in the course of a private party's dealings with Coinbase, a virtual

currency exchange.  *Id.* at 312.  Although traditional banks (like the bank at issue in

*Miller*) and virtual currency exchanges transact business through distinct media, both

sets of records are "limited" and voluntarily disclosed, features that result in the

forfeiture of the submitter's Fourth Amendment privacy protections.  *Id.*

The district court wrongly read *Carpenter* to displace *Miller*, and did not address *Gratkowski* at all.  ROA.1524-25.  *Carpenter* held that the third-party doctrine did not apply to "a new phenomenon:  the ability to chronicle a person's past movements through the record of his cell phone signals," 585 U.S. at 309, because cell-site location information creates an "exhaustive chronicle" of personal data, *id.* at 314, and because cell-site location information "is not truly 'shared' as one normally understands the term," *id.* at 315.  In addition, *Carpenter* expressly recognized that cell-site location information differs from bank records of "negotiable instruments to be used in commercial transactions" similar to the kinds of financial records at issue here. *Carpenter*, 585 U.S. at 314 (quoting *Miller*, 425 U.S.C. at 442); *see also id.* at 309 ("qualitatively different category"); *id.* at 314 ("world of difference"); *id.* at 315 ("privacy concerns far beyond those considered in … *Miller*").

In these respects, the information at issue in *Carpenter* differs materially from the information a client of a money services business exchanges in order to complete a covered transaction.  Here, as in *Miller*, the "nature of the particular" information is limited and "exposed to the [business'] employees in the ordinary course of business." *Miller*, 425 U.S. at 442.  And that information changes hands "voluntarily," as a condition of using the business' services.  *Id.*  Indeed, the *Gratkowski* court distinguished *Carpenter* on these very bases.  964 F.3d at 312.  *Miller* and *Gratkowski* are controlling here and show that the individual plaintiff has no likelihood of success on his Fourth Amendment claim.

23

**B.    Plaintiffs' APA claims are meritless.**

**1.    The Order did not require notice and comment.**

**a.**  "Section 4 of the APA, 5 U.S.C. § 553, prescribes a three-step [notice-and-comment] procedure for" rulemaking—that is, issuing "legislative rules," or "statement[s] of general or particular applicability and future effect" that are designed to "implement, interpret, or prescribe law or policy."  *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 95-96 (2015) (second alteration in original) (quoting 5 U.S.C. § 551(4)). By its terms, though, § 553 applies only to rulemakings.  "Orders"—a residual category for all agency actions other than rules ("the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making," 5 U.S.C. § 551(6))—are valid without notice and comment, because § 553 does not apply to the "adjudications" that precede them.  *City of Arlington v. FCC*, 668 F.3d 229, 240 (5th Cir. 2012), *aff'd*, 569 U.S. 290 (2013); *see* 5 U.S.C. § 551(7) (defining "adjudication" as "agency process for the formulation of an order").

This Court has held that the APA's notice-and-comment procedures do not apply to "investigatory" orders issued by an agency pursuant to statutory authority. *United States v. W.H. Hodges & Co.*, 533 F.2d 276, 278 (5th Cir. 1976) (per curiam).  In *W.H. Hodges*, pursuant to his authority to "require the filing . . . of 'annual or special, or both annual and special, reports or answers in writing to specific questions,' furnishing such information as may be required . . . as necessary to further [his]

24

enforcement of the [Packers and Stockyards] Act," *id.* at 278 n.1, the Secretary of Agriculture ordered all 38 active stockyard marketing agencies in Louisiana to file term-limited special reports to support his "investigation of rates charged by" those agencies, *id.* at 278.  Because that order was "clearly investigatory in nature, as opposed to an adjudicatory or rule-making process," it was "not subject to the procedures governing rule-making outlined in the APA."  *Id.* (citing *Genuine Parts Co. v. FTC*, 445 F.2d 1382, 1388 (5th Cir. 1971)).

    **b.**  Under these principles, the Order did not require notice and comment because it is not an APA "rule."

    To start, the authorizing statute itself uses the term "order."  31 U.S.C. § 5326(a).  Consistent with the presumption that Congress legislates against familiar legal backdrops, the Court should presume that Congress here meant to incorporate the APA definition of the term.  *George v. McDonough*, 596 U.S. 740, 746 (2022) (citation omitted).  That reading is buttressed by a second presumption:  that Congress intends a difference in meaning when it uses a term in one part of a statute but omits that term elsewhere.  *Rudisill v. McDonough*, 601 U.S. 294, 308 (2024) (citing *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 86 (2017)).  The next subsection in the statute, which grants the Secretary authority to demand reports from depository institutions, permits him to proceed "by regulation or order," 31 U.S.C. § 5326(b)— an unmistakable reference to the APA's rule-order distinction, and strong evidence that "order" in § 5326(a) means "order" as defined in 5 U.S.C. § 551(6) and (7).  *See*

*also* 31 U.S.C. § 5313(a) (Bank Secrecy Act provision authorizing the Secretary to "prescribe[] by regulation" a generally applicable currency transaction reporting requirement); *id.* § 5314(b) (foreign bank and financial account reporting statute) (repeatedly referring to "regulation[s] under this section"). By "transplant[ing]" the APA's use of "order" into the Bank Secrecy Act, Congress "br[ought] the old soil with it"—that is, made plain that notice and comment is not required for geographic targeting orders that meet § 5326's requirements. *See George*, 596 U.S. at 746 (quoting *Taggart v. Lorenzen*, 587 U.S. 554, 560 (2019)).

Context, too, supports the government's reading. *Feliciano v. Department of Transp.*, 145 S. Ct. 1284, 1293 (2025). Subsection (c) mandates that, unless waived by the agency, the existence of an order is to be kept confidential. 31 U.S.C. § 5326(c). That provision, in authorizing the agency to keep the existence of the order confidential, would be entirely without force if the agency were required to conduct public notice-and-comment rulemaking in order to issue a targeting order. That anomalous result counsels strongly against treating a targeting order as a legislative rule that would require notice and comment. *See Department of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 53 (2024).

Additional support for reading "order" to mean just that can be found by reading § 5326(a) "in light of the context from which [it] arose." *Bond v. United States*, 572 U.S. 844, 860 (2014); *see* Samuel L. Bray, *The Mischief Rule*, 109 Geo. L.J. 967, 968 (2021) ("The mischief rule instructs an interpreter to consider the problem to which

the statute was addressed, and also the way in which the statute is a remedy for that problem. Put another way, the generating problem is taken as part of the context for reading the statute."). By enacting into law a general reporting requirement (currently set at $10,000) and supplementing that authority with authority to mandate time-limited reporting "in a geographic area," 31 U.S.C. § 5326(a), Congress intended to provide the Secretary with a flexible tool to assess money-laundering conditions in emergent situations—conditions precisely like those underlying the promulgation of this Order, ROA.377. This conclusion is strengthened by the fact that when the statute was enacted, a geographic targeting order was limited to 60 days (later extended to the current 180). *See supra* p. 4. To obligate the agency to comply with procedures that can last months, *National Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1117 (D.C. Cir. 2019) (prescribing 30 days as "generally the shortest time period sufficient for interested persons to meaningfully review a proposed rule and provide informed comment" (citation omitted)), would obviate much of the utility the geographic targeting tool was created to afford to the Executive Branch.

As a matter of precedent, *W.H. Hodges* is squarely on point. There, as here, Congress vested the agency head with authority to require reporting as necessary to support the government's enforcement of federal law. 533 F.2d at 278 n.1; *see* 31 U.S.C. § 5326(a). And in both cases, the agency head exercised that authority in support of a specific, geographically limited investigation. *W.H. Hodges*, 533 F.2d at 278 (Louisiana-wide investigation); 90 Fed. Reg. at 12,107 (30 ZIP codes in Texas and

27

California selected).  *Genuine Parts Co. v. FTC*, on which the *W.H. Hodges* court relied in reaching its holding, explained (in the context of constitutional due process) why it would be error to equate investigative and adjudicative proceedings by an agency: because the adjudicative "type of proceedings would make a shambles of the investigation and stifle the agency in its gathering of facts."  445 F.2d at 1388 (quoting *Hannah v. Larche*, 363 U.S. 420, 443-44 (1960)).  Analogous considerations are at play here, where subjecting the agency to the requirements of notice and comment would unduly delay what Congress intended to be a quickly deployed (and temporally limited) order to generate information useful for the investigation, and interdiction, of criminal activity.  *See* 31 U.S.C. § 5311.[3]

---

[3] Indeed, Congress has explicitly authorized both FinCEN and other agencies to issue broadly applicable "orders" in a variety of contexts in which normal rulemaking is not feasible or advisable. *See, e.g.*, 21 U.S.C. §§ 811(h) (authorizing the Attorney General to issue temporary orders scheduling controlled substances), 2313a (authorizing the Treasury Secretary to sanction financial transactions "of primary money laundering concern in connection with illicit opioid trafficking . . . by order, regulation, or otherwise as permitted by law"); Combating Russian Money Laundering Act, Pub. L. 116-283, § 9714 (codified as a note to 31 U.S.C. § 5318A) (similar, with respect to "primary money laundering concern of Russian illicit finance); *see also Touby v. United States*, 500 U.S. 160 (1991) (upholding scheduling of controlled substances via "temporary scheduling order" under 21 U.S.C. § 811(h) against constitutional challenge); *United States v. Emerson*, 846 F.2d 541, 545 (9th Cir. 1988) ('[T]he absence of notice and public comment does not render section 811(h) a constitutionally infirm delegation of legislative power.  The temporary scheduling of a controlled substance is an emergency measure, lasting at most eighteen months. Requiring lengthy public comment could jeopardize the public safety sought to be protected by temporary scheduling.").

This Court's case law distinguishing between rulemaking and adjudication leads to the same result—notice and comment was not required. FinCEN classified its action as an order, a characterization entitled to "significant deference." *City of Arlington*, 668 F.3d at 241; *see* 90 Fed. Reg. at 12,106. Looking beyond the agency's characterization, the "ultimate product" in this case was not a rule. *See City of Arlington*, 668 F.3d at 240. In upholding the FCC's position that the agency's "Declaratory Ruling" was an order, not a rule, this Court looked directly to the agency's statutory authority to issue "declaratory order[s]." *Id.* at 241. Here, too, the statutory language is dispositive. *See* 31 U.S.C. § 5326(a).

**c.** The district court held that the Order was likely a rule because it "created an affirmative legal obligation" for money services businesses within the specified ZIP codes to file currency transaction reports. ROA.1529 (quoting ROA.1171). But rules and orders alike may create prospective legal obligations. 5 U.S.C. § 551(4) (rule) ("statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy"); *id.* § 551(6) (order) ("final disposition, whether affirmative, negative, *injunctive*, or declaratory in form" (emphasis added)).

The district court also appeared to find material that businesses subject to the Order were not referred to by name. *See* ROA.1529. There is no need to resort to the general principles distinguishing rulemaking from adjudication, however, as do the cases the district court cited. *See* ROA.1528-29 (citing *City of Arlington*, 668 F.3d at

242, and *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 216 (1988) (Scalia, J. concurring)).  For here, Congress has said that when the agency acts to require additional reporting with respect to a "group of domestic financial institutions . . . in a geographic area," 31 U.S.C. § 5326(a)—as FinCEN did when it identified money services businesses in 30 ZIP codes—what results is an "order" under the APA.

And in any event, even applying the general principles referred to, the Order is not a rule.  FinCEN did not in the Order articulate a "generalized standard," *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 294 (1974), that is "generally applicable," *Safari Club Int'l v. Zinke*, 878 F.3d 316, 332 (D.C. Cir. 2017), and intended to "implement, interpret, or prescribe law or policy," 5 U.S.C. § 551(4).  *See also United States v. Florida E. Coast Ry. Co.*, 410 U.S. 224, 246 (1973).  The agency instead acted with a measure of specificity in tailoring the Order to a particular type of business within certain ZIP codes.  *See Neustar, Inc. v. FCC*, 857 F.3d 886, 895 (D.C. Cir. 2017) ("[G]iven the fact-intensive nature of the Commission's role in these proceedings, it is surely within the agency's authority to proceed on a case-by-case basis rather than by rulemaking."). To be sure, the agency did not resolve a "dispute[]" or single out "specific individuals." *City of Arlington*, 668 F.3d at 242.  But the rulemaking-adjudication test does not definitively require that an adjudication be litigation-like.  *Id.* ("Adjudications *typically* 'resolve disputes among specific individuals in specific cases[.]'" (emphasis added); *Yesler Terrace Cmty. Council v. Cisneros*, 37 F.3d 442, 448 (9th Cir. 1994) ("An adjudication (which results in an order) is virtually any agency action that is not

30

rulemaking." (citation omitted)).  Nor must an agency's action affect only specified individuals to qualify as an order, *see ITServe All., Inc. v. U.S. Dep't of Homeland Sec.*, 71 F.4th 1028, 1035 (D.C. Cir. 2023), even if the adjudications that result in orders often do, *Neustar*, 857 F.3d at 895 ("[T]he Order under review determined the rights and obligations of two parties.").  For these reasons, on the spectrum between rules and orders under the APA, this Order falls on the latter end.

### 2.    The Order is not arbitrary or capricious.

**a.**  The APA permits a reviewing court to "set aside" action that is "arbitrary" or "capricious."  5 U.S.C. § 706(2)(A).  The court's role is limited, ensuring only "that an administrative agency 'examined the relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'"  *FDA v. Wages & White Lion Invs.*, 145 S. Ct. 898, 917 (2025) (alterations omitted) (quoting *Motor Vehicle Mfrs. Assn. of the U.S., Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983)).  "The scope of this review 'is narrow,' and reviewing courts must exercise appropriate deference to agency decisionmaking and not substitute their own judgment for that of the agency."  *Id.* (quoting *State Farm*, 463 U.S. at 43).

**b.**  The district court found the Order to be likely arbitrary and capricious on two grounds.  Neither withstands scrutiny.

***i.***  First, the district court held that the agency likely "failed to consider" the anticipated effect of the Order on businesses, countermeasures cartels might take to

31

evade the Order, how the agency might use the data it obtained, and the relationship

between the Order and two criminal cases cited in the evidentiary memo.  ROA.1530-

34.

 But the agency did consider these issues, explicitly.  On anticipated effects,

FinCEN acknowledged that the Order "would place a higher burden on Covered

Businesses due to the increased volume of [currency transactions reports] that would

result."  ROA.383.  On evasion, the agency observed that the Order could "encourage

illicit actors to adopt new methods or patterns of activity," therefore resolving to

"monitor shifts in activity, including any decreases in the flow of funds through

Covered Businesses and any increases in activity at [money services businesses] in

areas near to the counties covered by" the Order."  ROA.383.  To the extent that

would-be money launderers might "change the methods by which they launder

money, including by attempting to launder illicit funds through banks," that might "be

a benefit of the [Order]," the agency reasoned, "as banks have more stringent

reporting and recordkeeping obligations than [money services businesses] and would

likely inform FinCEN of new suspicious activity."  ROA.383.  On use of the data

obtained, the agency included in its evidentiary memo an "Analytic Plan."[4]  ROA.384.

And finally, the agency explained the relevance of the two criminal cases cited in the

---

[4] The Analytic Plan was redacted in the administrative record to conceal
sources and methods but is plainly not "entirely" absent from the record.  *State Farm*,
463 U.S. at 43.

memo:  those cases show that "services provided by [money services businesses] are sometimes provided wittingly to drug cartels, turning the [business] into a professional money launderer."  ROA.376.

By reasoning that the agency should have given a more robust explanation of the burdens to be imposed on businesses, ROA.1531-32, or that it should have included evidence in the record about its use of data obtained from the $10,000 reporting requirement, ROA.1534-35, the district court effectively (and impermissibly) formulated procedural requirements with no basis in the APA.  *See Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 685 (2020) ("We have repeatedly stated that the text of the APA provides the 'maximum procedural requirements' that an agency must follow in order to promulgate a rule." (quoting *Perez*, 575 U.S. at 100)).  Alternatively, to the extent the district court's opinion is read to conclude that more robust evidence is needed to support the Order, that amounts to an argument that the agency's decision was not "'the best one possible[,]' or even . . . 'better than the alternatives.'"  *Department of Comm. v. New York*, 588 U.S. 752, 777 (2019) (quoting *FERC v. Electric Power Supply Ass'n*, 577 U.S. 260, 292 (2016)).  But the APA does not assign such policy decisions to the courts.  It is enough that the agency considered the relevant data and articulated a reason for its decision.  *Wages & White Lion Invs.*, 145 S. Ct. at 917.

The district court also held that the agency likely should have considered the proportion of legitimate versus illegitimate transactions taking place (including

involving "money mules") at the covered money services businesses. ROA.1530-31

("No discussion of legitimate versus illegitimate transactions"; "No discussion of what

fraction of [money services business] transactions involve money mules"; "No

discussion of what fraction of [money services business] transactions are illicit versus

legitimate"). Once again, the district court erred. For starters, it is not reasonable to

expect FinCEN to have relevant data on hand, when the very purpose of the Order

was to collect information about illicit transactions in the target areas. ROA.370-71.

And there is no apparent reason (nor one identified by the district court or plaintiffs)

to suppose that the agency should have considered alternative sources of data on the

proportion of illicit versus licit transactions, if any such data sources even exist, before

exercising its statutory authority to collect it.

Furthermore, the APA mandates consideration only of "important aspect[s]"

of a problem. *State Farm*, 463 U.S. at 43. And here, it is not apparent why the

proportion in question was important—either to the agency's decision to impose the

Order, or to the question of the Order's tailoring. As the agency explained, the

purpose of the Order was to generate information on the emergent problem of drug-

related money laundering in border regions. ROA.377-78. The Order was necessary,

in other words, to gather the information the district court found lacking. As for

tailoring, the Order does not distinguish between illegitimate and legitimate

transactions. Sensibly so, for a business wittingly aiding money laundering would

presumably not advert the government to the fact, and a business unwittingly doing

so would have no way to comply.  Assuming the proportion-related data the district court identified as missing here were relevant, it would be relevant only to the question of whether, as a policy matter, the Order's promulgation was worthwhile.  That is the Executive Branch's determination, not the Judiciary's, to make.  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513-14 (2009).  At day's end, it was enough—that is, "reasonable and reasonably explained," *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)—for the agency to conclude that businesses in the covered areas are susceptible to abuse, and to require them to report information.

*ii.*  The district court also believed two aspects of the Order to be likely arbitrary:  the choice of $200 as the reporting threshold in the covered ZIP codes, ROA.1531, and the selection of ZIP codes themselves, ROA.1533.  Once again, the district court's analysis exceeds the "narrow" standard of review prescribed by the APA.  *Fox Television Stations, Inc.*, 556 U.S. at 513.

FinCEN justified its selection of a $200 threshold on the grounds it would "include nearly all cash transactions vulnerable to abuse by drug cartels through structuring payments to avoid [currency transaction reports], while excluding clearly de minimis amounts that are more likely to be legitimate."  ROA.382.  That conclusion was reasonable, notwithstanding the district court's passing (and unexplained) observation that it was "likely arbitrary."  ROA.1531.  And in identifying ZIP codes to be covered by the Order, FinCEN explained that it would consider "proximity to the border and to a border crossing" and "whether the number of

[currency transaction reports] filed in the ZIP code is high relative to the population, in comparison to other ZIP codes." ROA.378-79. The ZIP codes chosen track the agency's stated criteria. ROA.379-82.

In deeming the choice of ZIP codes likely arbitrary, the district court construed the agency to have espoused the theory "that [currency transaction reports] lead to prosecutions and hence a $200 threshold will lead to many more [reports] and thus many more prosecutions." ROA.1533. That "theory" is not the government's, however, it is instead how plaintiffs characterized the Order's purpose. *See* ROA.1093 (using identical language). FinCEN envisioned a broader purpose for the Order: to assist not only in case generation and subsequent prosecutions, but also to gather information about drug-related money laundering on the border. ROA.370-71. That the ZIP codes chosen could reasonably be expected to lead to that sort of information is common sense, as well as well documented in the record. ROA.377-78. The district court's second rationale for its conclusion that the selection of ZIP codes was arbitrary was speculation that "it isn't 'logical' to 'believe that the illicit revenue from [drug-trafficking] crimes is going to be sent back to Mexico via thousands of structured transactions via MSBs right at the border.'" ROA.1533 (quoting ROA.1094). That supposition flies in the face of the agency's contrary evidence, which is cited in the administrative record, *e.g.*, ROA.377, and is not a valid basis on which to second-guess the agency's policy choice.

## II.    The Remaining Equitable Factors Favor Vacatur

That plaintiffs are unlikely to succeed on the merits of their Fourth Amendment and APA claims by itself compels vacatur of the district court's preliminary injunction.  *La Union del Pueblo Entero v. FEMA*, 608 F.3d 217, 225 (5th Cir. 2010) ("Because we have determined that Plaintiffs cannot show a substantial likelihood of success on the merits, we need not address FEMA's additional arguments regarding the other necessary elements for preliminary injunctive relief.").  But in any event, the equitable factors also weigh against preliminary injunctive relief.

The district court credited plaintiffs' claims of irreparable injury in the form of "destruction of [their] businesses [and] loss of reputation and goodwill."  ROA.1537; *see* ROA.1535-36.  But the evidence plaintiffs offered fell short of establishing that any business has been (or imminently will be) rendered bankrupt because of the Order. Instead, plaintiffs offered speculative testimony about the length of time it would take them to complete the additional reporting required by the Order.  *E.g.*, ROA.310-11; ROA.314.  Despite acknowledging the existence of software that would considerably reduce the associated labor costs, ROA.1796-97, no witness testified that his business had implemented the use of such software.  And even if doing so would cost "anywhere between 6,000 to $12,000," ROA.1796-97, the record does not support that those costs are ruinous.  Nor did plaintiffs actually establish that any of their customers will be irretrievably lost, instead expressing fears that their customers would not want to cede personal information and might cease doing business with

37

them if compelled to do so. *E.g.*, ROA.315; ROA.318; ROA.1771. However genuinely felt, these anxieties and fears furnish an insufficient basis on which to foresee "imminent," or even "likely," irreparable harm. *Chacon v. Granata*, 515 F.2d 922, 925 (5th Cir. 1975); *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008).

In the end, plaintiffs' evidence establishes only that some customers might take their business elsewhere, for an indefinite period of time. Equity demands more. *See Hanson v. District of Columbia*, 120 F.4th 223, 244 (D.C. Cir. 2024) (per curiam) (the movant for a preliminary injunction "must demonstrate injury that is sufficiently certain, persuasively demonstrated, and so clearly irremediable that it warrants a court reaching out to alter the status quo before the merits are resolved" (citation omitted)).

Any irreparable injury plaintiffs face is outweighed by the harms the government faces from being hamstrung in its attempts to investigate and prosecute money laundering. It is in the public interest for the Government to act swiftly to combat illicit drug financing, particularly in light of the ongoing fentanyl crisis and evidence that drug cartels are using money services businesses to further their devastating criminal activity. *E.g.*, ROA.377-78.

At a minimum, the injunction should be vacated with instructions to the district court to narrow its order only to apply to those individual plaintiffs who can show actual or imminent irreparable injury. In the context of any judicial proceeding, the remedy accorded to a plaintiff must be "tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 585 U.S. 48, 73 (2018) (citation omitted); *see also Lewis v. Casey*,

518 U.S. 343, 357 (1996).  And in the particular context of injunctive relief, a plaintiff

must show a likelihood of irreparable harm.  *Starbucks Corp. v. McKinney*, 602 U.S. 339,

345 (2024) (citing *Winter*, 555 U.S. at 20).  From the foregoing two principles it

follows that a preliminary injunction should be crafted specifically to address the

plaintiffs' substantiated claims of actual or imminent irreparable injury.  *Califano v.*

*Yamasaki*, 442 U.S. 682, 702 (1979) ("[I]njunctive relief should be no more

burdensome to the defendant than necessary to provide complete relief to the

plaintiffs.").  The Supreme Court reaffirmed these principles only weeks ago when it

held that federal courts generally lack the authority to issue "universal" injunctions,

*i.e.*, those that are crafted to afford relief to non-parties.  *Trump v. CASA, Inc.*, 145 S.

Ct. 2540, 2550 (2025).  Here, that means differentiating among the plaintiffs and

witnesses (the latter category having included non-parties) to determine which

plaintiffs, if any, actually showed imminent irreparable harm to their businesses.

That this suit was brought under the APA does not disturb these traditional

equitable limitations on injunctive relief.  The APA's cause of action does not

authorize vacatur of rules.[5]  Congress enacted the APA against a background rule that

---

[5] The government acknowledges that this Court's precedents identify vacatur as
an available remedy under the APA, *e.g.*, *Data Mktg. P'ship, LP v. U.S. Department of*
*Labor*, 45 F.4th 846, 859-60 (5th Cir. 2022), but preserves its argument to the contrary.
In any event, this Court's decisions also make clear that a court may, but is not
required to, vacate an agency action on a universal basis.  *See Cargill v. Garland*, 57
F.4th 447, 472 (5th Cir. 2023) (en banc) (plurality opinion) (concluding, without
contradiction from any other member of the Court, that the district court could

*Continued on next page.*

statutory remedies should be construed in accordance with "traditions of equity practice." *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944). Courts "do not lightly assume that Congress has intended to depart from established principles" of equity, *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982), and ordinarily courts expect that Congress will make "an unequivocal statement of its purpose" if it intends to make "a drastic departure from the traditions of equity practice," *Hecht Co.*, 321 U.S. at 329.

The "set aside" language of 5 U.S.C. § 706(2) does not meet this standard. It neither refers to vacatur nor specifies as to whom the agency action should be set aside. *See United States v. Texas*, 599 U.S. 670, 695-96 (2023) (Gorsuch, J., concurring in the judgment); *Arizona v. Biden*, 40 F.4th 375, 397 (6th Cir. 2022) (Sutton, C.J., concurring). And elsewhere, the APA makes clear that it does not upset traditional equitable principles, providing that its authorization of judicial review does not affect "the power or duty of the court to . . . deny relief on any . . . equitable ground." 5 U.S.C. 702(1).

---

consider on remand "a more limited remedy" than universal vacatur of the rule, and instructing the district court to "determine what remedy—injunctive, declarative, or otherwise—is appropriate to effectuate" the judgment); *see also Texas Med. Ass'n v. U.S. Dep't of Health & Human Servs.*, 120 F.4th 494, 510 (5th Cir. 2024) (observing that, in certain situations, "party-specific vacatur is definitely appropriate."

## CONCLUSION

For the foregoing reasons, the preliminary injunction should be vacated or, at a minimum, narrowed.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

JUSTIN R. SIMMONS
  *United States Attorney*

SHARON SWINGLE
  *s/ Simon G. Jerome*

SIMON G. JEROME
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7209*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-1673*
  *simon.g.jerome@usdoj.gov*

July 2025

## CERTIFICATE OF SERVICE

I hereby certify that on July 31, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system.  Service will be accomplished by the appellate CM/ECF system.

*s/ Simon G. Jerome*

Simon G. Jerome

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because it contains 10,251 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Simon G. Jerome*
Simon G. Jerome

**ADDENDUM**

# TABLE OF CONTENTS

31 U.S.C. § 5326(a) ........................................................................................ A1

*Issuance of a Geographic Targeting Order Imposing Additional Recordkeeping
    and Reporting Requirements on Certain Money Services Businesses
    Along the Southwest Border*,
    90 Fed. Reg. 12,106 (Mar. 14, 2025) .................................................... A2

FinCEN Evidentiary Memorandum Supporting Southwest Border Geographic
    Targeting Order.......................................................................................... A5

**31 U.S.C. § 5326(a)**

**§ 5326. Records of certain domestic transactions.**

(a) In General.—If the Secretary of the Treasury finds, upon the Secretary's own initiative or at the request of an appropriate Federal or State law enforcement official, that reasonable grounds exist for concluding that additional recordkeeping and reporting requirements are necessary to carry out the purposes of this subtitle or to prevent evasions thereof, the Secretary may issue an order requiring any domestic financial institution or nonfinancial trade or business or group of domestic financial institutions or nonfinancial trades or businesses in a geographic area—

(1) to obtain such information as the Secretary may describe in such order concerning—

(A) any transaction in which such financial institution or nonfinancial trade or business is involved for the payment, receipt, or transfer of funds (as the Secretary may describe in such order), the total amounts or denominations of which are equal to or greater than an amount which the Secretary may prescribe; and

(B) any other person participating in such transaction;

(2) to maintain a record of such information for such period of time as the Secretary may require; and

(3) to file a report with respect to any transaction described in paragraph (1)(A) in the manner and to the extent specified in the order.

formal orders of investigation that authorize specifically-designated enforcement staff to exercise the Commission's statutory power to subpoena witnesses and take the other actions authorized by the relevant cited provisions.

The Commission delegated authority to issue formal orders of investigation to the Director on August 11, 2009. "Delegation of Authority to Director of Division of Enforcement," 74 FR 40068–01 (Aug. 11, 2009). The delegation was made effective for a one-year period, ending on August 11, 2010, to allow Commission review of the Division's exercise of formal order authority. On August 16, 2010, the Commission amended its rules to extend the Director's delegated authority to issue formal orders of investigation beyond the one-year period. "Delegation of Authority to the Director of Its Division of Enforcement," 75 FR 49820–01 (Aug. 16, 2010); *see also* 17 CFR 200.30–4(a)(13). The amendment will delete this delegation provision, 17 CFR 200.30–4(a)(13), to more closely align the Commission's use of its investigative resources with Commission priorities.

**Administrative Law Matters**

The Commission finds, in accordance with the Administrative Procedure Act ("APA"), that this amendment relates solely to agency organization, procedure, or practice. 5 U.S.C. 553(b)(A). Accordingly, the APA's provisions regarding notice of rulemaking and opportunity for public comment are not applicable. In accord with the APA, we find that there is good cause to establish an effective date less than 30 days after publication of this amendment. 5 U.S.C. 553(d). This amendment does not substantially affect the rights or obligations of non-agency parties and pertains to increasing efficiency of internal Commission operations. The amendment is therefore effective on March 14, 2025. For the same reasons, the provisions of the Small Business Regulatory Enforcement Fairness Act are not applicable. *See* 5 U.S.C. 804(3)(C) (the term "rule" does not include "any rule of agency organization, procedure, or practice that does not substantially affect the rights or obligations of non-agency parties"). Additionally, the provisions of the Regulatory Flexibility Act, 5 U.S.C. 60 *et seq.*, which apply only when notice and comment are required by the APA or other law, are not applicable. *See* 5 U.S.C. 601(2). This amendment does not contain any collection of information requirements as defined by the Paperwork Reduction Act of 1995. *See* 5 CFR 1320.3(c). Further, because this

amendment imposes no new burdens on private parties, the Commission does not believe that the amendment will have any impact on competition for purposes of section 23(a)(2) of the Securities Exchange Act of 1934. 15 U.S.C. 78w(a)(2).

**Statutory Authority**

The amendment contained in this release is being adopted pursuant to statutory authority granted to the Commission, including section 19 of the Securities Act of 1933, 15 U.S.C. 77s; sections 4A, 4B, and 23 of the Securities Exchange Act of 1934, 15 U.S.C. 78d–1, 78d–2, and 78w; section 38 of the Investment Company Act, 15 U.S.C. 80a–37; section 211 of the Investment Advisers Act, 15 U.S.C. 80b–11; and section 3 of the Sarbanes-Oxley Act, 15 U.S.C. 7202.

**List of Subjects in 17 CFR Part 200**

Administrative practice and procedure, Authority delegations (Government agencies).

**Text of Amendment**

For the reasons set out in the preamble, the Commission is amending 17 CFR part 200 as follows:

**PART 200—ORGANIZATION; CONDUCT AND ETHICS; AND INFORMATION AND REQUESTS**

■ 1. The authority citation for part 200 continues to read as follows:

**Authority:** 5 U.S.C. 552, 552a, 552b, and 557; 11 U.S.C. 901 and 1109(a); 15 U.S.C. 77c, 77e, 77f, 77g, 77h, 77j, 77o, 77q, 77s, 77u, 77z–3, 77ggg(a), 77hhh, 77sss, 77uuu, 78b, 78c(b), 78d, 78d–1, 78d–2, 78e, 78f, 78g, 78h, 78i, 78k, 78k–1, 78*l,* 78m, 78n, 78o, 78o–4, 78q, 78q–1, 78t–1, 78u, 78w, 78*ll*(d), 78mm, 78eee, 80a–8, 80a–20, 80a–24, 80a–29, 80a–37, 80a–41, 80a–44(a), 80a–44(b), 80b–3, 80b–4, 80b–5, 80b–9, 80b–10(a), 80b–11, 7202, and 7211 *et seq.;* 29 U.S.C. 794; 44 U.S.C. 3506 and 3507; Reorganization Plan No. 10 of 1950 (15 U.S.C. 78d); sec. 8G, Pub. L. 95–452, 92 Stat. 1101 (5 U.S.C. App.); sec. 913, Pub. L. 111–203, 124 Stat. 1376, 1827; sec. 3(a), Pub. L. 114–185, 130 Stat. 538; E.O. 11222, 30 FR 6469, 3 CFR, 1964–1965 Comp., p. 36; E.O. 12356, 47 FR 14874, 3 CFR, 1982 Comp., p. 166; E.O. 12600, 52 FR 23781, 3 CFR, 1987 Comp., p. 235; Information Security Oversight Office Directive No. 1, 47 FR 27836; and 5 CFR 735.104 and 5 CFR parts 2634 and 2635, unless otherwise noted.

**§ 200.30–4 [Amended]**

■ 2. Section 200.30–4 is amended by removing and reserving paragraph (a)(13).

By the Commission.

Dated: March 10, 2025.

**Vanessa A. Countryman,**
*Secretary.*
[FR Doc. 2025–04064 Filed 3–13–25; 8:45 am]
**BILLING CODE 8011–01–P**

**DEPARTMENT OF THE TREASURY**

**Financial Crimes Enforcement Network**

**31 CFR Part 1010**

**Issuance of a Geographic Targeting Order Imposing Additional Recordkeeping and Reporting Requirements on Certain Money Services Businesses Along the Southwest Border**

**AGENCY:** Financial Crimes Enforcement Network (FinCEN), Treasury.

**ACTION:** Order.

**SUMMARY:** FinCEN is issuing notice of a Geographic Targeting Order, requiring certain money services businesses along the southwest border of the United States to report and retain records of transactions in currency of more than $200 but not more than $10,000, and to verify the identity of persons presenting such transactions.

**DATES:** This action is effective April 14, 2025.

**FOR FURTHER INFORMATION CONTACT:** FinCEN's Regulatory Support Section by submitting an inquiry at *www.fincen.gov/contact.*

**SUPPLEMENTARY INFORMATION:**

**I. Background**

If the Secretary of the Treasury (Secretary) finds, upon his own initiative or at the request of an appropriate Federal or State law enforcement official, that reasonable grounds exist for concluding that additional recordkeeping and reporting requirements are necessary to carry out the purposes of the Bank Secrecy Act (BSA)[1] or to prevent evasions thereof, the Secretary may issue a Geographic Targeting Order (GTO) requiring any domestic financial institution or group of domestic financial institutions, or any domestic nonfinancial trade or business or group of domestic nonfinancial trades or businesses, in a geographic area to obtain such information as the Secretary may describe in such GTO concerning

[1] The Bank Secrecy Act, as amended, is codified at 12 U.S.C. 1829b, 1951–1960 and 31 U.S.C. 5311–5314, 5316–5336 and includes other authorities reflected in notes thereto. Regulations implementing the BSA appear at 31 CFR chapter X. The Secretary of the Treasury's authority to administer the BSA has been delegated to the Director of FinCEN.

any transaction in which such financial institution or nonfinancial trade or business is involved in for the payment, receipt, or transfer of funds (as the Secretary may describe in such GTO), and concerning any other person participating in such transaction. For any such transaction, the Secretary may require the financial institution or nonfinancial trade or business to maintain a record and/or file a report in the manner and to the extent specified. The maximum effective period for a GTO is 180 days unless renewed.[2] The authority of the Secretary to issue a GTO has been delegated to the Director of FinCEN (Director).[3]

The Director finds that reasonable grounds exist for concluding that the additional recordkeeping and reporting requirements set forth in the GTO contained in this document (the "Order") are necessary to carry out the purposes of the BSA or to prevent evasions thereof. This action is being taken in furtherance of Treasury's efforts to combat illicit finance by drug cartels and other illicit actors along the southwest border of United States. The Order does not alter any existing BSA obligation of a Covered Business (as defined in the Order), except as otherwise noted in the Order itself. Thus, for example, a Covered Business must continue to file Currency Transaction Reports (CTRs) for transactions in currency above $10,000 and Suspicious Activity Reports (SARs) where appropriate and in accordance with the BSA and applicable regulations. Although the dollar thresholds for filing SARs in the SAR regulation applicable to Covered Businesses remains the same (as low as $2,000),[4] FinCEN encourages the voluntary filing of SARs where appropriate to report transactions conducted to evade the $200 reporting threshold imposed by the Order.

## II. Geographic Targeting Order

### A. Businesses and Transactions Covered by This Order

1. For purposes of this Order, the "Covered Business" means a money services business, as defined in 31 CFR 1010.100(ff), located in the Covered Geographic Area.

2. For purposes of this Order, a "Covered Transaction" means each deposit, withdrawal, exchange of currency or other payment or transfer, by, through, or to the Covered Business which involves a transaction in

currency, of more than $200 but not more than $10,000.

3. For purposes of this Order, a "Covered Geographic Area" means the areas denoted by the ZIP codes below corresponding to the following seven counties in California and Texas:

a. Imperial County, California: 92231, 92249, 92281, and 92283;

b. San Diego County, California: 91910, 92101, 92113, 92117, 92126, 92154, and 92173;

c. Cameron County, Texas: 78520 and 78521;

d. El Paso County, Texas: 79901, 79902, 79903, 79905, 79907, and 79935;

e. Hidalgo County, Texas: 78503, 78557, 78572, 78577, and 78596;

f. Maverick County, Texas: 78852; and

g. Webb County, Texas: 78040, 78041, 78043, 78045, and 78046.

4. All terms used but not otherwise defined herein shall have the same meaning set forth in part 1010 of chapter X of subtitle B of title 31 of the Code of Federal Regulations.

### B. Reports Required To Be Filed by the Covered Business

5. Except as otherwise set forth in this Order, if the Covered Business is involved in a Covered Transaction, then the Covered Business shall report the Covered Transaction to FinCEN on a Currency Transaction Report within 15 days following the day on which the Covered Transaction occurred. In the case of the U.S. Postal Service, the obligation contained in the preceding sentence shall not apply to payments or transfers made solely in connection with the purchase of postage or philatelic products.

**Note:** When submitting the report, the Covered Business may receive a warning that the transaction is below $10,000. The Covered Business shall ignore the warning and continue with the submission.

6. Each report filed pursuant to this Order must be: (a) completed in accordance with the terms of this Order and the Currency Transaction Report instructions (when those terms and those instructions conflict, the terms of this Order prevail); and (b) e-filed though the BSA E-Filing System.[5]

7. Before concluding a Covered Transaction, the Covered Business must comply with the identification requirements set forth at 31 CFR 1010.312, including the requirement that the specific identifying information

(e.g., the account number of the credit card, the driver's license number) used in verifying the identity of the customer shall be recorded on the Currency Transaction Report, and the mere notation of "known customer" or "bank signature card on file" on the report is prohibited. For purposes of this requirement, the Covered Business need not identify employees of armored car services.

8. The Covered Business is not required to file a report otherwise required under this Order on a Covered Transaction between the Covered Business and a commercial bank.

9. Part IV of the Currency Transaction Report shall contain the following information in Field 45: "MSB0325GTO".

### C. Order Period

The terms of this Order are effective beginning April 14, 2025 and ending on September 9, 2025.

### D. Retention of Records

The Covered Business must: (a) retain all reports filed to comply with this Order and any other records relating to compliance with this Order for a period of five years from the last day that this Order is effective (including any renewals of this Order); (b) store all such records in a manner accessible within a reasonable period of time; and (c) make such records available to FinCEN, or any other appropriate law enforcement or regulatory agency, upon request, in accordance with applicable law.

### E. No Effect on Other Provision of the BSA or Its Implementing Regulations

Nothing in this Order otherwise modifies or affects any provision of the BSA or the regulations implementing the BSA to the extent not expressly stated herein.

### F. Confidentiality

This Order is being publicly issued, and its terms are not confidential.

### G. Compliance

The Covered Business must supervise, and is responsible for, compliance by each of its officers, directors, employees, and agents with the terms of this Order. The Covered Business must transmit this Order to each of its agents located in the Covered Geographic Area. The Covered Business must also transmit this Order to its Chief Executive Officer or other similarly acting manager.

### H. Penalties for Noncompliance

The Covered Business, and any of its officers, directors, employees, and

---

[2] 31 U.S.C. 5326; *see also* 31 CFR 1010.370.

[3] Treasury Order 180–01 (Jan. 14, 2020).

[4] 31 CFR 1022.320 (SAR rule for money services businesses).

[5] To electronically file a Currency Transaction Report, a Covered Business will need a BSA E-Filing User account. To create a BSA E-Filing User account, please visit *https://bsaefiling. fincen.treas.gov/Enroll_Now.html*. For more information on e-filing, please visit *https:// bsaefiling.fincen.treas.gov/AboutBsa.html*.

agents, may be liable, without limitation, for civil or criminal penalties for violating any of the terms of this Order.

### I. Validity of Order

Any judicial determination that any provision of this Order is invalid shall not affect the validity of any other provision of this Order, and each other provision shall thereafter remain in full force and effect. A copy of this Order carries the full force and effect of an original signed Order.

### J. Paperwork Reduction Act

The collection of information subject to the Paperwork Reduction Act contained in this Order has been approved by the Office of Management and Budget (OMB) and assigned OMB control number 1506–0056. An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a valid OMB control number.

### K. Questions

All questions about the Order should be directed to the FinCEN at *https://www.fincen.gov/contact*.

(Authority: 31 U.S.C. 5326)

**Andrea M. Gacki,**

*Director, Financial Crimes Enforcement Network.*

[FR Doc. 2025–04099 Filed 3–13–25; 8:45 am]

**BILLING CODE 4810–02–P**

---

## DEPARTMENT OF THE INTERIOR

**National Park Service**

**36 CFR Part 7**

**[NPS–GLCA–NPS39678; NPS–2024–0005; PPIMGLCAA0.PPMPSAS1Z.Y00000–255P10361]**

**RIN 1024–AE91**

### Glen Canyon National Recreation Area; Motor Vehicles; Postponement of Effective Date

**AGENCY:** National Park Service, Interior.

**ACTION:** Final rule; postponement of effective date.

**SUMMARY:** This action further postpones the effective date for a rule published on January 13, 2025, pending judicial review.

**DATES:** As of March 14, 2025, the effective date of the rule amending 36 CFR part 7 published at 90 FR 2621, January 13, 2025, delayed on February 13, 2025, at 90 FR 9518, is postponed indefinitely, pending judicial review.

The National Park Service (NPS) will publish a document in the **Federal Register** announcing the new effective date or other dates the public may need to know.

**FOR FURTHER INFORMATION CONTACT:** Michelle Kerns, Superintendent, Glen Canyon National Recreation Area, P.O. Box 1507, Page, Arizona 86040, by phone at 928–608–6210, or by email at *GLCA_Superintendent@nps.gov*. Individuals in the United States who are deaf, deafblind, hard of hearing, or have a speech disability may dial 711 (TTY, TDD, or TeleBraille) to access telecommunications relay services. Individuals outside the United States should use the relay services offered within their country to make international calls to the point-of-contact in the United States.

**SUPPLEMENTARY INFORMATION:** On January 13, 2025, the NPS published a final rule revising special regulations at Glen Canyon National Recreation Area to update rules about the use of motor vehicles on roads and off roads on designated routes and areas (the "Final Rule"; 90 FR 2621). On January 20, 2025, the President issued a memorandum titled "Regulatory Freeze Pending Review" ("Freeze Memo"). The Freeze Memo directed all executive departments and agencies to consider postponing for 60 days from the date of the Freeze Memo the effective date for any rules that had been published in the **Federal Register** but had not yet taken effect for the purpose of reviewing any questions of fact, law, and policy that the rules may raise.

On February 13, the NPS published an action delaying the effective date for the Final Rule until March 21, 2025 (90 FR 9518) for the purpose of giving agency officials the opportunity to further review any questions of fact, law, and policy that the Final Rule may raise.

After conducting that review, the NPS has determined that justice requires an indefinite postponement of the effective date of the Final Rule, pending resolution of ongoing litigation. Under section 705 of the Administrative Procedure Act "[w]hen an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review." 5 U.S.C. 705. The State of Utah, Wayne and Garfield Counties, and the Utah School and Institutional Trust Lands Administration have challenged the special regulations for motor vehicle use at Glen Canyon National Recreation Area that were promulgated in 2021 (the "2021 Rule"; 86 FR 3804) and the corresponding off-road vehicle

management plan ("ORV plan"). *State of Utah* v. *Haaland*, 4:24–cv–00048 (D. Utah). The plaintiffs allege numerous legal deficiencies, including claimed State interests in roads affected by the 2021 Rule, the plaintiffs' inability to economically develop school trust lands accessed from roads managed by the ORV Plan, and the opportunity for Department of the Interior agencies to better coordinate motorized vehicle regulation across jurisdictional boundaries. While the plaintiffs' challenge is to the 2021 Rule, many of the issues raised in that litigation, including the effects of off-road vehicle management on State interests and school trust lands, are also relevant to the Final Rule.

The NPS has determined that postponing the effective date of the Final Rule and preserving the regulatory status quo of the 2021 Rule pending the resolution of ongoing litigation regarding that rule is necessary in order to avoid unduly foreclosing potential remedies, ensure proper adjudication of these claims, and avoid creating a shifting regulatory landscape that may frustrate resolution of the issues raised in that litigation. Maintaining the status quo will also serve the public interest by avoiding confusion with the public on what motorized uses are allowed in the Recreation Area and avoiding unnecessary and costly agency operations to implement additional changes while the previous changes are the subject of the pending litigation.

Additionally, the Bureau of Land Management ("BLM") released its Travel Management Plan for the Henry Mountains and Freemont Gorge Area on January 17, 2025, shortly after the publication of the Final Rule. This area is adjacent to the Recreation Area, and roads from the Recreation Area extend into this BLM planning area, and vice versa. Postponing the effective date of the Final Rule will allow for ongoing coordination on these matters that will better inform the adjudication of the pending claims from the State of Utah and the other plaintiffs.

Finally, the National Parks Conservation Association and Southern Utah Wilderness Alliance, parties to the Settlement Agreement under which the Final Rule was published, have been granted intervenor status in the challenge from the State of Utah to the 2021 Rule, so that the interests of all parties will be heard and adequately protected by resolution of these issues in that forum. In light of this active litigation, the NPS has concluded that justice requires it to postpone the effective date for the Final Rule until the



Financial Crimes Enforcement Network
U.S. Department of the Treasury

*Global Investigations Division* | *Washington, D.C. 20220*

March XX, 2025

**INFORMATION MEMORANDUM FOR DIRECTOR ANDREA M. GACKI**

(U) **THROUGH:**            Matthew R. Stiglitz
                           Associate Director

                           Amanda Joca
                           Deputy Associate Director

                           Chase Lubbock
                           Office Director, Western Hemisphere

(U) **FROM:**               Kieran Murray and Shannon Mizzi
                           Global Investigative Specialists

(U//~~FOUO~~) **SUBJECT:**   Administrative Record for Geographic Targeting Order for Cash
                           Transactions at Southwest Border Money Services Businesses

**I.      (U) <u>Executive Summary</u>**

(U//~~FOUO~~) The Global Investigations Division (GID) of the Financial Crimes Enforcement
Network (FinCEN), a bureau of the Department of the Treasury (Treasury), recommends the
issuance of a public Geographic Targeting Order (GTO) to address cash-based money laundering
along the southwest border, including by Mexican drug cartels—including cartels linked to illicit
opioid trafficking.  This GTO would lower the threshold for filing Currency Transaction Reports
(CTRs) to $200 for money services businesses (MSBs) located in 30 ZIP codes along with
southwest border.  These ZIP codes are in two counties in California (Imperial and San Diego
counties) and five counties in Texas (Cameron, El Paso, Hidalgo, Maverick, and Webb counties).
The GTO would carry out the purposes of the Bank Secrecy Act (BSA), 31 U.S.C. 5311 *et seq*,
by collecting data that is expected to be highly useful to law enforcement for case generation,
ongoing investigations, and prosecutions targeting Mexican drug cartels, which are both drug
trafficking organizations (DTOs) and transnational criminal organizations (TCOs) and would
assist FinCEN and law enforcement in identifying the extent to which these actors are exploiting

MSBs to launder the proceeds of their crimes, thereby perpetuating narcotics trafficking and the synthetic opioid crisis in the United States.

## II.    (U) **Applicable Authority**

(U) FinCEN would issue the proposed GTO pursuant to 31 U.S.C. 5326 ("section 5326"). Section 5326 authorizes the Secretary of the Treasury (Secretary), upon finding that "reasonable grounds exist for concluding that additional recordkeeping and reporting requirements are necessary to carry out the purposes of [the BSA] or to prevent evasions thereof," to issue an order requiring "nonfinancial trades or businesses in a geographic area" to:

(1) Obtain specified information concerning any transaction in which such nonfinancial trades or businesses are involved "for the payment, receipt, or transfer of funds" and "any other person participating in such transaction;"

(2) "Maintain a record of such information" for the period set out in the order; and

(3) File a report regarding any such transaction "in the manner and to the extent specified in the order."[1]

(U) The purposes of the BSA include, but are not limited to, "requir[ing] certain reports … that are highly useful in criminal, tax, or regulatory investigations, risk assessments, or proceedings," "facilitat[ing] the tracking of money that has been sourced through criminal activity or is intended to promote criminal or terrorist activity," and "assess[ing] the money laundering … risks to financial institutions, products, or services to protect the financial system of the United States from criminal abuse and safeguard the national security of the United States."[2]  The authority of the Secretary to administer the BSA and its implementing regulations has been delegated to FinCEN.[3]

(U) Section 5326 authorizes a maximum effective period for a GTO of 180 days, unless renewed.[4]

---

[1] (U) 31 U.S.C. 5326(a); *see also* 31 CFR 1010.370(a).
[2] (U) 31 U.S.C. 5311(1)(A), (3) and (4).
[3] (U) Treasury, Treasury Order 180-01 (Jan. 14, 2020).
[4] (U) 31 U.S.C. 5326(d).

III.     (U) **Background**

    A.  (U) **FinCEN's Regulation of MSBs**

(U) An MSB is generally any person offering check cashing, offering foreign currency exchange services, and/or selling money orders, travelers' checks, or pre-paid access products for an amount greater than $1,000 per person, per day, in one or more transactions.  All persons that engage in the transfer of funds as a money transmitter are also considered MSBs, regardless of the amount of money transmission activity.[5]

(U) Every MSB must register with FinCEN by electronically filing FinCEN Form 107, Registration of Money Services Business, unless a person or business is only an MSB because they serve as an agent of another MSB.[6]  The MSB's owner or controlling person must register by the end of a 180-day period beginning the day after the date they established the MSB.[7]  They are also required to renew their MSB registration each two-calendar-year period following the initial registration by filing another Form 107.[8]  Although agents are not required to register as MSBs, any MSB must prepare and maintain—but not file with FinCEN—a list of its agents.[9]  There are persons who violate these rules by operating as MSBs without registering with FinCEN, often because they are engaging in illicit activity.  FinCEN and law enforcement agencies target such persons for enforcement measures.

(U) All MSBs (including those that are agents, rather than principals) must electronically file CTRs when they have a cash-in or cash-out currency transaction, or multiple transactions, totaling more than $10,000 during one business day for any one person, or on behalf of any one person.[10]  All individuals (except employees of armored car services)[11] conducting a transaction reportable on a CTR, for themselves or for another person, must be identified by means of an official document, such as a driver's license.[12]  CTRs collect information necessary to identify the person or entity on whose behalf the transaction is being conducted; the identity of the person conducting the transaction, if different; payment information; information about the relevant MSB or agent conducting the transaction (name, address, and identification number of the person

---

[5] (U) 31 CFR 1010.100(ff).
[6] (U) 31 CFR 1022.380(a).
[7] (U) 31 CFR 1022.380(b)(3).
[8] (U) 31 CFR 1022.380(b)(2).
[9] (U) 31 CFR 1022.380(d).
[10] (U) 31 CFR 1022.300-313.
[11] (U) FinCEN, FIN-2013-R001, "Treatment of Armored Car Service Transactions Conducted on Behalf of Financial Institution Customers or Third Parties for Currency Transaction Report Purposes" (July 12, 2013), *available at* https://www.fincen.gov/sites/default/files/administrative_ruling/2024-02-02/FIN-2013-R001.pdf.
[12] (U) 31 CFR 1022.312.

or entity conducting the transaction).  The persons conducting transactions reportable on a CTR are prohibited from structuring the transaction to evade the reporting requirement, such as by splitting transactions into smaller amounts in an attempt to evade the $10,000 reporting threshold.[13]

(U) All MSBs are required to develop, implement, and maintain an effective AML/CFT compliance program.  The program should be reasonably designed to prevent individuals from using the MSB to facilitate money laundering or to finance terrorist activities.  Each program must be written and take into account the inherent risks of the business, as well as:

- Incorporate policies, procedures, and internal controls reasonably designed to assure compliance with the BSA;

- Designate a person to assure day-to-day compliance with the BSA;

- Provide education and training to appropriate personnel; and

- Provide for an independent review to monitor and maintain an adequate program.[14]

(U) Generally, MSBs that know, suspect, or have reason to suspect that a transaction or pattern of transactions is suspicious and involves $2,000 or more, must electronically file a FinCEN Form 111, Suspicious Activity Report (SAR), on the activity.[15]

(U) MSBs are required to retain certain records with respect to transmittals of funds for $3,000 or more;[16] purchases of bank checks or drafts, cashier's checks, money orders or traveler's checks for $3,000 or more in currency;[17] and prepaid access.[18]

### B.  (U) Vulnerabilities of MSBs to Money Laundering

(U) While most of the business that MSBs conduct is legitimate and essential, MSBs are vulnerable to exploitation by money launderers.  Treasury's 2024 National Money Laundering Risk Assessment (NMLRA) identified the illicit financial activities of drug cartels,  as a major risk to MSBs and other types of financial institutions.[19]  And, FinCEN has identified money

---

[13] (U) 31 CFR 1022.314.
[14] (U) 31 CFR 1022.210.
[15] (U) 31 CFR 1022.320.
[16] (U) 31 CFR 1010.410.
[17] (U) 31 CFR 1010.415.
[18] (U) 31 CFR 1022.420; 31 CFR 1022.210 (d)(1)(iv).
[19] (U) Treasury, "National Money Laundering Risk Assessment" (2024), p. 21 ("The illicit financial activities of DTOs pose risks to banks, [MSBs], and other entities, such as real estate agents and attorneys."), *available at* https://home.treasury.gov/system/files/136/2024-National-Money-Laundering-Risk-Assessment.pdf.

transfers through MSBs as a financial typology associated with Mexico-based drug cartels and their illicit procurement of fentanyl precursor chemicals and manufacturing equipment.[20]

(U//FOU) MSBs along the southwest border are particularly at risk for abuse by money launderers for cartels, being in an area where cartels engaged in drug, human, and weapons trafficking intensively operate and need to move illicit cash across the border.  Mexico-based drug cartels, including the Sinaloa and Jalisco New Generation cartels, are the dominant producers and suppliers of fentanyl and other illicit drugs destined for the U.S. market.[21]  To enable their efforts to traffic fentanyl and other opioids and to launder their funds back to Mexico, these and other drug cartels have gained functional control, through violence, of nearly

---

[20] (U) FinCEN, "Supplemental Advisory on the Procurement of Precursor Chemicals and Manufacturing Equipment Used for the Synthesis of Illicit Fentanyl and Other Synthetic Opioids," (June 20, 2024), pp. 8-9 ("Money transfers through banks, MSBs, and online payment processors are a common financial typology associated with TCOs' procurement of fentanyl precursor chemicals and manufacturing equipment.  These transactions may be sent from Mexico or the United States to mainland [China] (including via Hong Kong and other jurisdictions) to individuals and shell and front companies associated with either a [China]-based supplier or a chemical broker.  While some money transfers are sent from TCOs in Mexico to [China]-based suppliers without crossing the U.S. financial system, many of these foreign transactions are cleared in U.S. dollars through U.S. correspondent banks, Mexico- and [China]-based agents of U.S. MSBs, and U.S. online payment processors."), *available at* https://www.fincen.gov/sites/default/files/advisory/2024-06-20/FinCEN-Supplemental-Advisory-on-Fentanyl-508C.pdf; *see also* Center for Strategic and International Studies, "Understanding the Impact of Remittances on Mexico's Economy and Safeguarding Their Future Impact" (Jan. 15, 2025), ("The expanding volume of remittance transactions provides more than economic benefits to regular Mexicans; it also presents ample opportunity for exploitation.  Criminal organizations take advantage of the small-increment nature of remittance transactions to evade oversight regulations and launder money related to drug trafficking and other illicit income streams, a practice which has increased in frequency since the Covid-19 pandemic disrupted cross-border movement and the associated traditional methods of bulk cash smuggling.") *available at* https://www.csis.org/analysis/understanding-impact-remittances-mexicos-economy-and-safeguarding-their-future-impact.
[21] (U) U.S. Drug Enforcement Administration, "National Drug Threat Assessment" (May 2024), *available at* https://www.dea.gov/sites/default/files/2025-02/508_5.23.2024%20NDTA-updated.pdf.  *See The New York Times*, "The American Drug Mules Smuggling Fentanyl into the U.S." (Sep. 28, 2024) ("Since 2019, when Mexico overtook China to become the dominant supplier of fentanyl in the United States, cartels have been flooding the country with the synthetic opioid.  The amount of fentanyl crossing the border has increased tenfold in the past five years.  Mexico has been the source of almost all of the fentanyl seized by U.S. law enforcement in recent years."), *available at* https://www.nytimes.com/2024/09/28/world/americas/fentanyl-drug-smugglers-us.html; Brookings Institute, "US-Mexico Relations and the fight against fentanyl trafficking" (Oct. 8, 2024) ("Mexico and specifically Mexican criminal groups, the Sinaloa cartel and Cartel Jalisco Nueva Generación, are the two main actors today that are producing fentanyl.  They make fentanyl from precursor chemicals that come from China.  These precursors arrived in Mexico.  The two cartels then synthesize them into fentanyl and then bring the fentanyl in various forms and through various means to the United States across the U.S.-Mexico border.  They dominate wholesale distribution of drugs in the U.S., certainly fentanyl, but equally so methamphetamine and cocaine.  And they really work until about the middle layer.  These groups are not the retailers themselves.  They the hire, they contract local criminal groups across the United States, but just about until the level of retail they bring drugs, produce drugs, trafficked drugs, distribute drugs in the United States.  And also, they of course then move proceeds from the United States to Mexico as well as weapons."), *available at* https://www.brookings.edu/articles/us-mexico-relations-and-the-fight-against-fentanyl-trafficking/.

all illegal traffic across the southern border of the United States.  In light of this fact, President Trump signed Executive Order 14157 in February 2025, creating a process by which certain drug cartels have been  named cartels as Foreign Terrorist Organizations and Specially Designated Global Terrorists.[22]  MSBs along the southwest border are therefore subject to a unique money laundering vulnerability, as, given their proximity to the border, these cartels leverage the services provided by these MSBs to return illicit proceeds to Mexico.

(U) MSBs typically offer a limited range of services compared to other financial institutions, with many offering services tailored to persons without bank accounts.  These MSBs are often agents of a larger MSB and offer MSB services as part of its operation as a corner store or chain retailer.  The competitively priced services and convenient location offered near the border by such MSBs make them attractive for persons interested in using cash to fund money transmittals moving value across the border to Mexico, or to Central and South American countries, for both licit and illicit purposes.[23]

(U) MSBs offer a range of services, primarily built around exchanging currencies, cashing checks, receiving cash to fund money transmittals, and paying out cash to recipients of money transmittals.  Due to the cash-intensive nature of this industry, it has become an avenue through which drug cartels move untraceable flows of value.  For example, illicit actors may move cash or checks to the southwest border from locations across the United States and then use the MSBs' services to exchange the cash to pesos or to cash out checks, with the value moved to Mexico.  Similarly, an MSB may be used to receive a money transmittal from anywhere in the United States, funneling the value to the southwest border, which can be cashed out and the value moved to Mexico.[24]  Moreover, illicit actors may comingle licit and illicit cash, making dirty money even more difficult to detect for MSBs.

---

[22] (U) Executive Order 14157, "Designating Cartels and Other Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists," 90 FR 8439, (Jan. 20, 2025), *available at* https://www.whitehouse.gov/presidential-actions/2025/01/designating-cartels-and-other-organizations-as-foreign-terrorist-organizations-and-specially-designated-global-terrorists/; U.S. Department of State, "Designation of International Cartels" (Feb. 20, 2025), *available at* https://www.state.gov/designation-of-international-cartels/.
[23] (U) D. Ore, "How Mexican narcos use remittances to wire U.S. drug profits home," *Reuters* (Aug. 18, 2023), *available at* https://www.reuters.com/investigates/special-report/mexico-drugs-remittances/.
[24] (U) FinCEN, "Supplemental Advisory on Identifying and Reporting Human Trafficking and Related Activity" (Oct. 15, 2020), p. 4 ("Funnel accounts generally involve an individual or business account in one geographic area that receives multiple cash deposits, often in amounts below the cash reporting threshold, from which the funds are withdrawn in a different geographic area with little time elapsing between the deposits and withdrawals.  Human traffickers may use interstate funnel accounts to transfer funds between geographic areas, move proceeds rapidly, and maintain anonymity.  In labor and sex trafficking schemes, human traffickers may open accounts in their name, or escort victims to a bank, and force them to open an account…In some cases, victims also are coerced or forced to

(U) Drug cartels and their affiliated professional money laundering organizations often hire loosely associated parties, including "money mules,"[25] to move funds to Mexico via U.S.-based MSBs, structured to evade reporting requirements (*i.e.*, keeping the amount of any individual cash transaction below the applicable reporting threshold to avoid identification and reporting requirements). Structuring can be accomplished by dividing illicit proceeds between multiple individuals who conduct transfers at one or multiple MSB locations.[26]

(U) The services provided by MSBs are sometimes provided wittingly to drug cartels, turning the MSB into a professional money launderer. For example, the owner of an MSB in California was convicted in 2024 for conspiracy to commit money laundering on behalf of the Jalisco New Generation Cartel, by knowingly laundering drug proceeds by accepting cash from drug dealers below the CTR threshold and wiring it to Mexico, disguising it to look like routine remittances.[27] Similarly, in 2017, the owners and employees of an MSB pleaded guilty to accepting cash that was represented as coming from drug sales, which, in exchange for a kickback, they agreed to launder to Mexico by breaking the transactions into smaller amounts, resulting in more than $40 million laundered over a roughly four-year timeframe.[28]

---

wire proceeds via [MSBs] to facilitate the funneling of proceeds."), *available at* https://www.fincen.gov/sites/default/files/advisory/2020-10-15/Advisory%20Human%20Trafficking%20508%20FINAL_0.pdf; FinCEN, "FinCEN Alert on Human Smuggling along the Southwest Border of the United States" (Jan. 13, 2023) ("Smuggling fees, often paid by the family members of migrants already settled in the United States and disguised as remittances, are sent to funnel accounts at financial institutions with branches or locations along both sides of the SW border."), *available at* https://www.fincen.gov/sites/default/files/shared/FinCEN%20Alert%20Human%20Smuggling%20FINAL_508.pdf.

[25] (U) FBI, "Money Mules," *available at* https://www.fbi.gov/how-we-can-help-you/scams-and-safety/common-frauds-and-scams/money-mules.

[26] (U) *See, e.g.*, FinCEN, "Advisory to Financial Institutions on Illicit Financial Schemes and Methods Related to the Trafficking of Fentanyl and Other Synthetic Opioids" (Aug. 21, 2019), pp. 3, 9 ("An analysis of sensitive financial data illustrates that when U.S. individuals purchase fentanyl directly from China and other foreign countries, they often structure the money transfers to evade [BSA] reporting and recordkeeping requirements. Individuals frequently transfer the funds using multiple MSB agent locations…Professional money laundering organizations hire loosely associated parties (including "money mules") to send money transfers to Mexico via U.S. MSBs, primarily money transmitters, structured to evade reporting requirements. In this context, structuring (*i.e.*, keeping the amount of the money transfer below the applicable threshold of $3,000 in order to avoid identification and reporting requirements) is accomplished through one of, or a combination of, the following: • The illicit proceeds are divided between multiple individuals who send the transfers; • An individual uses multiple MSB agent locations to send transfers; and/or • An individual sends multiple transactions consecutively."), *available at* https://www.fincen.gov/sites/default/files/advisory/2019-08-21/Fentanyl%20Advisory%20FINAL%20508.pdf.

[27] (U) Complaint, *United States v. Chavez Zepeda et al*, No. 2:22-cr-00064 (E.D. Cal., Mar. 14, 2022).

[28] (U) Indictment, *United States v. Perez et al*, No. 1:17-cr-00200 (N.D. Ga., June 16, 2016).

IV.    (U) **Justification for the GTO**

(U//FOUO) This GTO is necessary to carry out the purposes of the BSA because the GTO, due to the money laundering risks discussed above, would likely result in information highly useful in money laundering investigations, especially in the context of the fentanyl crisis, discussed in Section IV.A.  The anticipated benefits of the GTO are discussed in Section IV.B.

 **A.  (U) Necessity to Address the Fentanyl Crisis**

(U) The supply and sale of fentanyl and other synthetic opioids is one of the greatest national security threats facing the United States.  Nearly 38,000 Americans died from fentanyl use in the first six months of 2023, and fentanyl and other synthetic drugs, including methamphetamine, account for nearly all fatal drug overdoses that occur in the United States.[29]  Drug cartels make billions of dollars in profit from the production and distribution of these drugs in the United States, enriching themselves, and allowing them to continue to traffic in drugs and other illicit goods, as well as expand their economic, political, and social influence.[30]  Drug cartels and the professional money launderers who support their illicit drug trafficking activities—including Chinese Money Laundering Organizations (CMLOs)—introduce smuggled and illicitly generated cash into the legitimate financial system, including through MSBs.[31]

 **B.  (U) Anticipated Benefits of the GTO**

(U//FOUO) As discussed above, MSBs along the southwest border are a point of vulnerability in the U.S. financial system.  MSBs are, wittingly and unwittingly, facilitating the movement of funds that finance fentanyl trafficking and the commission of other crimes by drug cartels, including Mexico-based cartels, that threaten the national security of the United States.  Drug cartels based in Mexico and other countries in Central and South America need to repatriate illicitly generated proceeds to benefit from their crimes and remain in business.  FinCEN assesses that cash remittances conducted by MSBs along the southwest border are an important

---

[29] (U) U.S. Drug Enforcement Administration, "National Drug Threat Assessment" (May 2024), p. 1, *available at* https://www.dea.gov/sites/default/files/2025-02/508_5.23.2024%20NDTA-updated.pdf.

[30] (U) Treasury, "2024 National Money Laundering Risk Assessment," (Feb. 2024), pp. 18-24 (describing the major money laundering by DTOs of proceeds generated from the trafficking of illicit synthetic opioids), *available at* https://home.treasury.gov/system/files/136/2024-National-Money-Laundering-Risk-Assessment.pdf; U.S. Drug Enforcement Administration, "National Drug Threat Assessment," (May 2024), pp. 46-50 (describing how DTOs launder profits, providing in part that "The Sinaloa and Jalisco cartels, and other global criminal networks, generate billions of dollars in profits from the sale of illicit drugs"), *available at* https://www.dea.gov/sites/default/files/2024-05/5.23.2024%20NDTA-updated.pdf.

[31] (U) Treasury, "National Money Laundering Risk Assessment" (2024), p. 46 (describing how DTOs launder profits), *available at* https://home.treasury.gov/system/files/136/2024-National-Money-Laundering-Risk-Assessment.pdf.

avenue for this illicit activity, particularly since cartels also engage in bulk cash smuggling along the border, and so collect cash near border crossings.[32]

(U//FOUO) By lowering the CTR threshold, the information reported under this GTO would help Treasury, including FinCEN and its fellow Office of Terrorism and Financial Intelligence components, as well as its law enforcement partners identify cartel-related, money laundering and to conduct targeted investigations and prosecutions of suppliers and facilitators that enable the flow of deadly drugs such as fentanyl into the United States. These additional GTO reports are expected to generate new leads and identify new and related subjects in ongoing cases. For example, the resulting reports may allow the identification of a comprehensive network of potential money mules in the geographic areas in question. They may also create leads related to professional money launderers—operating on behalf of cartels, but also laundering proceeds for whomever will hire them—meaning that any increased monitoring of MSBs would likely capture information about the laundering of funds related to multiple criminal typologies. The GTO would also support investigations into MSBs themselves that may be complicit in supporting illicit activity or demonstrate poor AML/CFT controls.

(U//FOUO) Finally, the parameters of this GTO, in particular the reduced dollar reporting threshold, will help make structuring more difficult, thereby increasing the cost of doing business for cartels. In addition, the GTO will help law enforcement identify cases in which MSBs are used to receive cash from funneled to one location from multiple sources, as with the use of money mules. Each piece of information collected on a CTR form has the potential to augment an investigation, including the transaction date and amount; the name, date of birth, Social Security Number or Taxpayer Identification Number, phone number, email address, occupation, identification number, and account number of the individual and/or entity sending and receiving funds; the location and business at which the transaction took place; and information about the filer.

V.    (U) **Scope of the GTO**

    A. (U) **Covered Geographic Areas**

The GTO will initially cover the following ZIP codes near the U.S.-Mexico border in the states of California and Texas (the "Covered Geographic Area"), which were selected based on risk

---

[32] Homeland Security Investigations, "Issue #57," *Cornerstone* (Oct. 2024), *available at* https://content.govdelivery.com/accounts/USDHS/bulletins/3babbe0; U.S. Drug Enforcement Administration, "National Drug Threat Assessment" (May 2024), p. 49, *available at* https://www.dea.gov/sites/default/files/2025-02/508_5.23.2024%20NDTA-updated.pdf.

factors that include their proximity to the border and to a border crossing, and, based on a FinCEN analysis of CTR filings in 2024, whether the number of CTRs filed in the ZIP code is high relative to the population, in comparison to other ZIP codes. Therefore, GID assesses that these same ZIP codes likely correspond to a large number of cash transactions below the $10,000 threshold, relative to other ZIP codes. While MSBs in Arizona and New Mexico are likely also vulnerable to exploitation by drug cartels, GID chose to keep this GTO limited in scope, focusing on states containing the major U.S.-Mexico border crossings, both to limit burden and to be able to assess trends and effectiveness. However, FinCEN may consider expanding this GTO to ZIP codes in Arizona and New Mexico in the future.

*California*

| Zip Code | Rationale |
|---|---|
| *Imperial County* | |
| 92231 | Borders Mexico; contains significant border crossings – Calexico West and Calexico East Ports of Entry; 1,570 CTRs filed for a population of 39,542, the highest CTR to population ratio in the county. |
| 92249 | 43 CTRs filed for a population of 6,975, the second highest CTR to population ratio in the county. |
| 92281 | 11 CTRs filed for a population of 2,122, the third highest CTR to population ratio in the county. |
| 92283 | Borders Mexico; contains a border crossing – Andrade Port of Entry; 13 CTRs filed for a population of 2,695, the fourth highest CTR to population ratio in the county. |
| *San Diego County* | |
| 91910 | 1,358 CTRs filed for a population of 79,613, the seventh highest CTR to population ratio in the county. |

[33]

| 92101 | 2,142 CTRs filed for a population of 47,505, the fourth highest CTR to population ratio in the county. |
| --- | --- |
| 92113 | 930 CTRs filed for a population of 50,457, the sixth highest CTR to population ratio in the county. |
| 92117 | 1,394 CTRs filed for a population of 51,586, the fifth highest CTR to population ratio in the county. |
| 92126 | 4,752 CTRs filed for a population of 74,788, the third highest CTR to population ratio in the county. |
| 92154 | Borders Mexico; contains a significant border crossing – Otay Mesa Port of Entry; 6,494 CTRs filed for a population of 84,027 the second highest CTR to population ratio in the county. |
| 92173 | Borders Mexico; contains significant border crossings – San Ysidro Port of Entry and Cross Border Xpress; 2,793 CTRs filed for a population of 29,703, the highest CTR to population ratio in the county. |

*Texas*

| ZIP Code | Rationale |
| --- | --- |
| ***Cameron County*** | |
| 78520 | Borders Mexico; contains significant border crossings – Brownsville B&M and Brownsville Gateway; 207 CTRs filed for a population of 64,949, the second highest CTR to population ratio in the county. |
| 78521 | Borders Mexico; contains a significant border crossing – Brownsville-Veterans Port of Entry; 1,164 CTRs filed for a population of 88,708, the highest CTR to population ratio in the county. |
| ***El Paso County*** | |

25-50144.380

| 79901 | Contains significant border crossing – El Paso-PDN Port of Entry; 501 CTRs filed for a population of 10,0127, the fourth highest CTR to population ratio in the county. |
|---|---|
| 79902 | 420 CTRs filed for a population of 20,071, the fifth highest CTR to population ratio in the county. |
| 79903 | 2,414 CTRs filed for a population of 16,425, the highest CTR to population ratio in the county. |
| 79905 | Borders Mexico; contains a significant border crossing – El Paso-Bridge of the Americas Port of Entry; 2,603 CTRs filed for a population of 22,483, the third highest CTR to population ratio in the county. |
| 79907 | Contains a significant border crossing – El Paso Ysleta Port of Entry; 529 CTRs filed for a population of 78,652, the sixth highest CTR to population ratio in the county. |
| 79935 | 2,119 CTRs filed for a population of 17,523, the second highest CTR to population ratio in the county. |
| **_Hidalgo County_** | |
| 78503 | 451 CTRs filed for a population of 23,604, the second highest CTR to population ratio in the county. |
| 78557 | Borders Mexico; contains a significant border crossing – Hidalgo Port of Entry; 1,253 CTRs filed for a population of 13,986, the highest CTR to population ratio in the county. |
| 78572 | 256 CTRs filed for a population of 78,280, the fourth highest CTR to population ratio in the county. |
| 78577 | Borders Mexico; contains a significant border crossing – Pharr Port of Entry; 210 CTRs filed for a population of 79,937, the fifth highest CTR to population ratio in the county. |
| 78596 | 318 CTRs filed for a population of 37,329, the third highest CTR to population ratio in the county. |

| Maverick County | |
|---|---|
| 78852 | Borders Mexico; contains significant border crossings – Eagle Pass I and II Ports of Entry; 25 CTRs filed for a population of 56,712. |
| **Webb County** | |
| 78040 | Borders Mexico; contains significant border crossings – Laredo-World Trade; Laredo Bridge I; Laredo Juarez-Lincoln Ports of Entry; 702 CTRs filed for a population of 36,688, the highest CTR to population ratio in the county. |
| 78041 | Borders Mexico; 534 CTRs filed for a population of 48,491, the second highest CTR to population ratio in the county. |
| 78043 | 364 CTRs filed for a population of 43,473, the third highest CTR to population ratio in the county. |
| 78045 | Borders Mexico; contains a small border crossing – Laredo-Colombia Solidarity Port of Entry; 340 CTRs filed for a population of 65,354, the fourth highest CTR to population ratio in the county. |
| 78046 | 46 CTRs filed for a population of 71,956, the fifth highest CTR to population ratio in the county. |

**B.** (U) **Covered Transactions**

(U//FOUO) The impact of the GTO would be to generally lower the existing threshold for filing CTRs from $10,000 to $200. Under the GTO, a covered Transaction would be any deposit, withdrawal, exchange of currency or other payment or transfer, by, through, or to the Covered Business (defined, here, as an MSB operating in the Covered Geographic Area), which involves a transaction in currency of more than $200 but less than $10,000. Because the GTO, except as noted therein, would not otherwise alter any currently applicable BSA requirement, money services businesses would still be required to file transactions in currency of more than $10,000. The $200 threshold is proposed because it would include nearly all cash transactions vulnerable to abuse by drug cartels through structuring payments to avoid CTRs, while excluding clearly de minimis amounts that are more likely to be legitimate. It would also provide FinCEN with a snapshot in time of a significant sample of cash transactions in the Covered Geographic Areas,

allowing FinCEN to more fully understand the money laundering risks related to MSBs and cross-border cash remittances.

(U//FOUO) The GTO would retain the requirement to aggregate different cash transactions conducted by or on behalf of the same person during a single day, regardless of whether the additional cash transactions occur within the Covered Geographic Areas, but without lowering the $10,000 threshold. Aggregation is meant to detect structured transactions attempting to evade the filing threshold, but GID believes that the $200 filing threshold under the GTO largely negates the risks inherent in aggregation, as it would already capture the majority of cash transactions. Structuring below $200 to evade the requirement would make laundering large amounts of currency at the border more difficult and costly. Not requiring aggregation down to the $200 threshold also would help mitigate burdens on the Covered Businesses, as aggregation is inherently complicated.

(U//FOUO) GID does not expect that the lower reporting threshold will materially affect the flow of legitimate funds, including remittances, between the United States and Mexico. While the GTO would place a higher burden on Covered Businesses due to the increased volume of CTRs that would result, it is merely a reporting obligation and does not alter their obligations with respect to AML/CFT programs. GID does not expect these Covered Businesses to materially alter typical fees charged for cash services, given that the reporting period is temporary, and the Covered Businesses will face continued competition from banks and other financial institutions offering similar services (compared to which the Covered Businesses generally offer lower fees) and from MSBs outside of the Covered Geographic Areas.

(U//FOUO) GID recognizes that, due to its deterrent effect, this GTO may encourage illicit actors to adopt new methods or patterns of activity. FinCEN and its law enforcement partners will monitor shifts in activity, including any decreases in the flow of funds through Covered Businesses and any increases in activity at MSBs in areas near to the counties covered by this GTO. Based on the results of this analysis, FinCEN may expand or otherwise modify the geographic scope of this order to cover MSBs in additional ZIP codes or counties in any future issuances. FinCEN anticipates some illicit actors may change the methods by which they launder money, including by attempting to launder illicit funds through banks over MSBs; FinCEN believes that this may be a benefit of the GTO, as banks have more stringent reporting and recordkeeping obligations than MSBs and would likely inform FinCEN of new suspicious activity.

### C.  (U) **Covered Businesses**

(U//~~FOUO~~) Any person that meets the definition of an MSB operating in the Covered Geographic Areas, as well the subsidiaries and agents of an MSB if such subsidiaries and agents are located in the Covered Geographic Area, would be considered a "Covered Business".  MSBs are required to keep current lists of their agents and, as with other GTOs, MSBs would be responsible for communicating the order's requirements to its agents.

### D.  (U) **Order Period**

(U) To provide the Covered Businesses time to comply with the GTO, the relevant period for the GTO would begin 30 days after the order is published and be in force for 180 days from that date.

### E.  (U) **Analytic Plan**



25-5048.384

## V.  (U) **Conclusion**

(U//FOUO) For the foregoing reasons, GID believes that, by requiring reporting of high-risk cash transactions along the southwest border, the proposed GTO is necessary to carry out the purposes of the BSA.  Accordingly, GID recommends issuing the proposed GTO.

25-50144.385