**No. 25-50481**

## In The
# United States Court of Appeals
### For The Fifth Circuit

TEXAS ASSOCIATION OF MONEY SERVICES BUSINESSES, TAMSB;
NYDIA REGALADO, doing business as BEST RATE EXCHANGE; SAN ISIDRO
MULTI SERVICES, INCORPORATED; MARIO REGALADO, doing business as
BORDER INTERNATIONAL SERVICES; REYNOSA CASA DE CAMBIO,
INCORPORATED; LAREDO INSURANCE SERVICES, L.L.C.; ESPRO
INVESTMENT, L.L.C., doing business as LONESTAR MONEY EXCHANGE;
CRIS WIN, INCORPORATED, doing business as BROWNSVILLE CASA DE
CAMBIO; HIGH VALUE, INCORPORATED; R & C, INCORPORATED, doing
business as TEMEX MONEY EXCHANGE; ARNOLDO GONZALEZ, JR.;
E.MEX. FINANCIAL SERVICES, INCORPORATED,

*Plaintiffs – Appellees / Cross-Appellants*

*v.*

PAMELA BONDI, U.S. ATTORNEY GENERAL; SCOTT BESSENT, Secretary,
U.S. Department of Treasury; UNITED STATES DEPARTMENT OF
TREASURY; ANDREA GACKI, Director of the Financial Crimes
Enforcement Network; FINANCIAL CRIMES ENFORCEMENT NETWORK,

*Defendants – Appellants / Cross-Appellees*

On appeal from the U.S. District Court for the Western District
of Texas, 5:25-cv-344; Hon. Samuel Fred Biery, Jr., District Judge

---

### RESPONSE AND OPENING BRIEF OF CROSS-APPELLANTS

---

[*continued*]

**THE LAW OFFICE OF MARTIN GOLANDO, PLLC**

Martin Golando
2326 W. Magnolia
San Antonio, TX 78201
(210) 471-1185

*Counsel for Cross-Appellants Texas Association for Money Services Businesses (TAMSB); Reynosa Casa De Cambio, Inc.; Nydia Regalado d/b/a Best Rate Exchange; Mario Regalado d/b/a Border International Services; Laredo Insurance Services, LLC; E.Mex. Financial Services, Inc.; R & C, Inc. d/b/a Temex Money Exchange; San Isidro Multi Services, Inc.; Cris Win Inc. d/b/a Brownsville Casa De Cambio; and Espro Investment LLC d/b/a Lonestar Money Exchange*

**INSTITUTE FOR JUSTICE**

Robert Johnson
   *Lead Counsel*
16781 Chagrin Blvd., Suite 256
Shaker Heights, OH 44120
(703) 682-9320

Elizabeth Sanz
Andrew Ward
901 N. Glebe Rd., Suite 900
Arlington, VA 22203
(703) 682-9320

Katrin Marquez
2 S. Biscayne Blvd., Suite 3180
Miami, FL 33131
(305) 721-1600

Jeffrey Rowes
Christen Hebert
816 Congress Ave., Suite 970
Austin, TX 78701
(512) 480-5936

*Counsel for Cross-Appellants Arnoldo Gonzalez, Jr. and High Value, Inc.*

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel for Cross-Appellants certifies that the following listed persons and entities as described in the fourth sentence of 5th Cir. Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

| <u>Appellants</u> | <u>Counsel for Appellants</u> |
|---|---|
| Pamela Bondi,<br>*in her official capacity as* U.S. Attorney General | U.S. DEPARTMENT OF JUSTICE |
| | Brett A. Shumate,<br>Assistant Attorney General |
| Scott Bessent,<br>*in his official capacity as* Secretary of the Treasury | Justin R. Simmons,<br>United States Attorney |
| Andrea Gacki,<br>*in her official capacity as* Director of the Financial Crimes Enforcement Network | Sharon Swingle,<br>Attorney, Appellate Staff |
| | Simon G. Jerome,<br>Attorney, Appellate Staff |
| U.S. Department of the Treasury | Amy E. Powell,<br>Lead counsel below |
| Financial Crimes Enforcement Network | Robert D. Green,<br>Co-counsel below |

*[continued]*

i

| **Cross-Appellants** | **Counsel for Cross-Appellants** |
|---|---|
| Texas Association for Money Services Businesses | LAW OFFICE OF MARTIN GOLANDO |
| Reynosa Casa De Cambio, Inc. | Martin Golando, San Antonio, TX |
| Nydia Regalado, D/B/A Best Rate Exchange | LAW OFFICE OF ROLAND GUTIERREZ |
| Mario Regalado, D/B/A Border International Services | Roland Gutierrez, co-counsel below San Antonio, TX |
| Laredo Insurance Services, LLC | INSTITUTE FOR JUSTICE |
| E.Mex. Financial Services, Inc. | Robert Johnson, Shaker Heights, OH |
| R & C, Inc., D/B/A Temex Money Exchange | Jeffrey Rowes, Austin, TX |
| San Isidro Multi Services, Inc. | Christen Hebert, Austin, TX |
| Brownsville Casa De Cambio | Elizabeth Sanz, Arlington, VA |
| Espro Investment LLC, D/B/A Lonestar Money Exchange | Andrew Ward Arlington, VA |
| High Value, Inc. | Katrin Marquez, Miami, FL |
| Arnoldo Gonzalez, Jr. | |

/s/ Robert Johnson
*Lead Counsel for Cross-Appellants*

## STATEMENT REGARDING ORAL ARGUMENT

This case concerns a sweeping federal surveillance requirement and the guardrails, if any, imposed by the Constitution and the Administrative Procedure Act. Cross-Appellants agree that oral argument would aid the Court in deciding the significant questions presented.

# TABLE OF CONTENTS

**Page**

Certificate of Interested Persons ..................................................i

Statement Regarding Oral Argument .................................... iii

Table of Contents ...............................................................iv

Table of Authorities..........................................................vi

Jurisdictional Statement......................................................1

Statement of Issues ............................................................1

Introduction .......................................................................1

Statement of the Case .........................................................5

    A. Statutory and Regulatory Background ......................5

        1. Currency Transaction Reports .........................5

        2. Money Services Businesses ..............................7

        3. Geographic Targeting Orders...........................8

    B. The Challenged Border GTO....................................12

    C. Plaintiffs' Businesses................................................17

    D. Three Courts Preliminarily Enjoin The Border GTO...............20

        1. Plaintiffs' Suit In The Western District of Texas ..............20

        2. Parallel Litigation In The Southern District of California ........................23

        3. A Third Case, Also In The Western District of Texas........25

    E. Subsequent Developments ......................................25

Summary of Argument ........................................................................ 26

Standard of Review .......................................................................... 29

Argument ........................................................................................ 29

  I.  The Preliminary Injunction Should Be Affirmed. ......................... 29

    A. The Border GTO Is Likely Unlawful. ................................... 29

        1. The Border GTO Likely Violates The Fourth Amendment. ..................................................... 29

        2. The Border GTO Is Likely Arbitrary And Capricious. ...... 42

        3. The Border GTO Likely Required Notice And Comment. ............................................... 52

        4. The Border GTO Is Likely *Ultra Vires*. .............................. 60

    B. Plaintiffs Established That They Would Suffer Irreparable Harms. ................................................. 65

    C. Other Factors Likewise Favor Entry Of A Preliminary Injunction ................................................. 68

  II.  Under The APA, The District Court Should Have Postponed The Effective Date Of The Border GTO. ......................................... 69

Conclusion ...................................................................................... 73

Certificate of Service ....................................................................... 75

Certificate of Compliance ................................................................. 76

# TABLE OF AUTHORITIES

**Page(s)**

<span style="font-variant: small-caps;">CASES</span>

*Aguayo v. U.S. Bank,*
  653 F.3d 912 (9th Cir. 2011)................................................62

*Air Line Pilots Ass'n, Int'l v. Quesada,*
  276 F.2d 892 (2d Cir. 1960) ...............................................60

*Airbnb, Inc. v. City of Boston,*
  386 F. Supp. 3d 113 (D. Mass. 2019)..................................36

*Airbnb, Inc. v. City of New York,*
  373 F. Supp. 3d 467 (S.D.N.Y. 2019)..................................36

*Airlines for Am. v. DOT,*
  110 F.4th 672 (5th Cir. 2024) ................................67, 68, 72

*Ala. Ass'n of Realtors v. HHS,*
  594 U.S. 758 (2021)...............................................................63

*All. for Hippocratic Med. v. FDA,*
  78 F.4th 210 (5th Cir. 2023) ..........................................29, 71

*Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.,*
  878 F.2d 806 (5th Cir. 1989)................................................67

*Am. Airlines, Inc. v. DOT,*
  202 F.3d 788 (5th Cir. 2000)................................................53

*Biden v. Nebraska,*
  600 U.S. 477 (2023).........................................................63, 64

*Billings Clinic v. Azar,*
  901 F.3d 301 (D.C. Cir. 2018) .............................................57

vi

*Braidwood Mgmt., Inc. v. Becerra,*
   104 F.4th 930 (5th Cir. 2024) ........................................... 71

*Burgess v. FDIC,*
   871 F.3d 297 (5th Cir. 2017) ............................................. 67

*Cal. Bankers Ass'n v. Shultz,*
   416 U.S. 21 (1974) ................................................... *passim*

*Career Colls. & Schs. of Tex. v. DOE,*
   98 F.4th 220 (5th Cir. 2024) ............................. 4, 29, 69, 72

*Cargill v. Garland,*
   57 F.4th 447 (5th Cir. 2023) ...................................... 64, 71

*Carpenter v. United States,*
   585 U.S. 296 (2018) ......................................................... 41

*Chamber of Com. v. SEC,*
   85 F.4th 760 (5th Cir. 2023) ............................................ 51

*City of Arlington v. FCC,*
   668 F.3d 229 (5th Cir. 2012) ........................................... 53

*Club Retro, LLC v. Hilton,*
   568 F.3d 181 (5th Cir. 2009) ........................................... 39

*Cmty. Ass'ns Inst. v. Yellen,*
   No. 24-CV-1597, 2024 WL 4571412
   (E.D. Va. Oct. 24, 2024) ................................................. 37

*Data Mktg. P'ship, LP v. DOL,*
   45 F.4th 846 (5th Cir. 2022) ........................................... 43

*Dennis Melancon, Inc. v. City of New Orleans,*
   703 F.3d 262 (5th Cir. 2012) ........................................... 66

*DOL v. Kast Metals Corp.,*
   744 F.2d 1145 (5th Cir. 1984) ..................................... 55, 56

*Donovan v. Lone Steer, Inc.*,
  464 U.S. 408 (1984) ................................................................ 35, 36

*E. Bay Sanctuary Covenant v. Biden*,
  993 F.3d 640 (9th Cir. 2021) ........................................................ 72

*Encino Motorcars, LLC v. Navarro*,
  579 U.S. 211 (2016) ................................................................. 49

*FBME Bank Ltd. v. Lew*,
  125 F. Supp. 3d 109 (D.D.C. 2015) ................................................. 52

*FCC v. Prometheus Radio Project*,
  592 U.S. 414 (2021) .............................................................. 42, 43

*FDA v. R.J. Reynolds Vapor Co.*,
  145 S. Ct. 1984 (2025) .............................................................. 57

*Franciscan All., Inc. v. Becerra*,
  47 F.4th 368 (5th Cir. 2022) ......................................................... 71

*Genuine Parts Co. v. FTC*,
  445 F.2d 1382 (5th Cir. 1971) ....................................................... 55

*In re Clarke*,
  94 F.4th 502 (5th Cir. 2024) ......................................................... 71

*ITServ All., Inc. v. DHS*,
  71 F.4th 1028 (D.C. Cir. 2023) ...................................................... 56

*Jackson Women's Health Org. v. Currier*,
  760 F.3d 448 (5th Cir. 2014) ........................................................ 68

*Lake Carriers' Ass'n v. EPA*,
  652 F.3d 1 (D.C. Cir. 2011) ......................................................... 58

*League of Women Voters of U.S. v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016) ......................................................... 68

*Louisiana v. Biden*,
   55 F.4th 1017 (5th Cir. 2022) ............................................ 29

*Medina Cnty. Env't Action Ass'n v. Surface Transp. Bd.*,
   602 F.3d 687 (5th Cir. 2010) ............................................ 21

*Mexican Gulf Fishing Co. v. Dep't of Com.*,
   60 F.4th 956 (5th Cir. 2023) ............................ 43, 47, 51, 52

*Michigan v. EPA*,
   576 U.S. 743 (2015) ........................................................ 51

*Michigan v. EPA*,
   213 F.3d 663 (D.C. Cir. 2000) .......................................... 56

*Monsanto Co. v. Geertson Seed Farms*,
   561 U.S. 139 (2010) ........................................................ 69

*Nat'l Ass'n for Gun Rights, Inc. v. Garland*,
   741 F. Supp. 3d 569 (N.D. Tex. 2024) .............................. 21

*Neustar, Inc. v. FCC*,
   857 F.3d 886 (D.C. Cir. 2017) .......................................... 56

*Novedades y Servicios, Inc. v. FinCEN*,
   __ F. Supp. 3d __, 2025 WL 1501936
   (S.D. Cal. May 21, 2025) ........................................ *passim*

*NRDC v. EPA*,
   279 F.3d 1180 (9th Cir. 2002) .......................................... 56

*Opulent Life Church v. City of Holly Springs*,
   697 F.3d 279 (5th Cir. 2012) ............................................ 67

*Patel v. City of Los Angeles*,
   576 U.S. 409 (2015) ........................................................ 34

*Patel v. City of Los Angeles*,
   738 F.3d 1058 (9th Cir. 2013) .......................................... 34

*PBGC v. Ouimet Corp.*,
630 F.2d 4 (1st Cir. 1980) ................................................. 62

*Plante v. Gonzalez*,
575 F.2d 1119 (5th Cir. 1978) ......................................... 67

*Pub. Citizen v. EPA*,
343 F.3d 449 (5th Cir. 2003) ........................................... 51

*Rest. L. Ctr. v. DOL*,
120 F.4th 163 (5th Cir. 2024) .................................... 45, 71

*Safari Club Int'l v. Zinke*,
878 F.3d 316 (D.C. Cir. 2017) ......................... 54, 55, 56

*Small Bus. Ass'n of Mich. v. Yellen*,
769 F. Supp. 3d 722 (W.D. Mich. 2025) .................... 37

*Tex. Ass'n of Money Servs. Bus. v. Bondi*,
__ F. Supp. 3d. __, 2025 WL 1540621
(W.D. Tex. May 19, 2025) ................................................. 1

*Tex. Corn Producers v. EPA*,
__ F.4th __, 2025 WL 1741481
(5th Cir. June 24, 2025) .................................................. 70

*Tex. Med. Ass'n v. HHS*,
120 F.4th 494 (5th Cir. 2024) ....................................... 71

*Tex. Med. Ass'n v. HHS*,
110 F.4th 762 (5th Cir. 2024) ....................................... 71

*Texas v. DHS*,
123 F.4th 186 (5th Cir. 2024) ....................................... 65

*Texas v. EPA*,
132 F.4th 808 (5th Cir. 2025) ....................................... 71

*Texas v. United States*,
126 F.4th 392 (5th Cir. 2025) ....................................... 71

*Texas v. United States,*
  809 F.3d 134 (5th Cir. 2015) ....................................................... 26, 60

*Trump v. Casa, Inc.,*
  145 S. Ct. 2540 (2025) ..................................................................... 70

*United States v. Chevron U.S.A., Inc.,*
  186 F.3d 644 (5th Cir. 1999) ............................................................ 38

*United States v. Gratkowski,*
  964 F.3d 307 (5th Cir. 2020) ............................................................ 40

*United States v. Miller,*
  425 U.S. 435 (1976) .......................................................................... 40

*United States v. Morton Salt Co.,*
  338 U.S. 632 (1950) .............................................................. 34, 35, 38

*United States v. Oreira,*
  29 F.3d 185 (5th Cir. 1994) .............................................................. 10

*United States v. Smith,*
  110 F.4th 817 (5th Cir. 2024) ..................................................... 30, 41

*United States v. W.H. Hodges & Co.,*
  533 F.2d 276 (5th Cir. 1976) ............................................................ 55

*Valuta Corp. v. FinCEN,*
  No. 25-CV-191, 2025 WL 2389430
  (W.D. Tex. June 24, 2025) ...................................................... *passim*

*W & T Offshore, Inc. v. Bernhardt,*
  946 F.3d 227 (5th Cir. 2019) ............................................................ 54

*Wages & White Lion Invs., LLC v. FDA,*
  16 F.4th 1130 (5th Cir. 2021) ........................................................... 67

*Yesler Terrace Cmty. Council v. Cisneros,*
  37 F.3d 442 (9th Cir. 1994) .............................................................. 55

## CODES AND STATUTES

5 U.S.C.
§ 551(6) ............................................................................... 8
§ 551(7) ............................................................................... 8
§ 552(a)(1)(D) ................................................................... 63
§ 552(a)(2)(A) ................................................................... 63
§ 553(b) ............................................................................. 52
§ 553(c) ............................................................................. 52
§ 559 ................................................................................. 58
§ 705 ........................................................... 28, 29, 71, 72
§ 706 ........................................................... 43, 70, 71, 72

21 U.S.C. § 811 ......................................................................... 58

26 U.S.C. § 6103 ...................................................................... 31

28 U.S.C. § 1292(a)(1) .............................................................. 1

31 U.S.C.
§ 310 ................................................................................... 5
§ 310(b)(2)(C) .................................................................... 5
§ 5311 .................................................................. 27, 42, 44
§ 5313 .......................................................................... 5, 8
§ 5313(a) ........................................................................... 61
§ 5326 ....................................................................... *passim*
§ 5326(c) ...................................................................... 9, 62
§ 5326(d) ............................................................................ 9

42 U.S.C. § 7407(d)(2)(B) ...................................................... 58

Pub. L. 100-690, 102 Stat. 4181 (1988) ................................... 8

## RULES AND REGULATIONS

16 C.F.R. § 313.3(k)(1) ........................................................... 39

31 C.F.R.
§ 1010.100(ff)............................................................. 7, 12
§ 1010.100(t)(3) ............................................................. 7
§ 1010.306(a)(3) ............................................................. 5
§ 1010.311 .................................................................. 5, 7
§ 1010.370 ...................................................................... 9
§ 1010.370(b) .................................................................. 9
§ 1010.370(c)(6) ............................................................ 12
§ 1010.410(e) .................................................................. 8
§ 1010.415(a) .................................................................. 8
§ 1010.821 .................................................................... 13
§ 1022.210 ...................................................................... 7
§ 1022.320 ...................................................................... 7
§ 1022.320(a)(2) ............................................................. 8
§ 1022.380 ...................................................................... 7
§ 1022.410(b)(3) ............................................................. 8

Fed. R. App. P. 4(a)(3) ................................................... 1

**FEDERAL REGISTER PUBLICATIONS**

37 Fed. Reg. 6912 (Apr. 5, 1972) .............................................. 5

54 Fed. Reg. 33675 (Aug. 16, 1989) ....................................... 9, 10, 12, 48

64 Fed. Reg. 45438 (Aug. 20, 1999) ........................................ 7

85 Fed. Reg. 29022 (May 14, 2020) ............................... 6, 37, 51

89 Fed. Reg. 70258 (Aug. 29, 2024) ...................................... 11

90 Fed. Reg. 12106 (Mar. 14, 2025) ........................... 12, 13, 17, 37

**OTHER AUTHORITIES**

FinCEN, *Frequently Asked Questions*
(Mar. 24, 2025), https://perma.cc/FWE2-KJBJ ................................. 13

FinCEN, *Press Release*
(Oct. 15, 2024), https://perma.cc/RM3M-KGVR .............................. 11

FinCEN, *Press Release*
(Oct. 10, 2024), https://perma.cc/87VB-HBGB ..................................13

FinCEN, *Press Release*
(July 27, 2016), https://perma.cc/JTG6-SGV7 ..................................11

FinCEN, *Press Release*
(Apr. 21, 2015), https://perma.cc/UN9S-4HH8 ..................................11

FinCEN, *Press Release*
(Oct. 2, 2014), https://perma.cc/Z4SD-MPXU ..................................11

FinCEN, *Year in Review for FY 2023*
(2024), https://perma.cc/LB4Z-BJX9 ......................................................6

GAO, *Currency Transaction Reports: Improvements Could Reduce
Filer Burden While Still Providing Useful Information to Law
Enforcement* (Dec. 2024), https://perma.cc/FLL5-3CKB .................6, 7

House Select Subcommittee on the Weaponization of the Federal
Government, Interim Staff Report, *Financial Surveillance in the
United States: How the Federal Government Weaponized the
Bank Secrecy Act to Spy on Americans* (Dec. 6, 2024),
https://perma.cc/LBJ9-6FY9 .................................................................2

Press Release, House Oversight Committee, *Comer Investigates
Apparent Politically Motivated Debanking of Thirty Tech
Founders, First Lady Melania Trump* (Jan. 24, 2025),
https://perma.cc/B2KN-CS9V ...........................................................11

Testimony of Treasury Under Secretary to House Committee on
Banking and Financial Services (June 11, 1998),
https://perma.cc/Z4XC-94PY ............................................................10

## JURISDICTIONAL STATEMENT

Plaintiffs add to the government's statement that Plaintiffs timely noticed a cross-appeal on June 25, 2025. ROA.1608; *see* Fed. R. App. P. 4(a)(3). This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF ISSUES

Plaintiffs add to the government's statement an alternative ground for relief that was raised but not reached below: Whether the challenged agency action is likely *ultra vires*.

Plaintiffs' cross-appeal raises this issue: Given that Plaintiffs' claims arise under the Administrative Procedure Act, which allows a court to postpone the effective date of agency action generally, did the district court err by limiting relief to ten specific businesses?

## INTRODUCTION

Reading the opening brief, you might think the district court inexplicably enjoined a routine reporting requirement. But there is nothing routine about this dragnet general warrant, which is why three separate district courts found it likely unlawful. *See Tex. Ass'n of Money Servs. Bus. v. Bondi,* __ F. Supp. 3d. __, 2025 WL 1540621 (W.D. Tex. May 19, 2025); *Novedades y Servicios, Inc. v. FinCEN,* __ F. Supp. 3d __,

2025 WL 1501936 (S.D. Cal. May 21, 2025); *Valuta Corp. v. FinCEN*, No. 25-CV-191, 2025 WL 2389430 (W.D. Tex. June 24, 2025).

For years, the Financial Crimes Enforcement Network ("FinCEN") has subjected Americans' financial transactions to ever-increasing surveillance.[1] The action here marks a dramatic escalation, as FinCEN lowered the cash transaction reporting threshold from $10,000 to $200 for money services businesses in thirty zip codes. That is a reduction of ***98 percent***. Plaintiffs are subject to that requirement because they provide ordinary financial services—primarily currency exchange (trading dollars for pesos, and vice versa) but also check cashing and money transfers—to working-class customers who often lack bank accounts. The upshot is that Plaintiffs must report reams of everyday transactions to federal law enforcement, as FinCEN is treating both Plaintiffs and their customers as criminally suspect without any warrant or probable cause.

---

[1] *See generally* House Select Subcommittee on the Weaponization of the Federal Government, Interim Staff Report, *Financial Surveillance in the United States: How the Federal Government Weaponized the Bank Secrecy Act to Spy on Americans* (Dec. 6, 2024), https://perma.cc/LBJ9-6FY9 (detailing the "decaying state of Americans' financial privacy").

FinCEN has explained that its goal is to capture "nearly all cash transactions vulnerable to abuse," while "excluding clearly de minimis amounts," ROA.382, and that the resulting information will "generate new leads and identify new and related subjects in ongoing cases," ROA.378. In briefing below, FinCEN was even more explicit: It is seeking a "*full picture of MSB activity* in the region" to "generate analysis and information about *previously unsuspected money laundering*." ROA.840-41 (emphasis added). An information demand that seeks a "full picture" of activity at a business, to uncover "previously unsuspected" crimes, is a general warrant.

The government's general warrant is also a paperwork nightmare. By FinCEN's own estimate, for non-bank businesses without sophisticated automatic processing systems, each of these forms takes an average of 24 minutes. Given the volume of transactions, one small business with just three locations estimated it would take *1,645 hours per month* to file all the reports. ROA.310-11 ¶ 9. Mistakes filling out all that paperwork could lead to significant penalties.

It is far from clear that these costs will yield benefits. Nothing in the record explains how (for instance) FinCEN thinks a cartel would

launder funds by exchanging $201 in currency or cashing a $201 check, or, even if covered transactions could be abused, why cartels could not just transact in other zip codes. Only innocent businesses and customers will be caught in the dragnet.

After hearing from five witnesses (and considering declarations from six others), the district court correctly issued a preliminary injunction. The government's surveillance dragnet violates the Fourth Amendment as a general warrant; is arbitrary and capricious, as FinCEN has not adequately explained its decision to impose these extraordinary reporting burdens; and is a substantive rule that was issued without notice-and-comment. As another judge concluded, in parallel proceedings, it is also *ultra vires*.

Indeed, the only error was that the district court did not go far enough. The district court limited relief to these Plaintiffs, even though, in Administrative Procedure Act cases like this one, "[r]elief should not be party restricted." *Career Colls. & Schs. of Tex. v. DOE*, 98 F.4th 220, 255 (5th Cir. 2024).

## STATEMENT OF THE CASE

### A.     Statutory and Regulatory Background

### 1.     Currency Transaction Reports

The Bank Secrecy Act of 1970 authorizes the Treasury Secretary to require "a domestic financial institution" to file reports on cash transactions "in an amount, denomination, or amount and denomination, or under circumstances the Secretary prescribes by regulation." 31 U.S.C. § 5313. In 1972, after notice-and-comment, the Treasury Secretary issued a rule requiring reports on cash transactions over $10,000—referred to as "Currency Transaction Reports" or "CTRs." *See* 37 Fed. Reg. 6912 (Apr. 5, 1972) (codified at 31 C.F.R. § 1010.311).

CTRs are filed with FinCEN, which is a bureau within the Treasury Department. *See* 31 C.F.R. § 1010.306(a)(3); 31 U.S.C. § 310. Federal law directs FinCEN to "[a]nalyze and disseminate" reports to "identify possible criminal activity" and to "support ongoing criminal financial investigations and prosecutions." 31 U.S.C. § 310(b)(2)(C). FinCEN maintains a searchable database of CTRs, and it provides access to local, state, federal, and foreign law enforcement. ROA.1245-46 ¶¶ 24-27.

To comply with the Paperwork Reduction Act, FinCEN has estimated how long it takes to file a CTR. *See* 85 Fed. Reg. 29022 (May 14, 2020). FinCEN estimated eight minutes per CTR, but that is an average that includes large financial institutions (like Chase and Citibank) using automated processes. *Id.* at 29029. FinCEN estimated that non-bank filers without automated processes take twenty-four minutes. *Id.*

Because the $10,000 threshold has never been adjusted for inflation, the number of CTRs has ballooned, with FinCEN receiving over 20 million in 2023 alone. *See* FinCEN, *Year in Review for FY 2023*, at 3 (2024), https://perma.cc/LB4Z-BJX9. Most go unread: A report from the Government Accountability Office found that, from 2014 through 2023, "[l]aw enforcement agencies accessed a small percentage." GAO, *Currency Transaction Reports: Improvements Could Reduce Filer Burden While Still Providing Useful Information to Law Enforcement*, at 1 (Dec. 2024), https://perma.cc/FLL5-3CKB. If the $10,000 threshold were adjusted for inflation it would be over $72,000 today, and raising the threshold to that level would reduce the number of CTRs by at least 90 percent. *Id.* In response, FinCEN agreed with the report's

recommendation to reduce the number of CTRs "such as by raising the reporting threshold." *Id.* at 57. But that has not happened.

### 2.   Money Services Businesses

In 1999, again after notice and comment, FinCEN issued a rule defining a category of businesses subject to the Bank Secrecy Act called "money services businesses." 64 Fed. Reg. 45438 (Aug. 20, 1999). The definition of Money Services Business (or "MSB") includes businesses that offer currency exchange, check cashing, and money transfers. 31 C.F.R. § 1010.100(ff).

Money Services Businesses are required to file CTRs for cash transactions over $10,000. *See* 31 C.F.R. § 1010.311; *id.* § 1010.100(t)(3). And they are subject to other obligations under the Bank Secrecy Act regime. They are required to register with FinCEN. *See* 31 C.F.R. § 1022.380. They must maintain an effective anti-money laundering program. *Id.* § 1022.210. And, like banks and other financial institutions, they must report suspicious transactions—including transactions structured to evade the CTR requirement. *See id.* § 1022.320.

Still, MSBs conduct many transactions without reporting or even recording any customer information. *See, e.g.*, ROA.301-02 ¶ 11; 1860:6-

11; 1935:15-19. For currency exchange, FinCEN does not require MSBs to **record** customer information unless the transaction is over $1,000. 31 C.F.R. § 1022.410(b)(3). For other MSB transactions, the threshold is $3,000. *Id.* § 1010.410(e), .415(a). Even then, these thresholds are for recordkeeping, not reporting. Except for transactions that trigger the obligation to report suspicious activity, transactions need not be **reported** to FinCEN unless they are over $10,000.[2]

### 3.     Geographic Targeting Orders

While the Bank Secrecy Act provision authorizing CTRs directs the Treasury Secretary to act "by regulation," 31 U.S.C. § 5313, Congress in 1988 enacted another provision authorizing the Treasury Secretary to require reports by "order," Pub. L. 100-690, tit. VI, § 6185(c), 102 Stat. 4181, 4355 (1988).[3]

Specifically, the Treasury Secretary may "issue an order requiring any domestic financial institution or nonfinancial trade or business or group of domestic financial institutions or nonfinancial trades or

---

[2] Even the requirement to report suspicious transactions applies only to transactions that involve more than $2,000. *See* 31 C.F.R. § 1022.320(a)(2).

[3] The APA defines the term "order" as the "final disposition … in a matter other than a rule making," and defines "adjudication" as "agency process for the formulation of an order." 5 U.S.C. § 551(6), (7).

businesses in a geographic area" to collect information and file reports on financial transactions. 31 U.S.C. § 5326. By law, these orders are presumptively confidential. *Id.* § 5326(c). Orders expire after 180 days but can be renewed. *Id.* § 5326(d). Although the phrase does not appear in the statute, these orders have come to be referred to as "geographic targeting orders" or "GTOs."

In 1989, the Treasury Department promulgated regulations for the issuance of GTOs. *See* 54 Fed. Reg. 33675 (Aug. 16, 1989) (codified at 31 C.F.R. § 1010.370). The regulations provide that an "order … shall be directed to the Chief Executive Officer" of the targeted business and should require reports of transactions "by, through or to such financial institution specified in the order." 31 C.F.R. § 1010.370(b).

In the accompanying release, Treasury explained how it expected GTOs would work. After selecting a geographic area (which could range from "a few city blocks" to "a major metropolitan area"), the agency would "identify the affected financial institution or institutions in the geographic area that would receive the targeting order." 54 Fed. Reg. at 33675. "[G]eographic targeting orders would not be published in the Federal Register, but would be issued only to the affected financial

institutions," generally by "certified or registered mail, return receipt requested." *Id.* at 33676-77.[4] The agency also spelled out why GTOs are presumptively confidential: "[O]nce criminals learn of the enhanced reporting requirements and where they are applicable, criminals merely will move on to another non-targeted branch." *Id.* at 33678.

Consistent with this rulemaking, early GTOs involved investigations into specific businesses and specific potential wrongdoing. For instance, in 1991, a business was targeted after an informant heard conversations about money laundering. *See United States v. Oreira*, 29 F.3d 185, 187 (5th Cir. 1994). Later in the 1990s, FinCEN issued a GTO directing twelve money transmitting businesses in New York City to report on transactions wiring money to Colombia—*after* investigations produced evidence that the businesses had funneled around $800 million to Colombia in a single year.[5]

---

[4] Treasury would also "contact the institution a few days after" and would "make every effort to work with the targeted financial institutions to ensure maximum compliance … at a minimum burden." 54 Fed. Reg. at 33676. Overall, Treasury expected a typical GTO would cover only around 250 transactions per institution per year—or around 120 hours of paperwork burdens. *Id.* at 33678.

[5] *See Novedades*, 2025 WL 1501936, at *16; *see also* ROA.1351-53 ¶¶ 4-11; Testimony of Treasury Under Secretary to House Committee on Banking and Financial Services (June 11, 1998), https://perma.cc/Z4XC-94PY. The GTO later expanded to cover an additional 10 businesses. *Id.*

Over time, FinCEN's use of GTOs has become more aggressive.[6]

Most notably, beginning in 2016, FinCEN issued successive GTOs

requiring title insurance companies to report the identities of cash buyers

of residential properties. That GTO first applied in New York City and

Miami, but FinCEN broadened the scope with successive renewals,

eventually covering dozens of cities in fourteen states and D.C.[7] The

process of expansion culminated in a rulemaking that (beginning

December 2025) will apply the reporting requirement nationwide. *See*

89 Fed. Reg. 70258 (Aug. 29, 2024).[8]

---

[6] A 2014 GTO in Los Angeles targeted "nearly every business in the Fashion District"—some 2,000 entities ranging from lingerie stores to flower shops. FinCEN, *Press Release* (Oct. 2, 2014), https://perma.cc/Z4SD-MPXU. The next year, FinCEN targeted around 700 electronics-exporting businesses in Miami to "shed light on cash transactions that may be tied to trade-based money laundering." FinCEN, *Press Release* (Apr. 21, 2015), https://perma.cc/UN9S-4HH8.

[7] *See* FinCEN, *Press Release* (July 27, 2016), https://perma.cc/JTG6-SGV7; FinCEN, *Press Release* (Oct. 15, 2024), https://perma.cc/RM3M-KGVR.

[8] FinCEN's view of its authority has grown in other ways as well. For instance, a recent investigation by the House Subcommittee on the Weaponization of the Federal Government detailed how FinCEN, "without any specific evidence of particularized criminal conduct," compelled banks to report supposedly-suspicious transactions involving legal (but FinCEN-disfavored) activities like shopping at Dick's Sporting Goods and Bass Pro Shop, buying firearms and religious texts, and "taking trips for 'no apparent legitimate reason.'" *Financial Surveillance in the United States*, *supra* note 1, at 3015-17. Concerns have also been raised about how financial surveillance can lead banks to close accounts of targeted individuals—a phenomenon known as "debanking." *See* Press Release, House Oversight Committee, *Comer Investigates Apparent Politically Motivated Debanking of Thirty Tech Founders, First Lady Melania Trump* (Jan. 24, 2025), https://perma.cc/B2KN-CS9V.

## B.    The Challenged Border GTO

FinCEN issued the GTO at issue—the Border GTO—on March 14, 2025. *See Issuance of a Geographic Targeting Order Imposing Additional Recordkeeping and Reporting Requirements on Certain Money Services Businesses Along the Southwest Border*, 90 Fed. Reg. 12106 (Mar. 14, 2025). Contrary to the statutory presumption that GTOs are confidential—and contrary to the agency's earlier expectation that GTOs "would not be published in the Federal Register," 54 Fed. Reg. at 33676—the Border GTO was published in the Federal Register. Also contrary to Treasury's initial expectations, *id.* at 33677, affected businesses did not receive ***any*** individualized notice.[9]

Rather than target specific businesses, the Border GTO defines a ***category*** of "Covered Businesses": any "money services business, as defined in 31 C.F.R. § 1010.100(ff), located in the Covered Geographic Area." 90 Fed. Reg. at 12107. The "Covered Geographic Area" consists of 30 zip codes along the border in California and Texas. *Id.* The zip codes

---

[9] *See* ROA.1856:20-1857:8, 1918:12-17, 1822:21-24, 1889:20-1890:4. Nor, as the 1989 release anticipated, did anyone from FinCEN reach out to targeted businesses to help minimize the burden. 54 Fed. Reg. at 33676. And, although Treasury regulations provide that GTOs should include the name of a "Treasury official to be contacted," 31 C.F.R. § 1010.370(c)(6), the "contact" identified in the Border GTO was "the FinCEN at *https://www.fincen.gov/contact*," 90 Fed. Reg. at 12108.

are not contiguous, and some are surrounded by untargeted zip codes. *See* ROA.331-38 (maps). For "Covered Businesses" in the "Covered Geographic Area," the Border GTO lowers the CTR threshold from $10,000 to $200. 90 Fed. Reg. at 12107.

The Border GTO states that Covered Businesses "may be liable, without limitation, for civil and criminal penalties for violating any of the terms of this Order." 90 Fed. Reg. at 12108. FinCEN issued "FAQs" clarifying that penalties for willful violations are $71,545 per transaction. FinCEN, *Frequently Asked Questions* 8 (Mar. 24, 2025) (citing 31 C.F.R. § 1010.821), https://perma.cc/FWE2-KJBJ. Even negligent violations trigger per-violation penalties of $1,430, which could add up quickly across hundreds or thousands of transactions. *See* 31 C.F.R. § 1010.821. Under these same penalty provisions, banks are routinely assessed civil penalties of hundreds of millions—or even billions—of dollars for BSA reporting lapses.[10]

After this lawsuit was filed, the government produced an internal memorandum containing its rationale for the Border GTO. *See* ROA.370.

---

[10] *See* FinCEN, *Press Release* (Oct. 10, 2024), https://perma.cc/87VB-HBGB ($1.3 billion penalty for BSA reporting failures including late-filed CTRs).

The memo is dated "March XX," so it is impossible to tell whether it was finalized before or after the March 14 publication of the Border GTO—or if it was ever finalized at all. ROA.370*; see also Novedades*, 2025 WL 1501936, at *18 n.4.[11] The government has also produced an "administrative record" that consists of the documents cited in the March XX Memo. *See* ROA.387-809, 1443-1502.

In the March XX Memo, FinCEN admits that the purpose of lowering the reporting threshold is to cast a much wider net for criminal investigations by generating CTRs for everything except "clearly de minimis amounts." ROA.382. By gathering much more information, the Border GTO will supposedly "generate new leads and identify new and related subjects in ongoing cases." ROA.378. It may "create leads related to professional money launderers," "support investigations into MSBs themselves," and "capture information about the laundering of funds related to multiple criminal typologies." ROA.378.

The March XX Memo acknowledges that "most of the business that MSBs conduct is legitimate and essential." ROA.373. Services offered by

---

[11] A "Clearance Sheet" shows the memo was "[d]rafted" in February 2025; but the date the memo was "[c]leared" by FinCEN's "Principal Deputy Assistant General Council [sic]," as well as the date it was "[a]pproved" by Director Gacki, are listed as "MM/DD/YY." ROA.386.

MSBs are "tailored to persons without bank accounts," and MSBs in the targeted zip codes provide "competitively priced services and convenient location[s] offered near the border." ROA.375.

The March XX Memo nevertheless asserts without citation that "MSBs along the southwest border are particularly at risk for abuse by money launderers for cartels." ROA.374. The March XX Memo does not, however, explain how transactions like exchanging $201 worth of pesos for dollars (or vice versa) could be used to launder funds, or, assuming such services are used for money laundering, why cartels could not just engage in transactions outside the covered zip codes.

Far from supporting the Border GTO, the sources cited in the March XX Memo detail many *unrelated* ways that cartels launder funds. According to one source, "it would take approximately 2,564 deposits of the average $390 remittance to move a million dollars across the border." ROA.526. So, instead, cartels launder funds using a "vast network of Chinese money launderers," ROA.526, "trade-based money laundering," ROA.582, "cryptocurrency exchanges," ROA.582, "bulk cash smuggling," ROA.582, and "money mules" who are "used to create shell companies to open business bank accounts," ROA.421. The cited sources

also discuss unlicensed money services businesses—underground entities that would not be captured by the Border GTO. ROA.465-66. When the cited sources do mention money laundering through licensed MSBs, they were in Ohio, Georgia, Missouri, and Utah. ROA.639-41, 757, 773. The one cited case involving an MSB in California was in Oakland— approximately five hundred miles from the border. ROA.1443.

The March XX Memo explains that—rather than selecting zip codes based on concrete information about money laundering—FinCEN selected zip codes "based on risk factors that include their proximity to the border and to a border crossing, and, based on a FinCEN analysis of CTR filings in 2024, whether the number of CTRs filed in the ZIP code is high relative to the population." ROA.378-79. In other words, zip codes were selected for the **$200** reporting requirement based on their number of **over-$10,000** transactions. ROA.379. Those over-$10,000 transactions often occurred just dozens of times. *See* ROA.382 (zip code was targeted because it had "46 CTRs filed for a population of 71,956"); ROA.379 ("11 CTRs"); ROA.380 ("207 CTRs"); ROA.381 ("210 CTRs"); ROA.382 ("25 CTRs"). FinCEN did not analyze whether the over-$10,000 transactions

16

were illegitimate. Nor did it explain what over-$10,000 transactions have to do with small-dollar reporting.

The Border GTO expires on September 9, 2025. 90 Fed. Reg. at 12107. But, as discussed, other GTOs have been repeatedly renewed and expanded, and the March XX Memo contemplates that the agency "may consider expanding this GTO to ZIP codes in Arizona and New Mexico in the future." ROA.379.

### C.    Plaintiffs' Businesses

Plaintiffs are ten businesses subject to the Border GTO, the trade association in which they are members, and one individual manager of one of the businesses who also uses its services.

The plaintiff businesses are regulated as MSBs because they provide currency exchange. Currency exchange is an essential and common service along the border, where "[f]amilies go back and forth, relatives go shopping, and tourists also cross the border frequently." ROA.1541. Typical customers are "local people, people who live close in the area," "construction workers," and "blue collar people." ROA.1810:21-23. Some plaintiff businesses offer additional non-bank financial

services, including check cashing, ROA.317, 326, and money transfers, ROA.326.

Plaintiff businesses range in size, but all are small. The smallest, High Value, operates a single location five blocks from the International Bridge in Laredo. ROA.1541. High Value is open 24/7 and has only one cashier on duty at a time. ROA.215. The only service that High Value provides is exchanging dollars to pesos, and vice versa. ROA.1541. The same is true of San Isidro Multi-Services, a three-location family business with its main operation, a 24/7 drive-thru currency exchange, near the International Bridge in Hidalgo. ROA.1760:12-1762:11. On the larger side, Reynosa Casa de Cambio is a family-owned-and-operated business that has been serving border communities for nearly 50 years, ROA.1836:15-19, and that provides currency exchange, check cashing, and money transmission in six covered zip codes, ROA.326 ¶¶ 4-5.[12]

The Border GTO would subject these businesses to, as the district court found, an "explosion of paperwork." ROA.1542. Plaintiff Reynosa,

---

[12] *See also, e.g.*, ROA.314 ¶¶ 4-5 (Border International Services offers currency exchange in three covered zip codes); ROA.317 ¶¶ 4-5 (Espro Investments LLC offers currency exchange and check cashing in two covered zip codes); ROA.320 ¶¶ 4-5 (Best Rate Exchange offers currency exchange in four covered zip codes); ROA.1433 ¶¶ 4-5 (Brownsville Casa de Cambio offers currency exchange in one covered zip code).

for example, typically "files about 30 CTRs per month," but, after the GTO, faces "***6,000 to 7,000 CTRs per month***." ROA.1541 (emphasis added). Reynosa's chief compliance officer testified that this paperwork would be "[i]nsurmountable." ROA.1854:21-1855:3. Other businesses testified to similar burdens, which vary based only on their size. For instance, High Value, the smallest business, would face an estimated ***eight to ten hours per day*** of added paperwork, ROA.1200 ¶ 18, which the manager described as "impossible"—stating that, absent an injunction, "we're going to have to close." ROA.1879:11-14; *see, e.g.*, ROA.315, 321, 324 (similar burdens on other businesses).

Because the Border GTO applies to thirty zip codes—and there are other nearby zip codes not covered—customers can take their business elsewhere. When Reynosa started requiring CTR information from customers, it lost "about 50-percent [of customers] in these two days." ROA.1855:18-1856:5. Customers "did not want to wait in long lines or give their personal information when exchanging such a small amount of currency, particularly given that identity theft is increasing so much." ROA.1541. *See also* ROA.1771:6-1772:1 (same at another business); ROA.1540 (testimony that check cashers "have an apprehension about

giving … a clerk at a gas station their Social Security number"). Lost customers, of course, mean lost revenue. ROA.1540.

On top of this, Plaintiffs object to being roped into the government's surveillance dragnet. *See, e.g.*, ROA.306 ("[T]he Border GTO makes High Value turn over customers' private information to the federal government when [it] does not suspect High Value's customers of any crime … mak[ing] High Value a sort of spy on High Value's customers on behalf of the federal government."); ROA.327 ("The Border GTO forces us to collect information on our customers that we would not otherwise collect and to report information to the federal government that we would not otherwise report.").

### D.    Three Courts Preliminarily Enjoin The Border GTO

Three sets of plaintiffs sued to challenge the Border GTO, and three district judges entered preliminary relief.

#### 1.    Plaintiffs' Suit In The Western District of Texas

Plaintiff TAMSB, the Texas Association for Money Services Businesses, filed this case in the Western District of Texas on April 1, 2025, two weeks before the effective date. ROA.19. Judge Biery entered a temporary restraining order on April 11. ROA.194. Plaintiffs amended

the Complaint to add TAMSB's ten member companies and individual Plaintiff Arnoldo Gonzalez as parties. ROA.197. Plaintiffs moved for a preliminary injunction, and Judge Biery held an evidentiary hearing on May 12. Judge Biery orally granted the motion at the hearing and, on May 19, entered a written decision. ROA.1503.[13]

Judge Biery first held Plaintiffs likely to succeed under the Fourth Amendment. ROA.1521-25. Judge Biery distinguished the government's primary authority, *California Bankers Ass'n v. Shultz*, 416 U.S. 21 (1974), which "upheld [the] uniform, nationwide requirement to report cash transactions over $10,000," noting that the Border GTO "is not uniform across the country and instead targets particular MSBs and imposes special reporting burdens on all but *de minimis* transactions." ROA.1522-23. The Border GTO "intrudes on most transactions and thus is not reasonable." ROA.1523. Further, the district court also found (after

---

[13] Judge Biery also granted a motion to supplement the administrative record with the testimony and evidence from the hearing, reasoning that supplementation was appropriate because the record was generated without public input. ROA.1517 (citing *Nat'l Ass'n for Gun Rights, Inc. v. Garland*, 741 F. Supp. 3d 569, 600 (N.D. Tex. 2024), *appeal docketed*, No. 24-10707 (5th Cir. Aug. 6, 2024)); *see also Medina Cnty. Env't Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 706 (5th Cir. 2010). The opening brief does not challenge that aspect of Judge Biery's decision.

hearing testimony from affected businesses) that the government's demands are unduly burdensome. ROA.1524.

Judge Biery next held Plaintiffs likely to succeed on their claim that the Border GTO required notice-and-comment. ROA.1527-29. Notice-and-comment is required for rulemaking, and FinCEN "announced a 'rule' applicable to broad classes of unspecified individuals" rather than issuing a GTO "to specific parties as part of a specific investigation under specific facts." ROA.1529.

Finally, Judge Biery held Plaintiffs likely to succeed on their claim that the Border GTO is arbitrary and capricious. ROA.1530-34. Judge Biery noted, "[w]ithin the statutes and regulations relied upon by the Government the word 'reasonable' is used several times." ROA.1504. Yet FinCEN did not adequately explain why it was adopting this sweeping reporting requirement. Among other things, the "Government does not attempt to justify the immense burden Plaintiffs have shown the GTO will likely impose," ROA.1531; there is no logical link between a high number of over-$10,000 transactions in a zip code and transactions as low as $201, ROA.1533; and "FinCEN itself relies on sources that say the GTO will be ineffective but ignores them," ROA.1534.

Judge Biery also acknowledged, but did not reach, Plaintiffs' claim that the Border GTO is *ultra vires*. ROA.1535.

Judge Biery found that other equitable factors—including the risk of irreparable harm—likewise favored relief. ROA.1535-36. "[T]he Court heard that MSBs are being crushed by the cost of compliance, facing significant losses and incurring dozens of extra hours of labor per day." ROA.1536. Judge Biery also recounted testimony that customers would take their business elsewhere, to non-covered businesses or jurisdictions, rather than turn over their personal information. ROA.1535.

Lastly, Judge Biery limited relief to the members of TAMSB. Judge Biery acknowledged Plaintiffs' argument that the APA authorizes broader relief, ROA.1537, but he nonetheless limited relief "subject to the forthcoming opinion by the Supreme Court in *Trump v. Casa, Inc.*, No. 24A884, regarding universal injunctions." ROA.1537.

## 2. Parallel Litigation In The Southern District of California

A second case challenging the Border GTO was filed on April 15, 2025, in the Southern District of California. *See Novedades y Servicios v. FinCEN*, __ F. Supp. 3d __, 2025 WL 1501936 (S.D. Cal. May 21, 2025). The plaintiffs in that case are an MSB located in a covered zip code in

San Diego that provides check cashing, money transfers, and money orders, as well as its owner, who uses its services. *Id.* at *4.

Judge Sammartino issued a TRO and preliminary injunction. *See id.* at *5, *26. She found the plaintiffs likely to succeed on three grounds: Like Judge Biery, Judge Sammartino found that the Border GTO likely required notice-and-comment, *id.* at *17, and is likely arbitrary and capricious, *id.* at *18-22. Addressing an issue that Plaintiffs also raised in this case, but that Judge Biery did not reach, Judge Sammartino also found the Border GTO likely *ultra vires. Id.* at *8, *10-17. Judge Sammartino interpreted the "plain language" of Section 5326, the statute FinCEN invoked here, and found that "Congress has authorized FinCEN to utilize GTOs as limited, investigatory tools directed to an identifiable business or group of businesses based on particularized facts," which the Border GTO is not. *Id.* at *10.

Judge Sammartino's preliminary injunction covers all MSBs located in the Southern District of California. She declined the government's request to limit relief to just the parties before her, explaining that "the APA expressly departs from [the] background rule" that relief must be party-specific. *Id.* at *26. At the same time, Judge

Sammartino stated that "the Court will limit relief to within its jurisdiction" to allow for percolation in parallel litigation. *Id.*

### 3. A Third Case, Also In The Western District of Texas

The third case challenging the Border GTO was filed on May 30, 2025, in the Western District of Texas. *See Valuta Corp. v. FinCEN*, No. 25-CV-191, 2025 WL 2389430 (W.D. Tex. June 24, 2025). The plaintiffs in that case are two MSBs in covered zip codes in El Paso. The owners of both businesses testified at the preliminary injunction hearing before Judge Biery, submitted declarations to Judge Sammartino, and filed their own case after the first two courts entered relief that did not reach their businesses. Judge Schydlower entered a TRO by written order, and, on July 22, entered a preliminary injunction for the named plaintiffs. Judge Schydlower's written PI decision is forthcoming.

### E. Subsequent Developments

Almost a month after Judge Biery issued his written decision on the preliminary injunction, the government noticed this appeal. Plaintiffs cross-appealed the proper scope of preliminary relief. The government also appealed the preliminary injunction in California to the Ninth Circuit. *See* No. 25-4238 (9th Cir.). Both this case and the California case

have been stayed in the district courts pending appeal. The plaintiffs in the third district court case have moved for summary judgment, and proceedings there continue.

## SUMMARY OF ARGUMENT

**I.A.** The government's appeal focuses on likelihood of success on the merits, but the district court correctly found Plaintiffs likely to succeed on three separate grounds. Plus, this Court can also affirm on a fourth ground that Plaintiffs raised below (although Judge Biery did not reach it) and that Judge Sammartino relied upon in parallel litigation. *See Texas v. United States*, 809 F.3d 134, 178 (5th Cir. 2015) (court can affirm preliminary injunction "on any grounds supported by the record").

**1.** First, the Border GTO is a general warrant that likely violates the Fourth Amendment. The government's primary case, *California Bankers Ass'n v. Shultz*, 416 U.S. 21 (1974), establishes that financial reporting requirements must be "reasonable" and "limited in nature," and a requirement that a business report everything not *de minimis*, without any particularized need or focus, is not reasonable. To the contrary—as the district court found after an evidentiary hearing—the government's demands are unduly burdensome.

**2.** Second, the Border GTO is arbitrary and capricious. FinCEN was required to explain why it had "reasonable grounds" to think this information was "necessary," 31 U.S.C. § 5326, and "highly useful," *id.* § 5311, but instead it asked for everything it might ever want on the theory that everything will include something. The agency also did not meaningfully consider costs and benefits: It did not explain why the Border GTO will yield any benefits (when cartels can move to other zip codes), much less benefits that justify the costs.

**3.** Third, the Border GTO required notice-and-comment. Under general administrative law principles, the Border GTO is a rule because it demands information from a category of businesses (MSBs) rather than from identified businesses based on particularized facts. The government invites the Court to disregard general principles on the theory that Congress authorized it to act by "order." But the statute authorizes FinCEN to act by order, not by a rule that it calls an order.

**4.** Finally, for similar reasons, the Border GTO is *ultra vires*. The statute's use of the word "order" indicates that Congress authorized limited requests for information directed to specific businesses based on particularized facts, not this type of sweeping surveillance dragnet. This

conclusion is confirmed by other aspects of the statute—including the presumption of confidentiality, which is fundamentally inconsistent with the Border GTO's rule-like command. Interpreting the statute this way brings it into line with traditional agency subpoena practice and, as a result, lessens the Fourth Amendment concerns.

**B.** As for the other equitable factors: Judge Biery correctly found that Plaintiffs established irreparable injury, and the government does not meaningfully contest that finding. **C.** Other factors favor Plaintiffs, too, as Plaintiffs' concrete injuries vastly outweigh the government's speculation about potential future investigations.

**II.** There is, however, one respect in which the district court erred. Although the Border GTO is unlawful across the board, the district court limited relief to Plaintiffs. Limits on non-party relief do not apply in Administrative Procedure Act cases like this, as this Court's decisions make clear. Under Section 705 of the APA and this Court's on-point law, the district court should have delayed the Border GTO's effective date writ large.

## STANDARD OF REVIEW

This Court reviews the grant of a preliminary injunction for abuse of discretion, "reviewing findings of fact for clear error and conclusions of law *de novo*." *Louisiana v. Biden*, 55 F.4th 1017, 1022 (5th Cir. 2022). The same standards apply to stays under Section 705 of the APA. *See All. for Hippocratic Med. v. FDA*, 78 F.4th 210, 256 (5th Cir. 2023), *rev'd on other grounds*, 602 U.S. 367 (2024); *accord Career Colls. & Schs. of Tex. v. DOE*, 98 F.4th 220, 255-56 (5th Cir. 2024).

## ARGUMENT

## I.    The Preliminary Injunction Should Be Affirmed.

### A.    The Border GTO Is Likely Unlawful.

#### 1.    The Border GTO Likely Violates The Fourth Amendment.

FinCEN has itself stated that the Border GTO is targeted to gather information on everything happening at these businesses that is not "clearly de minimis," ROA.382, and that it expects the resulting information will "generate new leads and identify new and related subjects in ongoing cases," ROA.378; *see also* ROA.840-41 ("full picture" to uncover "previously unsuspected money laundering"). In other words, FinCEN wants to know ***everything*** of substance that happens at the

targeted businesses, so that it can uncover criminal wrongdoing. In the process, FinCEN is treating everyone who uses these businesses as potential criminals: Its dragnet will sweep up "waiters or waitresses and construction workers and teachers," ROA.1915:15-20, and transactions that involve the monetary equivalent of a shopping cart of groceries. This is "the exact sort of 'general, exploratory rummaging' that the Fourth Amendment was designed to prevent." *United States v. Smith*, 110 F.4th 817, 837 (5th Cir. 2024) (citation omitted).

a.   The Interest Of The Businesses.

As to the Fourth Amendment interests of the MSBs themselves, the government argues its surveillance dragnet is a routine "statutory or regulatory reporting requirement," Op. Br. 18, "of which there are thousands," *id.* at 19 (cleaned up). But the government cites nothing remotely like the Border GTO, and none of its cases support this invasive and burdensome general warrant.

The various reporting requirements cited by the government (*see* Op. Br. 19) highlight the extraordinary privacy invasion here. The government compares the Border GTO to a tax return, but, while tax returns are obviously invasive, even tax returns do not require

businesses to gather and report details on every (non-*de minimis*) transaction. Tax returns are also collected to verify regulatory compliance, not for the purpose of law enforcement surveillance, and are governed by strict confidentiality rules. *See* 26 U.S.C. § 6103. Meanwhile, reports of political expenditures (in addition to being subject to all manner of constitutional challenges) are made available to the public in the name of transparency, not collected in a law enforcement database. And employment verification is collected by employers and not necessarily reported at all. The government's reliance on such examples is telling. The Border GTO's requirement to report all non-*de minimis* transactions is unprecedented.

The government also invokes the over-$10,000 CTR requirement, but that requirement likewise does not apply to every non-*de minimis* transaction at a business. The Supreme Court's decision upholding the $10,000 threshold, *Cal. Bankers Ass'n v. Shultz*, 416 U.S. 21 (1974), shows why that matters. *Shultz* stated that the relevant question was whether the reporting requirement was "reasonable," including whether the "information is sufficiently described and **limited in nature**." *Id.* at 67 (emphasis added). And *Shultz* found that standard satisfied because

the $10,000 threshold—equivalent to $70,000 after inflation—limited reporting to "abnormally large transactions in currency." *Id.*; *see also id.* at 78 (Powell, J., concurring) (relying on $10,000 threshold and stating that "[a] significant extension of the regulations' reporting requirements, however, would pose substantial and difficult constitutional questions").[14] By contrast, the Border GTO's $200 threshold would be equal to about $30 in 1974. It is designed to intrude on ***most*** transactions, not just abnormally large ones. The shift from "abnormally large" to not "clearly de minimis" (ROA.382) renders the Border GTO unreasonable.

The government has much to say about *Shultz*, but most of it focuses on other aspects of the decision. The government focuses on its interest in fighting cartels (Op. Br. 15-16), the asserted relevance of the information demanded (*id.* at 16-17), and its assertion that it has sufficiently defined the information required (*id.* at 17). But when it comes to the word "limited," it offers only *ipse dixit*: "To be sure, a lower dollar threshold means the Order applies to a greater number of transactions than the $10,000 reporting requirement. But that does not

---

[14] Justice Powell's concurrence was joined by Justice Blackmun. 416 U.S. at 78. With three Justices dissenting, *see id.* at 79, 91, 93, the concurring Justices provided necessary votes for the decision.

change the fact that the information to be obtained is limited[.]" *Id.* at 17.

The government's circular reasoning exposes the breadth of its position.

In the government's apparent view—so long as it invokes a legitimate

law enforcement interest—it could equally demand information on $50

transactions, or $5 transactions, or ***all*** transactions. That is not what

*Shultz* says.

Even the parts of *Shultz* that the government emphasizes do not

help it. The Supreme Court viewed the reporting requirement in *Shultz*

as "relevant" and "sufficiently described" precisely because it focused on

"abnormally large transactions." 416 U.S. at 67; *see also id.* at 38

("Congress recognized the importance of reports of large and unusual

currency transactions in ferreting out criminal activity."). Here, by

contrast, FinCEN seeks to gather information about routine transactions

without any regard to whether they are especially vulnerable to money

laundering (or vulnerable at all). For example, how would a cartel

conceivably launder funds by converting pesos to dollars in $201

increments? Or cashing $201 checks? The government never says. It just

wants to know everything not trivial—a classic general warrant.

The government reads *Shultz* for the proposition that it can hoover up information without individualized suspicion because its demand is "uniform," thereby avoiding "concern regarding the potential for arbitrary invasions of privacy." Op. Br. 18 (marks and citation omitted). But that only points to another key distinction with *Shultz*, as the Border GTO is decidedly ***not*** uniform and instead targets a type of business in thirty zip codes. As the district court explained, *see* ROA.1522, the Border GTO's unique combination of breadth and specificity is part of what makes it a general warrant. The government wants to know most everything—without individualized suspicion—but only for a certain type of business in a certain area. That creates precisely the risk of arbitrary enforcement the Fourth Amendment is designed to prevent. *See Patel v. City of Los Angeles*, 738 F.3d 1058, 1064 (9th Cir. 2013), *aff'd*, 576 U.S. 409 (2015).[15]

The government's other key case, *United States v. Morton Salt Co.*, 338 U.S. 632 (1950), involves a non-uniform information demand, but, as the district court recognized, also supports Plaintiffs' position. *See*

---

[15] Indeed, as explained *infra* Part I.A.2, there is more than "potential" for arbitrariness. The Border GTO is arbitrary to the extreme.

ROA.1523. *Morton Salt* addressed an FTC order directing 20 companies and a trade association to file reports verifying compliance with a prior cease-and-desist order. 338 U.S. at 634-36. The Court upheld the information demand because it was sufficiently related to the FTC's need to ensure compliance with its prior orders, but the Court also explained that authority to require reports is limited by the Fourth Amendment— which "is not confined literally to searches and seizures as such, but extends as well to the orderly taking [of information] under compulsion of process." *Id.* at 651-52. The Court emphasized that "a governmental investigation into corporate matters may be of ***such a sweeping nature*** and so ***unrelated to the matter properly under inquiry*** as to exceed the investigatory power." *Id.* at 652 (emphases added). The Border GTO is precisely such a "sweeping" demand.

Viewed through the lens of *Morton Salt*, one way to think about the Border GTO is as a staggeringly overbroad subpoena for corporate records. Applying the Fourth Amendment, the Supreme Court has held that a subpoena for corporate records must be "sufficiently limited in scope, relevant in purpose, and specific in directive so that compliance will not be unreasonably burdensome." *Donovan v. Lone Steer, Inc.*,

464 U.S. 408, 415 (1984). The Border GTO fails that standard because it is not limited in scope, is not relevant to any specific need for information relative to these businesses, and is unduly burdensome. It is not targeted and is, instead, a general warrant.

A district court adopted this framing in *Airbnb, Inc. v. City of New York*, 373 F. Supp. 3d 467, 472, 474-75 (S.D.N.Y. 2019), which applied the Fourth Amendment to grant a preliminary injunction against an ordinance that required short-term rental companies to file "monthly transaction reports" with "voluminous data regarding customers who use their platforms." *Airbnb* analogized that bulk reporting requirement to an overbroad subpoena, explaining that, unlike a typical subpoena, the reporting obligation "applies across-the-board" without individualized suspicion. *Id.* at 491. The court explained that, historically, "[a]n attempt … to compel an entire industry monthly to copy and produce its records as to all local customers would have been unthinkable under the Fourth Amendment." *Id.* at 494; *see also Airbnb, Inc. v. City of Boston*, 386 F. Supp. 3d 113, 125 (D. Mass. 2019) (similar). Yet that's exactly what is happening here. To Plaintiffs' knowledge, *Airbnb* is the only case that involves a reporting requirement anywhere near as broad as the Border

GTO, and that requirement was likely unconstitutional. The government, by contrast, has offered no case upholding such a broad reporting command.[16]

Under the standards for agency subpoenas, the Border GTO is also unreasonable because it is immensely burdensome. At the preliminary injunction hearing, witnesses described an "explosion in paperwork," ROA.1542, with increases like 0 CTRs ever filed to 500 in less than a month, ROA.1541; 1-2 a month to nearly 3,300 a month, ROA.1540; 10 a month to 1,500 a month, ROA.1542; and 30 a month to 6,000 to 7,000 a month, ROA.1541. Each of those, by FinCEN's own estimate, demands 24 minutes away from running the business. 85 Fed. Reg. at 29029.[17] Unsurprisingly, one small-business owner testified to working until 2:00 a.m. to deal with a backlog of 700 CTRs. ROA.1542. That is not

---

[16] A district court also applied similar reasoning to strike down another FinCEN initiative—the Corporate Transparency Act—under the Fourth Amendment. *See Small Bus. Ass'n of Mich. v. Yellen*, 769 F. Supp. 3d 722, 735-37 (W.D. Mich. 2025), *appeal docketed*, No. 25-1438 (6th Cir. May 2, 2025); *but see Cmty. Ass'ns Inst. v. Yellen*, No. 24-CV-1597, 2024 WL 4571412, at *9 (E.D. Va. Oct. 24, 2024) (rejecting Fourth Amendment challenge). The reporting here—encompassing every non-*de minimis* transaction—is even more intrusive than the CTA, which required new corporate entities to file reports detailing their ownership structure. In March 2025, FinCEN revoked the CTA and adopted a revised reporting requirement limited to foreign entities. *See* 90 Fed. Reg. 13688 (Mar. 26, 2025).

[17] The first-hand testimony reflected similar numbers. ROA.1769:12-19 (45 minutes), ROA.1816:10-14 (13 to 15 minutes), ROA.1854:7-18 (20 to 25 minutes), ROA.1894:22-23 (15 minutes), ROA.1910:3-5 (20 minutes).

reasonable, particularly given the lack of individualized suspicion to justify such demands.

The district court expressly found the Border GTO unduly burdensome after an evidentiary hearing, *see* ROA.1524, and the government does not (and cannot) dispute that finding of fact. It also concedes, as it must, that burden "may figure into" reasonableness. Op. Br. 20. So it instead argues that "*Shultz* and *Morton Salt* make clear that [burden] is a secondary consideration." *Id.* This argument, however, misreads those cases, which focused on things other than burden not because burden is unimportant, but because the burden was minimal.[18] By contrast, in cases that do concern burden, the Fourth Amendment is violated when "compliance threatens to unduly disrupt or seriously hinder normal operations of a business." *United States v. Chevron U.S.A., Inc.*, 186 F.3d 644, 649 (5th Cir. 1999). Which is exactly what the district court found. ROA.1542.[19]

---

[18] In *Shultz* the only fact about burden was that Bank of America had about 0.2% less profit because of the required reporting—unsurprising for abnormally large transactions that are by definition uncommon. 416 U.S. at 50 n.22. In *Morton Salt*, the affected businesses did not even argue that the reporting was unreasonably burdensome. 338 U.S. at 653.

[19] The government gestures at—but does not invoke—the Fourth Amendment's "pervasively regulated" doctrine when it refers to MSBs in passing as "heavily regulated." Op. Br. 16. That doctrine does not apply because "the government may

b.    The Interest Of Customers.

As the district court recognized, ROA.1524, the Border GTO also forces targeted businesses to intrude on the privacy of customers. *See, e.g.*, ROA.306, 327. This includes Plaintiff Gonzalez, who uses his MSB to get pesos to pay his doctor in Mexico and does not want to be "under the microscope" because of those transactions. ROA.1541-42.[20] And it includes all the other customers—"construction workers," ROA.1810:22, "waiters or waitresses," ROA.1915:19, "[t]ourists and local people," ROA.1877:21, and "working class people," ROA.1915:20—who are treated as suspect by the government's indiscriminate dragnet.

The government argues that customers have no relevant privacy interest under the third-party doctrine, as a customer "willingly cedes a limited subset of his personal information to a regulated business." Op. Br. 22. But that is factually incorrect: The disclosure required by the Border GTO is not "willing." The record shows that MSBs normally conduct many transactions subject to the Border GTO without collecting

---

not use an administrative inspection scheme to search for criminal violations." *Club Retro, LLC v. Hilton*, 568 F.3d 181, 197-98 (5th Cir. 2009) (citation omitted).

[20] There is no real question that customers have a legitimate expectation of privacy in these records of their ordinary, everyday financial transactions. This expectation is reflected in federal law, which protects the privacy of the transactions. *See* 16 C.F.R. § 313.3(k)(1).

*any* customer information; for instance, while federal law requires MSBs to record customer information for currency exchanges over $1,000, MSBs frequently exchange amounts below $1,000 without collecting any information. *See supra* p. 7-8; *see also* ROA.304 ¶¶ 23; ROA.307 ¶¶ 39-42; ROA.1891:5-13, 1903:8-16. The same is true of other MSB transactions, which typically only require recordkeeping for amounts over $3,000. *See supra* p. 7-8; *see also* ROA.1811:1-1812:18, 1833:1-4.

The compulsory nature of this disclosure distinguishes the government's cases. In *United States v. Miller*, 425 U.S. 435, 442 (1976), the Court relied on the fact that "[a]ll of the documents obtained, including financial statements and deposit slips, contain only information voluntarily conveyed to the banks." Similarly, *United States v. Gratkowski*, 964 F.3d 307, 311-12 (5th Cir. 2020), cited the "voluntariness of the exposure" in holding that a customer did not have a privacy interest in information on the public blockchain or in a financial institution's records. Even *Shultz* relied on the fact that—when it came to over-$10,000 reporting—the information required was generally "information the bank as a party to the transaction already possesses or would acquire in its own interest." 416 U.S. at 67. And that makes sense:

40

The information a bank would normally require from a customer to engage in an over-$10,000 cash transaction is significantly different from the amount of information that a non-bank MSB would normally require to (for instance) change a small amount of pesos for dollars.

The government seemingly reads *Miller* as a blank check authorizing demands for "transaction-related records." But, to the contrary, the Supreme Court has warned that courts should not "uncritically extend" *Miller* to "novel" contexts. *Carpenter v. United States*, 585 U.S. 296, 309, 319 (2018). And this Court has not hesitated to invalidate modern equivalents of general warrants; it did so just last year for geofence searches in *Smith*, 110 F.4th at 836, explaining that, even with a warrant, the government cannot search "everything or everyone in sight." The Border GTO is just such a general warrant, demanding to know everything of any substance that customers do at a particular type of business. It treats every customer and MSB as a potential criminal without individualized suspicion. That general warrant violates the Fourth Amendment rights of both businesses and customers.

## 2.    The Border GTO Is Likely Arbitrary And Capricious.

Judge Biery—along with Judges Sammartino and Schydlower—also correctly found the Border GTO likely arbitrary and capricious. ROA.1504; *Novedades*, 2025 WL 1501936, at *18-22; *Valuta*, 2025 WL 2389430, at *1. As Judge Biery noted, "[w]ithin the statutes and regulations relied on by the Government the word 'reasonable' is used several times." ROA.1504. "The primary prerequisite is that the Secretary find '***reasonable grounds***' to conclude 'that additional recordkeeping and reporting requirements are ***necessary*** to carry out the purposes of' the BSA, 'or to prevent evasions thereof.'" ROA.1507 (quoting 31 U.S.C. § 5326) (emphases added). The relevant statutory "purposes" include generating records that would be "***highly useful***" for law enforcement. ROA.1507 (quoting 31 U.S.C. § 5311) (emphasis added). The agency's decision—finding these statutory prerequisites met—was not "reasonable and reasonably explained." ROA.1530 (citing *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)).

The government responds that whether the Border GTO makes sense is a "policy decision[]" for the agency. Op. Br. 33. True enough. But the problem for the government is that the agency's resolution of that

question cannot be arbitrary and capricious. *See* 5 U.S.C. § 706. Take, for instance, *Mexican Gulf Fishing Co. v. Dep't of Com.*, 60 F.4th 956, 961 (5th Cir. 2023), where plaintiffs brought both Fourth Amendment and APA challenges to a rule requiring fishing boats to report GPS location data. The Court found the rule arbitrary and capricious, and, in doing so, explained that "too much deference would essentially allow the Government to bury its head in the sand." *Id.* at 973.

The Border GTO cannot survive APA review. Its purpose is supposedly to fight "Mexican drug cartels." ROA.370. But FinCEN came up with an arbitrary solution, failed to reasonably answer glaring questions about whether the Border GTO would actually be highly useful, and failed to reasonably explain how the speculative benefits could offset the obvious costs. The government largely argues that FinCEN said *something*—but that is not the same as "reasonably explained the decision." *Prometheus Radio Project*, 592 U.S. at 423.[21]

---

[21] Given the March XX date on memo justifying the Border GTO, ROA.370-86, it is not even clear that the memo can properly be considered. *See Data Mktg. P'ship, LP v. DOL*, 45 F.4th 846, 856 (5th Cir. 2022) (agency cannot rely on "*post hoc*" rationales); *see also Novedades*, 2025 WL 1501936, at *18 n.4.

a.   <u>The Border GTO's Scope Is Arbitrary.</u>

To start, what are the "reasonable grounds" to believe that information about **these** transactions, at **these** businesses, in **these** zip codes is "necessary" to serve the purpose of the BSA, much less that such information would be "highly useful"? *See* 31 U.S.C. §§ 5311, 5326. The agency failed to articulate any reasonable explanation.

The Border GTO demands information about everyday transactions at these businesses. But why? There is no finding that all such transactions are vulnerable to money laundering. To the contrary, as Judge Biery points out, "The Court has never seen nor heard of a case of money laundering from pesos to dollars." ROA.1505. Similarly, is check cashing a typical route for money laundering? The record does not suggest it. Yet both are caught in the dragnet.

The choice of the $200 threshold is similarly arbitrary and unexplained. The March XX Memo reasons that the $200 threshold will capture "nearly all cash transactions vulnerable to abuse by drug cartels through structuring payments to avoid CTRs, while excluding clearly de minimis amounts that are more likely to be legitimate." ROA.382. In other words, by asking for essentially everything, FinCEN is bound to

find something. Such reasoning cannot be squared with the statute's use of the words "reasonable" and "necessary," much less "highly useful." After all, "by that logic, any dollar amount less than $10,000 would pass muster," and such reasoning "provides no limiting principle or mechanism for understanding when a reporting threshold goes so low as to be counterproductive." *Novedades*, 2025 WL 1501936, at *40; *see also Rest. L. Ctr. v. DOL*, 120 F.4th 163, 176 (5th Cir. 2024). The agency also offers no analysis whatsoever of what portion of these records—if any— will actually be useful. *See* ROA.1530. The agency was bound to explain why it needed these records, and it did not satisfy that obligation just by saying that it was asking for everything it could possibly want.

The choice of zip codes, meanwhile, is an inexplicable checkerboard. *See* ROA.332-38 (maps showing various targeted zip codes with unaffected zip codes in between or adjacent). Essentially, FinCEN looked at counties near major border crossings in California and Texas and chose zip codes based on criteria like "sixth highest CTR to population ratio" in the county (that's **county**, not country). ROA.380, 378-79. FinCEN never explains why such a "ratio" would reveal anything about the need for the Border GTO. *See* ROA.1513 ("The Court fails to see the

logic or the connection between the alleged high number of $10,000 CTRs to $200 transactions being connected to money laundering."). There is no finding that these over-$10,000 transactions are illegitimate, and there is no explanation why over-$10,000 transactions would suggest a need for information about over-$200 transactions.

The government protests that the Border GTO will eventually yield the missing justification: "[I]t is not reasonable to expect FinCEN to have relevant data on hand, when the very purpose of the Order was to collect information about illicit transactions." Op. Br. 34. But—in addition to highlighting the Fourth Amendment problem—that gets the agency's statutory obligation precisely backwards. The agency must have "reasonable grounds" to find records "necessary" *before* it asks for them; it cannot ask for records on the supposition that they will eventually supply the "reasonable grounds."

Alternatively, the government briefly asserts that the administrative record *does* contain evidence supporting its choice of transactions, businesses, and zip codes. But, to the contrary, the administrative record exposes a fundamental disconnect between the problem to be addressed and the solution adopted: The two pages of the

March XX Memo that the government repeatedly cites, ROA.374-75, rely on citations about electronic remittances and money transfers to China. *See also* ROA.1534 (district court discussing the same). And the record evidence that does involve MSBs involves MSBs far from the border. ROA.639-41, 757, 773, 1443; *see also* ROA.1533.[22] Yet FinCEN has decided to target MSBs that are physically located near the border, and to target a broad variety of transactions beyond remittances. Why? The agency never really explains.

      b.   <u>There Is No Reasoned Explanation Of Benefits.</u>

FinCEN also failed to explain its way through two obvious reasons the Border GTO will not work. Without addressing these issues, FinCEN could not explain why there are "reasonable grounds" to think the Border GTO is "necessary." And, without addressing these issues, FinCEN also could not adequately consider "the costs and benefits associated with the regulation." *Mexican Gulf Fishing*, 60 F.4th at 973 (holding that

---

[22] For instance, FinCEN's evidence for its statement that "MSBs along the southwest border are an important avenue for this illicit activity" consists of (1) a Homeland Security blog post about electronic transfers sent from anywhere directly into Mexico and (2) a page of a DEA report about bulk-cash smuggling that does not mention MSBs. ROA.378 n.32.

consideration of costs and benefits is necessary to "satisfy minimum standards of rationality" (citation omitted)).

The first problem with the Border GTO is that its checkerboard coverage makes evasion trivial. As the judge in one parallel case noted, in some areas a cartel member could avoid the Border GTO by crossing the street. *Valuta*, 2025 WL 2389430, at *1; *see also* ROA.332-33, 335-36, 338 (maps of targeted zip codes). Testimony in the record explains that "someone can drive for two or three minutes … and go to a location where the GTO doesn't apply" and that "people do, in fact, drive a few minutes to a different location." ROA.1772:14-21.

This problem is not just self-evident; it used to be the government's own view. When the Treasury Department first explained how GTOs would work, it said that they would be confidential because "once criminals learn of the enhanced reporting requirements and where they are applicable, criminals merely will move on to another non-targeted branch." 54 Fed. Reg. at 33678. Here, those criminals are (in FinCEN's own description) "transnational criminal organizations," ROA.500, that "adapt rapidly to changes in the regulatory … environment," ROA.507. In other words, FinCEN is targeting cartels capable of using virtual

currencies to buy fentanyl precursors from China, ROA.507, yet assuming they will not leave the zip code.

The government says it addressed this issue, but cites just a single sentence of the March XX Memo stating that FinCEN will keep an eye on things. *See* Op. Br. 32 (quoting statement, at ROA.383, that FinCEN will "monitor shifts in activity"). Notably, this discussion does not acknowledge FinCEN's prior position on the issue of evasion, in the 1989 rule release, even though an agency "must at least display awareness that it is changing position and show that there are good reasons for the new policy." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (quotation marks omitted). This statement also raises many more questions than it answers. Most notably, how will FinCEN "monitor" shifts in activity, if activity shifts to areas where the Border GTO is not in effect? The agency never says.

Second, FinCEN has not shown it can act on the extra reports. Again, FinCEN's own statements affirmatively disprove it. FinCEN gets 20 million CTRs each year; law enforcement only looks at a small portion even at the $10,000 level; and FinCEN's official position is that it wants fewer CTRs. *See supra* p. 6; *see also* ROA.1218-20. Yet the Border GTO

will result in a flood of CTRs for even smaller-dollar amounts. Under the circumstances, FinCEN needed a real explanation why these reports would be any different than the hundreds of millions it has already ignored. *See* ROA.1218-20.[23]

The government now says it addressed the "use of the data" because the March XX memo contains an "Analytic Plan." Op. Br. 32. But the plan is not in the record, and the government never says what it consists of. The agency's position amounts to: Trust us, we have a plan. Under the APA, that is not enough.

### c.   There Is No Reasoned Explanation Of The Costs.

It is bad enough that benefits are speculative, but, as Judge Biery recognized, FinCEN also offered no reasoned analysis of compliance costs. ROA.195.

The March XX Memo's discussion of costs reads, in full: "While the GTO would place a higher burden on Covered Businesses due to the increased volume of CTRs that would result, it is merely a reporting

---

[23] For this reason, a former FinCEN official has submitted a declaration predicting that the Border GTO will "result in more BSA Reports, that are less useful to law enforcement, while increasing burdens on financial institutions." ROA.1251 ¶ 45. As noted *infra* Part I.A.3, this is the type of objection that would have been raised if the agency had allowed notice-and-comment.

obligation and does not alter their obligations with respect to [anti-money-laundering] programs." ROA.383. Merely? Again, not according to FinCEN's own information. FinCEN's own most recent estimate is that, for small businesses without sophisticated software, each CTR takes 24 minutes to complete. 85 Fed. Reg. at 29029. FinCEN also knows that a $200 threshold is well below the $390 average remittance transaction at MSBs. ROA.526. So FinCEN should have known that it was imposing hours of new compliance burdens daily.

The government responds that requiring consideration of costs imposes "procedural requirements with no basis in the APA." Op. Br. 33. Not so. As this Court held, in *Mexican Gulf Fishing*, agency action is arbitrary and capricious if the agency "failed to consider an important aspect of the problem," and "[t]his includes, of course, considering the costs and benefits." 60 F.4th at 973 (citing, in part, *Michigan v. EPA*, 576 U.S. 743, 751 (2015)). Consideration of costs and benefits is, the Court held, necessary to "satisfy minimum standards of rationality." *Id.* (quoting *Pub. Citizen v. EPA*, 343 F.3d 449, 455 (5th Cir. 2003)); *see also Chamber of Com. v. SEC*, 85 F.4th 760, 777 (5th Cir. 2023).

Finally, this failure to weigh costs against benefits is particularly egregious given the agency's failure to consider viable alternatives—including beginning with an incremental change, rather than dropping the reporting threshold by 98 percent in one fell swoop. *See Novedades*, 2025 WL 1501936, at \*22; *see also FBME Bank Ltd. v. Lew*, 125 F. Supp. 3d 109, 125 (D.D.C. 2015) (finding, in another context, that FinCEN's "failure to explain its consideration of potentially viable alternatives appears to have run afoul of the APA").

In sum, FinCEN did not adequately assess costs, did not adequately assess benefits, and did not explain why the benefits were worth the costs. That puts the case on all fours with *Mexican Gulf Fishing*, where the "insignificant benefits [did] not bear a rational relationship to the serious financial and privacy costs imposed." 60 F.4th at 973.

### 3.    The Border GTO Likely Required Notice And Comment.

Judge Biery—and Judge Sammartino—also correctly found the Border GTO likely unlawful because it was promulgated without notice-and-comment. ROA.1529; *see also Novedades*, 2025 WL 1501936, at \*17. The APA requires notice-and-comment for rules, *see* 5 U.S.C. §§ 553(b), (c), and the Border GTO is in substance a rule. Moreover, had notice-and-

comment been allowed, businesses could have raised all the concerns that (as discussed above) render the Border GTO arbitrary and capricious.

The government responds that there was "no need to resort to the general principles distinguishing rulemaking from adjudication" because the provision under which it issued the Border GTO (31 U.S.C. § 5326) alters those principles. Op. Br. 29. Below, Plaintiffs first start with the general principles the government would have the Court disregard and, second, explain why Section 5326 does not change them.

> a. Under Ordinary APA Principles, The Border GTO Is A Rule.

The APA requires notice and comment for rules, but not orders; the difference between the two is that "rulemaking affects the rights of broad classes of unspecified individuals," whereas an order is a product of adjudication, which typically "resolve[s] disputes among specific individuals in specific cases." *City of Arlington v. FCC*, 668 F.3d 229, 242 (5th Cir. 2012), *aff'd,* 569 U.S. 290 (2013).[24]

---

[24] While different types of agency adjudications follow different types of procedures, a common throughline is that agency adjudication generally must provide for notice and an opportunity to be heard. *See, e.g.*, *Am. Airlines, Inc. v. DOT*, 202 F.3d 788, 797 (5th Cir. 2000). For informational demands, like agency subpoenas, that opportunity to be heard generally comes in the form of pre-compliance review. FinCEN provided no such procedure here.

Judge Biery correctly held that the Border GTO is likely a rule, not an order, as FinCEN "did not adjudicate a 'concrete dispute' between 'specific individuals' and issue an 'order' in their case with an 'immediate effect' on them alone," and instead "announced a 'rule' applicable to broad classes of unspecified individuals that has 'legal consequences only for the future.'" ROA.1529. The type of subpoena-like informational demand that FinCEN anticipated in its earlier 1989 rule release, *see supra* p. 9-10, would be an order: A specific demand for information directed to particular companies, based on particular facts and a particularized need for information. But the Border GTO is something different. It does not address a particular company or companies based on particular facts, and, instead, imposes new reporting obligations on businesses that meet a regulatory definition ("MSBs").

Numerous cases support this conclusion. For instance, in *W & T Offshore, Inc. v. Bernhardt*, 946 F.3d 227 (5th Cir. 2019), agency action was a rule (even though the agency labeled it an "order") because it involved the "creation and uniform application of a new methodology." 946 F.3d at 237, 239. Likewise, in *Safari Club International v. Zinke*, a "determination" about importing ivory was a "rule" because it "applied to

all potential imports of sport-hunted elephant trophies from Zimbabwe" and did not "adjudicate any dispute between specific parties." 878 F.3d 316, 333 (D.C. Cir. 2017); *see also Yesler Terrace Cmty. Council v. Cisneros*, 37 F.3d 442, 448 (9th Cir. 1994) (agency action was a rule because it "affected the rights of a broad category of individuals not yet identified").

The government cites *United States v. W.H. Hodges & Co.*, 533 F.2d 276 (5th Cir. 1976), but that case confirms the point. The request for information there was an order, not a rule, because it was directed to specific companies based on a particularized need; the order directed 38 companies to provide information "in the course of an investigation of rates charged by stockyard marketing agencies in Louisiana." *Id.* at 278; *see also Genuine Parts Co. v. FTC*, 445 F.2d 1382, 1391 (5th Cir. 1971) (request for information related to investigation into specific company). This Court addressed *W.H. Hodges* in a later case and explained that the mere fact that agency action seeks information does not make it an order. *See DOL v. Kast Metals Corp.*, 744 F.2d 1145, 1149-50 & n.4 (5th Cir. 1984) ("information-gathering can be the result of a rule"). Thus, in *Kast*, an agency action that set out "criteria and method[s]" for information

gathering was a rule. *Id.* at 1147, 1151. Applying those principles, the Border GTO is a rule because it requires reporting by a category of companies, rather than addressing specific companies based on particularized facts.[25]

The government responds that the Border GTO is not "generally applicable" because it applies to "a particular type of business within certain ZIP codes." Op. Br. 30. As to "particular *type* of business," that is part of what makes the Border GTO a rule; the GTO applies to a regulatory definition (MSBs), not specific businesses. That, then, leaves the government's observation that the Border GTO is restricted to certain zip codes. But rules can also be geographically limited. *See Safari Club International*, 878 F.3d at 333 (import restriction limited to Zimbabwe was a rule); *Michigan v. EPA*, 213 F.3d 663, 669 (D.C. Cir. 2000) (EPA did not provide adequate notice-and-comment when issuing "final rule mandating that 22 states and the District of Columbia revise their SIPs"); *NRDC v. EPA*, 279 F.3d 1180, 1183, 1186 (9th Cir. 2002) (EPA did not

---

[25] The government's other cases are not to the contrary. *See, e.g.*, *ITServ All., Inc. v. DHS*, 71 F.4th 1028, 1035 (D.C. Cir. 2023) (agency decision that "arose out of a specific controversy involving an employer" was an order); *Neustar, Inc. v. FCC*, 857 F.3d 886, 895 (D.C. Cir. 2017) (agency decision that "determined the rights and obligations of two parties" was an order).

provide adequate notice-and-comment when issuing permit for an "entire class of hypothetical dischargers in a given geographical region"). The fact that the Border GTO applies to MSBs in 30 zip codes, not nationwide, does not make it less of a rule.[26]

b.   <u>Section 5326 Does Not Displace Ordinary Principles Of Administrative Law.</u>

The government argues there "is no need to resort to the general principles" because Congress, in Section 5326, authorized FinCEN to act by order. Op. Br. 29-30. But nothing in Section 5326 disturbs the APA's usual procedural requirements. When Section 5326 authorizes FinCEN to act by order, it authorizes an order as that term is defined in the APA—not an "order" that is actually a rule.

Both the government and Plaintiffs agree that—interpreting the word "order" in Section 5326—the "Court should presume that Congress here meant to incorporate the APA definition." Op. Br. 25. As the Supreme Court recently held, a "'term of art' across administrative law" "carries the same meaning outside the APA as in it." *FDA v. R.J. Reynolds Vapor Co.*, 145 S. Ct. 1984, 1992-93 (2025). But, having

---

[26] Nor does it matter that the Border GTO is "temporally limited." Op. Br. 28. Rules can be too. *See, e.g.*, *Billings Clinic v. Azar*, 901 F.3d 301 (D.C. Cir. 2018) (assessing rulemakings setting reimbursement rates for specific fiscal years).

57

correctly stated that premise, the government does not follow it. The government would have the Court read "order" to mean something entirely different. When Section 5326 says that "the Secretary may issue an order," it means, in the government's apparent view, that the "Secretary may issue a rule but call it an 'order,' and can do so without notice-and-comment." In other words, rather than "incorporating" APA definitions, the government reads Section 5326 as overriding them.

Nothing in Section 5326 supports the government's departure from general APA principles. The APA provides that, for a statute to excuse an agency from APA procedural requirements, it must do so expressly. *See* 5 U.S.C. § 559. And Congress knows how to do exactly that. *See, e.g.*, 42 U.S.C. § 7407(d)(2)(B) (certain EPA actions "shall not be subject to the provisions of sections 553 through 557 of Title 5 (relating to notice and comment)"); 21 U.S.C. § 811 (specifying special procedures, including for notice-and-comment, for temporary and permanent classifications of controlled substances). As a result, courts "look[] askance at agencies' attempts to avoid the standard notice and comment procedures." *Lake Carriers' Ass'n v. EPA*, 652 F.3d 1, 6 (D.C. Cir. 2011) (citation omitted).

Nothing in Section 5326 provides the kind of express permission to skip notice-and-comment that courts require to override the APA.

The government argues that reading "order" to mean "a rule that we call an order" is necessary to effectuate the statute's purpose. The government says that notice-and-comment would be impractical when dealing with ongoing investigations, Op. Br. 27, and it says that notice-and-comment would make it impossible to keep GTOs confidential, as the statute contemplates, *id.* at 26. But these arguments get things backwards: They do not show that Congress intended FinCEN to issue rules but call them orders; rather, they show that, when Congress authorized FinCEN to issue "orders" it expected FinCEN to issue ***orders***—*i.e.*, subpoena-like requests for information directed to particular businesses based on a particularized need (like the more limited GTOs anticipated in the 1989 rule release). Such orders would not require notice-and-comment. The fact that notice-and-comment is required is a symptom of the fact that (as explained below) the Border GTO exceeds FinCEN's statutory authority.

### 4.    The Border GTO Is Likely *Ultra Vires.*

That brings us to the final ground for affirmance, which Judge Biery did not reach, although it was raised below, but which Judge Sammartino relied upon. *See* ROA.1535; *Texas*, 809 F.3d at 178 (court can affirm preliminary injunction "on any grounds supported by the record"). Section 5326 authorizes FinCEN to issue an "order" to either a "business" or "group" of businesses. 31 U.S.C. § 5326. That language, as Judge Sammartino concluded, contemplates "limited, investigatory tools directed to an identifiable business or group of businesses based on particularized facts." *Novedades*, 2025 WL 1501936, at *10. By contrast, FinCEN promulgated a rule that defined a category of businesses, applicable across a vast geographic area, and required every unidentified business that might fit within that category to identify itself and comply. That type of command does not fit within the statutory language. Five arguments confirm this interpretation.

***First***, as explained above, Section 5326 contemplates that FinCEN act via "order." When Congress enacted Section 5326 in 1988, the distinction between rules and orders was already well understood. *See Air Line Pilots Ass'n, Int'l v. Quesada*, 276 F.2d 892, 896 (2d Cir. 1960)

(an order results from "application of a statute or other legal standard to a given fact situation involving particular individuals"). Plus, Treasury already had authority to require reports by "regulation." *See* 31 U.S.C. § 5313(a). The primary difference between Section 5326 and the already-existing provision of the Bank Secrecy Act was that Section 5326 gave the agency authority to act by "order." That new authority would be redundant if "order" meant "rule."

The government's contrary interpretation would lead to absurd results. If FinCEN can use Section 5326 to impose a new reporting obligation for all MSBs in 30 zip codes, why not 30 states? Or 49? Or 50? The United States is, after all, a "geographic area." Under the government's interpretation, so long as it calls its action an "order," it can impose new reporting obligations for any category of businesses in any part of the country, no matter how sweeping the category or how large the area. That is not the scheme that Congress adopted.

***Second***, Section 5326(a) specifies that a GTO should apply to a "domestic financial institution or nonfinancial trade or business or group of domestic financial institutions or nonfinancial trades or businesses in a geographic area." That language confirms that GTOs are directed to an

61

identified business or group of businesses, not a regulatory category. *See Novedades*, 2025 WL 1501936, at *15 ("The most natural way to read this provision, in context, is that FinCEN may issue an order resulting from a factual determination with respect to either a single business or with respect to a group of multiple businesses," not "a factual determination with respect to a zip code[.]"); *cf. PBGC v. Ouimet Corp.*, 630 F.2d 4, 10-11 (1st Cir. 1980) (using "group" in the corporate context to refer to "a parent-subsidiary group").[27]

**Third**, "strong evidence" for this interpretation is found at 31 U.S.C. § 5326(c), which provides for confidentiality of GTOs. *See Novedades*, 2025 WL 1501936, at *15, *17. An order directed at a particular business (or group of businesses) can be kept confidential because it can be served directly on the business; indeed, that is precisely the procedure the agency itself contemplated in 1989 when it promulgated regulations (still in effect today, but disregarded here)

---

[27] That is particularly true because the word "group" appears alongside the statute's initial reference to a single "domestic financial institution." *See Aguayo v. U.S. Bank*, 653 F.3d 912, 927 (9th Cir. 2011) ("words used in a list should be read together and given related meaning"). To give a concrete analogy, if a bride told her in-laws they could invite a "friend or group of friends" to her wedding, she would be surprised if her in-laws published an open-ended invitation in the newspaper for "all our friends in the zip code."

providing that GTOs are to be served on the chief executive officers of identified companies. *See supra* p. 9. By contrast, a rule that establishes standards for categories of businesses by its nature cannot be confidential, as it must be publicized so that businesses can read it and determine whether they must comply; for that reason, rules are typically published in the Federal Register.[28] That FinCEN published the Border GTO in the Federal Register, and publicized it via press release, "elucidates just how far GTOs have drifted from Congress's original intention." *Novedades*, 2025 WL 1501936, at \*17.

**Fourth**, this conclusion is confirmed by the major questions doctrine, under which courts "expect Congress to speak clearly when authorizing an agency to exercise powers of vast economic and political significance." *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 764 (2021) (cleaned up). At a single stroke, FinCEN infringed the privacy interests of an undetermined number of businesses and their customers from Brownsville to San Diego. Congress certainly did not give FinCEN that power **clearly**. This case is thus like *Biden v. Nebraska*, in which the

---

[28] By law, agencies must publish "substantive rules of general applicability adopted as authorized by law" in the Federal Register. 5 U.S.C. § 552(a)(1)(D). Orders, on the other hand, are generally not published but are (if not confidential) available at the agency for public inspection. *Id.* § 552(a)(2)(A).

Supreme Court held that wholesale forgiveness of student loans could not be justified under a provision allowing the government to "waive or modify" student loans. 600 U.S. 477, 496-500 (2023). The Court reasoned that the authority to waive or modify student loans envisioned more modest action: "the words 'waive or modify' do not mean 'completely rewrite.'" *Id.* at 506-07. Likewise here. "Order" does not clearly mean "rule," nor does "business in a geographic area" clearly mean "every MSB in 30 zip codes." Section 5326 does not allow FinCEN to impose a massive financial dragnet, and even if it might, Congress cannot be thought to have crammed that elephant into this mousehole.

***Finally***, confirmation comes from the canon of constitutional avoidance. *See, e.g.*, *Cargill v. Garland*, 57 F.4th 447, 471 (5th Cir. 2023) (en banc). As explained in Part I.A.1, the Border GTO raises serious questions under the Fourth Amendment in part because it is much more sweeping than a typical subpoena, and, also unlike a typical subpoena, is not based on individualized facts. Construing Section 5326 as limited to "orders" directed to particular businesses, or groups of businesses, based on particularized facts, ameliorates these constitutional issues.

**B.     Plaintiffs Established That They Would Suffer Irreparable Harms.**

The district court also did not abuse its discretion by finding that Plaintiffs will suffer irreparable harm. After hearing from (or reading the sworn statements of) eleven witnesses, Judge Biery found that "the GTO's impact on the MSBs has been skyrocketing labor costs, a permanent decrease in customers, and a decrease in revenue because the fees charged are proportionate to the amount exchanged. The explosion in paperwork is a threat to MSBs' employees' livelihood and there is a subsequent danger that the GTO could destroy family businesses." ROA.1542.[29] The government's counterargument, which after a six-hour hearing contains four cited sentences, *see* Op. Br. 37-38, comes nowhere close to showing that Judge Biery got this clearly wrong. *See Texas v. DHS*, 123 F.4th 186, 211 (5th Cir. 2024) ("We review findings on likelihood of irreparable harm for clear error. Moreover, in reviewing a court's preliminary injunction ruling, we must give due regard to the trial

---

[29] In the San Diego case, the district court similarly found "credible Plaintiffs' avowal that the regulatory burden imposed by the [Border] GTO would be simply unsustainable." *Novedades*, 2025 WL 1501936, at *24. In El Paso, the district court found "immediate and irreparable harm absent emergency injunctive relief, including the threat of business closure, reputational injury, and loss of customers and goodwill." *Valuta*, 2025 WL 2389430, at *1.

court's opportunity to judge the witnesses' credibility." (cleaned up)). In fact, the record shows that Judge Biery was clearly right. *See, e.g.*, ROA.1775:2-4 ("So basically we would eventually have to close down. We don't have the capacity to meet with the GTO guidelines due to the employment costs.").[30]

All this easily exceeds the necessary showing of irreparable injury. As "courts have long recognized": "it is not so much the magnitude but the ***irreparability*** that counts for purposes of a preliminary injunction." *See Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (quotation marks omitted). Even the government concedes that there is some harm. ROA.1953:16-21 ("I don't think we dispute that there are" "some costs on plaintiffs"). Because of sovereign immunity,

---

[30] *See also, e.g.,* ROA.1816:24-1817:3 ("I slammed my phone down in frustration and – yeah, I was – it was very tough, very frustrating because it was one of the few things at work that I've done, that I couldn't, you know, get on top of no matter how hard I tried."); ROA.1835:1 ("If things don't get better, I will stop cashing checks."); ROA.1854:21:22 ("Honestly, the only way I can describe it … it is impossible."); ROA.1855:12-13 ("And, honestly, it has been – it has been very difficult. It has been devastating."); ROA.1879:11-14 ("[W]e're going to have to close, actually. It's hard to comply … doing 10, 15 CTRs, and now 24 a day, it's impossible to do it."); ROA.1921:13-17 ("This is not sustainable, what is happening right now.").

The government doesn't believe this credited testimony because larger businesses use sophisticated software to submit CTRs, *see* Op. Br. 37, but Judge Biery rejected that argument. ROA.1536; *see also, e.g.*, ROA.1864:8-9, ROA.1681:20-23. Software cannot collect information from customers, cannot enter that information into the computer, is expensive and complex, and is not a magic bullet.

that harm is irreparable. *Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021) ("complying with an agency order later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs" (cleaned up)); *Airlines for Am. v. DOT*, 110 F.4th 672, 677 (5th Cir. 2024) (collecting other cases).

Nor is the irreparable harm limited to compliance burdens. Other irreparable harms include "damage to the goodwill of [Plaintiffs'] customers," *Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 810 n.1 (5th Cir. 1989), and "reputational injury," *Burgess v. FDIC*, 871 F.3d 297, 304 (5th Cir. 2017). *See generally* ROA.1539-42. Plus, lost privacy is inherently irreparable. *See, e.g.*, *Plante v. Gonzalez*, 575 F.2d 1119, 1135 (5th Cir. 1978) ("Privacy of personal matters is an interest in and of itself, protected constitutionally … and at common law."). And that is particularly true of privacy rights protected by the Fourth Amendment, as the "deprivation of a constitutional right" is always irreparable. *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 295 (5th Cir. 2012) (citations omitted).

### C.    Other Factors Likewise Favor Entry Of A Preliminary Injunction

As for the public interest and balance of equities, "[i]t is always in the public interest to prevent the violation of a party's constitutional rights." *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 458 n.9 (5th Cir. 2014) (citation omitted). Furthermore, "there is generally no public interest in the perpetuation of unlawful agency action." *Airlines for Am.*, 110 F.4th at 677. "[T]here is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (citation omitted).

The government offers the truism that "[i]t is in the public interest for the Government to act swiftly to combat illicit drug financing." Op. Br. 38. But, as discussed above, "swiftly" isn't the right word. The point of the Border GTO is data collection for later—assembling possibly millions of CTRs that might be examined at some unknown date. "The absence of any non-speculative evidence that the data collected by the [Border] GTO will, in fact, keep the public safer as juxtaposed with a wealth of non-speculative evidence that the [Border] GTO will, in fact, threaten the existence of" Plaintiffs means "the balance of equities and

public interest tip sharply in Plaintiffs' favor." *Novedades*, 2025 WL 1501936, at *25; *see also Valuta*, 2025 WL 2389430, at *1-2.

## II. Under The APA, The District Court Should Have Postponed The Effective Date Of The Border GTO.

Although Judge Biery correctly entered a preliminary injunction, he did err in one limited respect. At the time of the preliminary-injunction hearing, the Supreme Court was considering the propriety of nationwide injunctions. Because of that debate, Judge Biery declined to protect non-parties from the Border GTO. That was a mistake of law. The standards for nationwide injunctions do not control cases, like this one, under the Administrative Procedure Act. In APA cases about broad policies, this Court has definitively held that preliminary "[r]elief should not be party restricted." *Career Colls.*, 98 F.4th at 255.

The district court's complete reasoning for limiting preliminary relief to the parties was that "Plaintiffs' request for vacatur and enjoinment entirely is denied, subject to the forthcoming opinion by the Supreme Court in *Trump v. Casa, Inc.*, No. 24A884, regarding universal injunctions." ROA.1537. But "universal injunctions" and relief under the APA are different remedies subject to different standards. *See, e.g.*, *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010). The

*CASA* case worrying Judge Biery was thus clear that "[n]othing we say today resolves the distinct question whether the Administrative Procedure Act authorizes federal courts to vacate federal agency action." *Trump v. CASA*, 145 S. Ct. 2540, 2554 n.10 (2025). Which makes sense. The question in *CASA* was "whether Congress has granted federal courts the authority to universally enjoin the enforcement of an executive or legislative policy" "under the Judiciary Act of 1789," *id.* at 2550, and the case did not concern the APA's separate review provisions. The district court's conflation of these questions was an error of law.

On the correct question, the answer starts with the text of the APA. Congress provided that, when "agency action" is "contrary to constitutional right," "arbitrary [and] capricious," "not in accordance with law," or issued "without observance of procedure required by law," courts ***"shall"*** "hold unlawful and set [it] aside." 5 U.S.C. § 706. That language expressly authorizes vacatur of unlawful agency action, as this Court has said again and again and again.[31] The statute contemplates relief just as broad as the challenged agency action.

---

[31] *E.g.*, *Tex. Corn Producers v. EPA*, __ F.4th __, 2025 WL 1741481, at *17 (5th Cir. June 24, 2025) ("Section 706 'extends beyond the mere non-enforcement remedies available to courts that review the constitutionality of legislation, as it empowers

The scope of preliminary relief should be no less broad. Under 5 U.S.C. § 705, the appropriate preliminary remedy is to "postpone the effective date" of the agency action. This language similarly contemplates relief as broad as the challenged action. The APA does not say that courts should postpone the effective date of the agency action *for some parties*; it says that the court should postpone the effective date of the "action."

Indeed, although you wouldn't know it from the government's brief, this Court has squarely "conclude[d] that the scope of preliminary relief

---

courts to "set aside"—*i.e.*, formally nullify and revoke—an unlawful agency action.'"); *Texas v. EPA*, 132 F.4th 808, 862 (5th Cir. 2025) (vacatur is "default rule"); *Texas v. United States*, 126 F.4th 392, 418 (5th Cir. 2025) ("APA empowers and commands" vacatur); *In re Clarke*, 94 F.4th 502, 512 (5th Cir. 2024) ("Should plaintiffs prevail on their APA challenge, this court must 'set aside' CFTC's *ultra vires* rescission action, with nationwide effect."); *Rest. L. Ctr.*, 120 F.4th at 177 ("[O]ur court's 'default rule is that vacatur is the appropriate remedy.'"); *Tex. Med. Ass'n v. HHS*, 110 F.4th 762, 780 (5th Cir. 2024) ("In addition to being statutorily permissible, and required in this circuit, universal vacatur is appropriate … ."); *All. for Hippocratic Med. v. FDA*, 78 F.4th 210, 254 (5th Cir. 2023) ("Upon a successful APA claim, vacatur effectively rescinds the unlawful agency action."), *rev'd on other grounds*, 602 U.S. 367 (2024); *Braidwood Mgmt., Inc. v. Becerra*, 104 F.4th 930, 952 (5th Cir. 2024) ("In addition to its potency and peculiarly broad nature, vacatur under § 706 is, as we have repeatedly described it, the 'default' remedy for unlawful agency action."); *rev'd on other grounds*, 145 S. Ct. 2427 (2025); *Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 374-75 (5th Cir. 2022) ("Vacatur is the only statutorily prescribed remedy for a successful APA challenge to a regulation."). The government stresses that vacatur, as opposed to party-specific relief, is not *required*, but its two citations do not outweigh this precedent. Op. Br. 39 n.5. One opinion has been vacated, *see Tex. Med. Ass'n v. HHS*, 120 F.4th 494, 510 (5th Cir. 2024), and the other is a plurality opinion that explains that "[v]acatur is the only statutorily prescribed remedy for a successful APA challenge to a regulation" before remanding to let the parties brief things in the district court, *Cargill v. Garland*, 57 F.4th 447, 472 (5th Cir. 2023) (en banc), *aff'd on other grounds*, 602 U.S. 406 (2024).

71

under Section 705 aligns with the scope of ultimate relief under Section 706, which is not party-restricted." *Career Colls.*, 98 F.4th at 226. This law remains just as binding in this Court today as it was before the Supreme Court decided *CASA*.

In *Career Colleges*, a district court denied a preliminary injunction to a group of colleges challenging federal regulatory changes to student-loan discharges. 98 F.4th at 226. On an interlocutory appeal, the Fifth Circuit administratively stayed the regulatory changes for just the parties, then explicitly expanded its stay to cover non-parties, *id.* at 233, and then (in a section of its published opinion titled "Relief Should Not Be Party Restricted") directed the district court to enter preliminary relief "nationwide" because the changes were "almost certainly unlawful as to" everyone they covered *Id.* at 255-56. Citing the "specific statutory text and longstanding administrative law principles" involved, this Court unmistakably rejected that the government's "arguments that general equitable and constitutional principles require the panel to limit any relief to the named parties." *See also, e.g.*, *Airlines for Am.*, 110 F.4th at 677 (staying preliminarily unlawful rule generally); *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 681 (9th Cir. 2021) (explaining that "a

successful APA claim by a single individual can affect an 'entire' regulatory program" and affirming nationwide preliminary relief). The result should have been the same here.

Ultimately, this case shows why the availability of broad preliminary relief matters. Plaintiffs are challenging a single agency action: an "order" that was published as a release in the Federal Register and that rises or falls based on legal claims that have nothing to do with any particular party's facts. Other plaintiffs in other cases have sued bringing those same claims. Three federal judges have now found this agency action likely unlawful. Yet—because no court has granted relief suited to the scope of the action—there are *still* businesses along the Texas border that are suffering immense compliance burdens as they struggle to comply. That is not the system Congress enacted in the APA.

## CONCLUSION

The district court's preliminary injunction should be affirmed. The Court should also remand for the district court to postpone the Border GTO's effective date writ large.

Dated: August 28, 2025.

Respectfully submitted,

/s/ Robert Johnson

**THE LAW OFFICE OF MARTIN GOLANDO, PLLC**

Martin Golando
2326 W. Magnolia
San Antonio, TX 78201
(210) 471-1185
martin.golando@gmail.com

*Counsel for Cross-Appellants Texas Association for Money Services Businesses (TAMSB); Reynosa Casa De Cambio, Inc.; Nydia Regalado d/b/a Best Rate Exchange; Mario Regalado d/b/a Border International Services; Laredo Insurance Services, LLC; E.Mex. Financial Services, Inc.; R & C, Inc. d/b/a Temex Money Exchange; San Isidro Multi Services, Inc.; Cris Win Inc. d/b/a Brownsville Casa De Cambio; and Espro Investment LLC d/b/a Lonestar Money Exchange*

**INSTITUTE FOR JUSTICE**

Robert Johnson
    *Lead Counsel*
16781 Chagrin Blvd., Suite 256
Shaker Heights, OH 44120
(703) 682-9320
rjohnson@ij.org

Elizabeth L. Sanz
Andrew Ward
901 N. Glebe Rd., Suite 900
Arlington, VA 22203
(703) 682-9320
bsanz@ij.org
award@ij.org

Katrin Marquez
2 S. Biscayne Blvd., Suite 3180
Miami, FL 33131
(305) 721-1600
kmarquez@ij.org

Jeffrey Rowes
Christen Hebert
816 Congress Ave., Suite 970
Austin, TX 78701
(512) 480-5936
jrowes@ij.org
chebert@ij.org

*Counsel for Cross-Appellants Arnoldo Gonzalez, Jr. and High Value, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on August 29, 2025, an electronic copy of the foregoing was filed with the Clerk of Court for the United States Court of Appeals for the Fifth Circuit using the appellate CM/ECF system, and that service on all counsel of record will be accomplished by the appellate CM/ECF system. The brief was finalized on August 28, 2025, but could not be filed on that date because of a CM/ECF outage. Per guidance on the Fifth Circuit's website, the August 28 filing deadline was "automatically extended to Friday, August 29." Counsel for Plaintiffs–Appellees/Cross-Appellants emailed a courtesy copy of the brief to Counsel for Defendants–Appellants/Cross-Appellees on August 28.

/s/ Robert E. Johnson
*Lead Counsel for Cross-Appellants*

# CERTIFICATE OF COMPLIANCE

1.    This motion complies with the type-volume limitation of Fed. R. App. P. 27(d)(2) because this brief contains 15,197 words.

2.    This motion complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Century Schoolbook font.

/s/ Robert Johnson
*Lead Counsel for Cross-Appellants*

**ADDENDUM**

# TABLE OF CONTENTS

**Page**

31 U.S.C. § 5326 ..................................................................... A1

31 U.S.C. § 5313 ..................................................................... A3

54 Fed. Reg. 33675 (Aug. 16, 1989)........................................ A4

## 31 U.S.C. § 5326

**§ 5326. Records of certain domestic transactions.**

(a) In general.--If the Secretary of the Treasury finds, upon the Secretary's own initiative or at the request of an appropriate Federal or State law enforcement official, that reasonable grounds exist for concluding that additional recordkeeping and reporting requirements are necessary to carry out the purposes of this subtitle or to prevent evasions thereof, the Secretary may issue an order requiring any domestic financial institution or nonfinancial trade or business or group of domestic financial institutions or nonfinancial trades or businesses in a geographic area--

(1) to obtain such information as the Secretary may describe in such order concerning--

(A) any transaction in which such financial institution or nonfinancial trade or business is involved for the payment, receipt, or transfer of funds (as the Secretary may describe in such order), the total amounts or denominations of which are equal to or greater than an amount which the Secretary may prescribe; and

(B) any other person participating in such transaction;

(2) to maintain a record of such information for such period of time as the Secretary may require; and

(3) to file a report with respect to any transaction described in paragraph (1)(A) in the manner and to the extent specified in the order.

(b) Authority to order depository institutions to obtain reports from customers.--

(1) In general.--The Secretary of the Treasury may, by regulation or order, require any depository institution (as defined in section 3(c) of the Federal Deposit Insurance Act)--

(A) to request any financial institution or nonfinancial trade or business (other than a depository institution) which engages in any reportable transaction with the depository institution to provide the depository institution with a copy of any report filed by the financial institution or nonfinancial trade or business under this subtitle with respect to any prior transaction (between such financial institution or nonfinancial trade or business and any other person) which involved any portion of the funds which are involved in the reportable transaction with the depository institution; and

(B) if no copy of any report described in subparagraph (A) is received by the depository institution in connection with any reportable transaction to which such

subparagraph applies, to submit (in addition to any report required under this subtitle with respect to the reportable transaction) a written notice to the Secretary that the financial institution or nonfinancial trade or business failed to provide any copy of such report.

(2) Reportable transaction defined.--For purposes of this subsection, the term "reportable transaction" means any transaction involving funds (as the Secretary may describe in the regulation or order) the total amounts or denominations of which are equal to or greater than an amount which the Secretary may prescribe.

(c) Nondisclosure of orders.--No financial institution or nonfinancial trade or business or officer, director, employee or agent of a financial institution or nonfinancial trade or business subject to an order under this section may disclose the existence of, or terms of, the order to any person except as prescribed by the Secretary.

(d) Maximum effective period for order.--No order issued under subsection (a) shall be effective for more than 180 days unless renewed pursuant to the requirements of subsection (a).

**A2**

**31 U.S.C. § 5313 (excerpt)**

### § 5313. Reports on domestic coins and currency transactions.

(a) When a domestic financial institution is involved in a transaction for the payment, receipt, or transfer of United States coins or currency (or other monetary instruments the Secretary of the Treasury prescribes), in an amount, denomination, or amount and denomination, or under circumstances the Secretary prescribes by regulation, the institution and any other participant in the transaction the Secretary may prescribe shall file a report on the transaction at the time and in the way the Secretary prescribes. A participant acting for another person shall make the report as the agent or bailee of the person and identify the person for whom the transaction is being made.

(b) The Secretary may designate a domestic financial institution as an agent of the United States Government to receive a report under this section. However, the Secretary may designate a domestic financial institution that is not insured, chartered, examined, or registered as a domestic financial institution only if the institution consents. The Secretary may suspend or revoke a designation for a violation of this subchapter or a regulation under this subchapter (except a violation of section 5315 of this title or a regulation prescribed under section 5315), section 4111 of the National Housing Act (12 U.S.C. 1730d), or section 21 of the Federal Deposit Insurance Act (12 U.S.C. 1829b).

(c)(1) A person (except a domestic financial institution designated under subsection (b) of this section) required to file a report under this section shall file the report--

(A) with the institution involved in the transaction if the institution was designated;

(B) in the way the Secretary prescribes when the institution was not designated; or

(C) with the Secretary.

(2) The Secretary shall prescribe--

(A) the filing procedure for a domestic financial institution designated under subsection (b) of this section; and

(B) the way the institution shall submit reports filed with it.

Dated: July 26, 1989.

Gene R. Haislip,

*Deputy Assistant Administrator, Office of Diversion Control, Drug Enforcement Administration.*

[FR Doc. 89-19134 Filed 8-15-89; 8:45 am]

BILLING CODE 4410-09-M

---

## EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### 29 CFR Part 1627

### Congressional Action Concerning the Commission's Final Rule Allowing for Non-EEOC Supervised Waivers Under the Age Discrimination in Employment Act (ADEA)

**AGENCY:** Equal Employment Opportunity Commission.

**ACTION:** Notice of congressional action regarding final rule on ADEA waivers.

**SUMMARY:** On July 30, 1987 the Equal Employment Opportunity Commission voted to approve a final rule creating a legislative regulation and administrative exemption allowing for non-EEOC supervised waivers of private rights under the Age Discrimination in Employment Act (under section 9 of the ADEA and 29 CFR 1627.15). This final rule was published in the **Federal Register** of Thursday, August 27, 1987 (52 FR 32293).

On October 1, 1988 the President signed Public Law 100-459 (appropriations for fiscal year 1989) which includes the following language:

Provided, That the final rule regarding unsupervised waivers under the Age Discrimination in Employment Act, issued by the Commission on August 27, 1987 (29 CFR 1627.16(c)(1)-(3), shall not have effect during fiscal year 1989; Provided further, That none of the funds may be obligated or expended by the Commission to give effect to any policy or practice pertaining to unsupervised waivers under the Age Discrimination in Employment Act, except that this proviso shall not preclude the Commission from investigating or processing claims of age discrimination, and pursuing appropriate relief in Federal court, regardless of whether an unsupervised waiver of rights has been sought or signed.

**EFFECTIVE DATE:** October 1, 1988.

**FOR FURTHER INFORMATION CONTACT:** John K. Light, Attorney-Advisor, ADEA Division, Coordination and Guidance Services, Office of Legal Counsel, Equal Employment Opportunity Commission, 1801 L Street, NW., Washington, DC 20507, (202) 663-4690.

Signed this 10th day of August 1989, at Washington, DC.

For the Commission.

Clarence Thomas,

*Chairman, Equal Employment Opportunity Commission.*

[FR Doc. 89-19139 Filed 8-15-89; 8:45 am]

BILLING CODE 6570-06-M

---

## DEPARTMENT OF THE TREASURY

### 31 CFR Part 103

### Amendment to the Bank Secrecy Act Regulations Relating to Geographic Reporting of Certain Domestic Currency Transactions

**AGENCY:** Departmental Offices, Treasury.

**ACTION:** Final rule.

**SUMMARY:** Section 6185(c) of Title VI of the Anti-Drug Abuse Act of 1988, Pub. L. 100-690, November 18, 1988, permits the Secretary of the Treasury to issue an order to require financial institutions or groups of financial institutions in certain geographic locations to report currency transactions in amounts less than $10,000 for a limited period of time. This Final Rule establishes the procedures that Treasury would follow in issuing such an order.

**DATE:** This final rule is effective September 15, 1989.

**ADDRESS:** Amy G. Rudnick, Director, Office of Financial Enforcement, Office of the Assistant Secretary (Enforcement), Department of the Treasury, Room 4320, 1500 Pennsylvania Avenue, NW., Washington, DC 20220.

**FOR FURTHER INFORMATION CONTACT:** Kathleen A. Scott, Attorney Advisor, Office of the Assistant General Counsel (Enforcement), (202) 566-9947.

**SUPPLEMENTARY INFORMATION:** Section 6185(c) of title VI of the Anti-Drug Abuse Act of 1988 added a new section 5326 to the Bank Secrecy Act, 31 U.S.C. 5311-5326.

*Section 5326. Records of Certain Domestic Coin and Currency Transactions*

(a) *In general.* If the Secretary of the Treasury finds, upon the Secretary's own initiative or at the request of an appropriate Federal or State law enforcement official, that reasonable grounds exist for concluding that additional recordkeeping and reporting requirements are necessary to carry out the purposes of this subtitle and prevent evasions thereof, the Secretary may issue an order requiring any domestic financial institution or group of domestic financial institutions in a geographic area—

(1) To obtain such information as the Secretary may describe in such order concerning—

(A) Any transaction in which such financial institution is involved for the

payment, receipt, or transfer of United States coins or currency (or such other monetary instruments as the Secretary may describe in such order) the total amounts or denominations of which are equal to or greater than an amount which the Secretary may prescribe; and

(B) Any other person participating in such transaction;

(2) To maintain a record of such information for such period of time as the Secretary may require; and

(3) To file a report with respect to any transaction described in paragraph (1)(A) in the manner and to the extent specified in the order.

(b) *Maximum effective period for order.*— No order issued under subsection (a) shall be effective for more than 60 days unless renewed pursuant to the requirements of subsection (a).

The practical effect of this amendment is to permit the Secretary to lower the currency transaction reporting threshold of § 103.22(a) for some or all types of currency transactions, for some or all types of customers, for a financial institution or a group of financial institutions in a specified geographic area of the United States for a limited period of time. This reporting requirement would be in addition to the present requirement in 31 U.S.C. 5313 and 31 CFR 103.22(a) that requires financial institutions to report currency transactions over $10,000. The reason that Congress amended the Bank Secrecy Act to permit the lowering of the current currency reporting threshold was because of its concern with schemes involving the structuring of currency transactions below $10,000 to avoid the Bank Secrecy Act reporting requirements in certain areas of the country. *See* H. Rep. No. 100-716, 100th Cong., 2d Sess. 8.

### Notice of Proposed Rulemaking

On March 24, 1989, Treasury published a Notice of Proposed Rulemaking in which it proposed procedures and limitations to govern the issuance of an order under section 5326(a). 54 FR 12238. Under the proposed rule, prior to selecting an area of the country for targeted reporting, Treasury would be required to make a determination that there may exist a significant level of drug money laundering or other illegal activity being conducted in that geographic area at levels below the current $10,000 currency reporting threshold. Treasury then would identify the affected financial institution or institutions in the geographic area that would receive the targeting order. In the preamble to the proposed regulation, Treasury stated that, at least initially, geographic areas subject to the enhanced reporting

**A4**

requirement could be as small as a few city blocks or as large as a major metropolitan area.

Under the proposed regulation, each financial institution in a targeted area would receive an order requiring it to keep a record of specified currency transactions at or above a specified monetary limit for a certain period of time (not to exceed 60 days), with respect to all or certain types of customers, and to file a report as prescribed by Treasury on those transactions and the individuals involved in those transactions beginning on a date designated in the order. The proposed regulation further provided that the order would set forth all the information required to be reported, instructions on how and where to file the reports (not necessarily the Detroit Computing Center), and the length of time that the records generated in response to an order issued under section 5326 were to be retained. Treasury notes that there may be variations in the orders received by the targeted financial institutions within a specific geographic area.

Treasury stated that it would be as specific as possible in delineating what would be expected of a financial institution served with a section 5326 geographic targeting order and that it would consider the amount of time necessary to implement the order. In addition, Treasury stated that it would make every effort to work with the targeted financial institutions to ensure maximum compliance with the targeting order at a minimum burden to the financial institutions. For this reason, Treasury said that the name of a Treasury contact would be provided for assistance if needed.

In the proposed rule, Treasury emphasized that in complying with a geographic targeting order, financial institutions would not be required to purchase additional computer hardware or software. However, Treasury encouraged, but indicated that it would not require, financial institutions, when feasible, to adjust any existing computerized aggregation systems that they had in place in order to capture the information provided in the order. Treasury also stated that it did not expect financial institutions with manual aggregation systems to have any problems adjusting their manual systems in order to capture the data required to be reported. Treasury emphasized, however, that if a financial institution had knowledge through other means, e.g., the personal knowledge of a bank employee, that there were aggregated transactions falling within

the limits described in the order, the financial institution would be required to report those aggregated transactions, regardless of whether the existing system at the financial institution was able to identify the aggregated transactions. Finally, Treasury said that it would make every effort to work with financial institutions filing magnetically who received a section 5326 order so as not to disrupt the magnetic media filing process.

Treasury stated that geographic targeting orders would not be published in the Federal Register, but would be issued only to the affected financial institutions. Treasury made clear that issuance of a section 5326 order to a financial institution would not exempt that institution from its duty to report all over-$10,000 currency transactions.

In the preamble, Treasury explained that the Right to Financial Privacy Act, 12 U.S.C. Chapter 35, would not apply to geographic targeting orders because that information is required to be reported by law. 12 U.S.C. 3413. Therefore, targeted financial institutions would not be required to notify customers of their temporarily enhanced reporting requirements. In order to ensure proper use of the order, Treasury stated that it would normally request targeted financial institutions not to notify the public of the enhanced reporting requirement limit.

Treasury further proposed that in order to comply with a section 5326 order, financial institutions generally would be required to use IRS Form 4789, the Currency Transaction Report ("CTR"), which currently is used by financial institutions to report currency transactions over $10,000. In addition, Treasury explained that, in general, unless otherwise specified in the order, all the provisions of 31 CFR Part 103 relating to the reporting of currency transactions in excess of $10,000 would apply to reports filed on transactions falling within the scope of a section 5326 order, and that, unless otherwise noted in the order, existing exemptions granted by a targeted bank under 31 CFR 103.22(B) prior to the time it received the order could continue to be utilized in complying with a section 5326 order. However, Treasury emphasized that no new exemptions could be granted to businesses that have regular and frequent currency transactions in amounts either above or below $10,000, without the approval of Treasury. Finally, while the legislation gives Treasury the authority to include other monetary instrument transaction reporting in such an order, Treasury indicated that it anticipated that, as a

general rule, it would use section 5326 orders to require reporting on currency transactions only.

## Discussion of Comments

Thirty-three comments were received on the above-described Notice of Proposed Rulemaking. These comments have been considered carefully in drafting the final rule. A discussion of the major comments follows.

### Systems Issues

Most commenters stated that they would not be able to use their computer systems if only one branch of a financial institution were targeted for the lower reporting requirement. As a result, they explained that they would be forced to adopt a temporary manual system for processing the reports, which possibly could lessen the accuracy of reports and pose additional problems for the financial institution. Many also sought guidance in handling aggregated transactions conducted by or on behalf of the same person when the transactions took place at branches both in and outside of the targeted area.

After carefully considering these issues, Treasury has decided that it will require reporting of currency transactions at or below $10,000 only for those transactions that occur at the branch of the financial institution that is targeted. Thus, only those transactions occurring at the targeted branch should be aggregated for purposes of complying with a geographic targeting order. If a financial institution aggregates transactions among its branches, it should report transactions in currency conducted by or on behalf of the same person that exceed $10,000 in the normal manner, i.e., on a CTR to the Detroit Computing Center. Only aggregated transactions resulting solely from the targeted branch which exceed the lowered reporting threshold should be sent or made available in accordance with the order. The order may also specify that photocopies of forms filed with the Detroit Computing Center also be sent to the address specified in the order or otherwise be made available as instructed in the order.

Financial institutions may, but are not required to, change their computer systems to accommodate a lower reporting threshold at a targeted branch. If a financial institution's computer system cannot accommodate the lowering of the currency transaction reporting threshold over $10,000 for one or more of its branches, the financial institution will be required to use a manual system for completing the reports.

*Procedural Issues*

The comments raised numerous procedural issues. Many commenters requested that Treasury set forth in the final rule the minimum amount of time that financial institutions will be given to implement a geographic targeting order. Commenters estimated that they needed between 10 to 90 days advance notice of the imposition of an enhanced reporting requirement. After reviewing these comments and considering the different circumstances in which a targeting order may be issued, Treasury has concluded that it would be detrimental to define in advance, and without reference to particular facts, how much time should be given to implement an order. Treasury, however, will give as much time as feasible to implement a section 5326 order, and will work with each financial institution to ensure maximum compliance with an order.

Several commenters recommended that Treasury establish a dollar limit below which it would not target currency transactions. The specific recommendations asked for limits of between $3,000 and $5,000. After considering the comments, Treasury has decided that in order to be able to respond to changing law enforcement needs, it cannot set a dollar amount below which Treasury will not target currency transactions for special reporting. Treasury, however, notes that before granting a request for a targeting order and establishing reporting limits, it will consider the law enforcement need for the information.

A few commenters suggested that Treasury specifically provide in the regulations exactly who in the financial institution will be served with a geographic targeting order. Various suggestions were made as to who would be served, including the Chief Executive Officer ("CEO"), the manager of the targeted branch, or the Bank Secrecy Act compliance officer. Because Treasury believes that these suggestions have merit, it has amended the proposal to specify that the CEO of a targeted financial institution be served with a geographic targeting order. Treasury has selected the CEO as the person to be served because it believes that by serving the CEO, senior officials at the targeted financial institution will be informed of the issuance of the order.

Ordinarily, Treasury will serve a targeting order by sending it by certified or registered mail, return receipt requested. In addition, in order to ensure that the order has been received and is being implemented, in most cases,

Treasury will contact the institution a few days after it has been sent.

Other issues that were raised by the comments concerned the actual filing of the reports: where to file, what type of report to file, and the time deadlines for filing. With respect to the place of filing, the final regulation provides that the order will indicate the specific place the reports are to be sent or will indicate that the reports are to be made available for pick up by designated individuals. If a financial institution that files CTR's by magnetic media is targeted, and the financial institution would like to report transactions for the targeted branch of the financial institution on magnetic tape, Treasury will work with the financial institution to determine where and how to file the reports.

As for the format of the report, Treasury has decided generally to require financial institutions to use the CTR form to file the information on transactions targeted below $10,000. Treasury made this decision because financial institutions are familiar with the CTR form and their employees know how to complete these forms. The regulation, however, provides Treasury with the ability to order targeted financial institutions to use a different format if the circumstances necessitate it. A geographic targeting order will specify the format in which the reports will be required to be filed.

Finally, with respect to the time required to file these reports, Treasury has decided that it will specify in each section 5326 order when the reports must be filed. Generally, however, Treasury anticipates that in most instances it will require the filing of these reports soon after the date of the transaction and no more than 15 days from the date of the transaction, as is required now for filing CTR's.

A few comments asked about the types of transactions in currency that would be targeted. One commenter requested that Treasury not differentiate among different types of transactions (*e.g.*, targeting only purchases of money orders and cashier's checks), while another asked that cash withdrawals not be included in targeting orders. Because each order will depend on the specific facts and circumstances surrounding the request for the targeting order, Treasury is not able to delineate in advance the types of transactions to be included in the order. In many cases, not all types of transactions in currency may be included in the order; in other cases, all types of currency transactions may be targeted. In some cases, only the currency transactions of certain types of customers may be targeted.

One commenter noted that any revisions to the original order should be made in writing. Treasury agrees with that comment and accordingly has included in the final regulation a provision that revisions to a geographic targeting order will not be effective until made in writing. This will ensure that a formal record is kept of all changes made to the original targeting order. It is anticipated that, in some cases, Treasury and the financial institution initially will discuss any revisions to the order, and that these revsions will be reduced to writing by Treasury later.

Several commenters requested that the regulation provide a limit on the number of times a section 5326 order may be renewed. Because there may be instances where an extended targeted period may be necessary, Treasury has decided not to put a limit on the number of times an order may be renewed. However, Treasury notes that in order to renew an order it must make a determination that there may be a significant level of drug money laundering or other illegal activity may be occurring in that area at levels below $10,000, keeping in mind Congress' admonition that these orders be of "limited duration."

Finally, many banks asked to be permitted to continue utilizing existing exemptions at the targeted branches of the banks and to be able to add new unilateral exemptions at exemption limits below $10,000. In the Notice of Proposed Rulemaking, Treasury had stated that banks would be able to continue to use their existing exemptions, unless otherwise indicated in the order, and that banks could not add new exemptions either above or below $10,000 unless approved by Treasury. Because Treasury wants to closely scrutinize currency transactions taking place at targeted financial institutions, it is standing by this position and is incorporating it into the final rule. Thus, unless otherwise noted in an order, during the course of a targeted reporting period, a targeted bank may not grant new exemptions, either above or below $10,000, but it may continue to use the exemptions it already has in place.

*Customer Relations Issues*

In the Notice of Proposed Rulemaking, Treasury indicated that generally it would request the targeted financial institution not to disclose the existence and specifics of an order to persons not employed at the financial institution. Many commenters had questions about such a requirement, including what potential penalties were applicable if

the financial institution made a disclosure, what specific guidelines to follow in handling customer inquiries, and whether therefore financial institutions could raise a good faith defense if information were disclosed. Treasury has considered these issues carefully. Treasury realizes that financial institutions may have difficulties with customers who will not be satisfied with a response that the information is required by Federal regulation, and that they will continue to press the financial institution as to why the information is required. Treasury has balanced this against the real probability that information disclosed by the financial institution, either upon request or voluntarily by an employee of the financial institution, could interfere with the ability of law enforcement to obtain useful information on drug money laundering and other illegal activities occurring in the targeted area. Treasury fears that once criminals learn of the enhanced reporting requirements and where they are applicable, criminals merely will move on to another non-targeted branch.

In light of these concerns, Treasury has decided to retain its initial proposal that the specifics of a geographic targeting order not be disclosed outside the targeted institution. Thus, an order issued under section 5326 will request that the existence of the order not be disclosed to anyone outside the financial institution. Treasury recommends that financial institutions tell customers who ask why the information is required only that they are required to fill out the report pursuant to a Federal regulation. Treasury further recommends that the financial institution notify Treasury in the event of any disclosure of the existence or specifics of an order to persons outside the targeted branch. Finally, Treasury recommends that if the customer's conduct raises the suspicions of the financial institution, that the financial institution report that activity to the Treasury contact person listed in the order.

*Miscellaneous Issues*

Several miscellaneous issues were raised in the comments. One nonbank financial institution with branches nation-wide requested that a financial institution be subject to no more than one section 5326 order at a time. While Treasury cannot guarantee that a financial institution will have to comply with only one order at a time, it does anticipate that initially targeting orders generally will be issued consecutively, and not concurrently, in order to assess their success.

Several commenters recommended that the regulation specify the maximum amount of time that the reports generated in response to a section 5326 order must be retained. Treasury agrees with these comments and, accordingly, the final rule provides that the maximum retention period for the reports and records of reports generated by a targeting order will be no more than five years, the current maximum retention period in the Bank Secrecy Act regulations.

Some commenters wanted to know what they should do if they observe suspicious activity at a targeted branch and whether the activity should be reported to the local office of the Internal Revenue Service Criminal Investigation Division pursuant to Bank Secrecy Act Administrative Ruling 88-1. If suspicious activity occurs at a targeted branch, Treasury would prefer the financial institution to report the activity to the Treasury employee named in the geographic targeting order as the contact person. As stated above, once an area has been targeted for enhanced reporting, Treasury will closely scrutinize all activity occurring in the targeted area, including reports of suspicious activity.

Finally, several commenters asked what the potential penalties were for failing to comply with a geographic targeting order. The penalties in 31 U.S.C. 5321 and 5322 that are applicable to failures to comply with the Bank Secrecy Act and its implementing regulations will be applicable to failures to comply with a section 5326 order. Civil penalties may be imposed up to the greater of the amount invoved in the transaction, if any, (not to exceed $100,000) or $25,000. Any person who willfully violates these provisions also would be subject to criminal penalties of not more than $250,000 or imprisonment of not more than 5 years, or both.

**Conclusion**

After careful consideration of the comments received in response to the Notice of Proposed Rulemaking, Treasury is adopting the regulation as proposed, with the changes noted above.

**Executive Order 12291**

This Final Rule is not a major rule for purposes of Executive Order 12291. It is not anticipated to have an annual effect on the economy of $100 million or more. It will not result in a major increase in costs or prices for consumers, individual industries, Federal, State, or local government agencies, or geographic regions. It will not have any significant adverse effects on competition, employment, investment, productivity,

innovation, or on the ability of United States-based enterprises to compete with foreign-based enterprises in domestic or foreign markets. A Regulatory Impact Analysis therefore is not required.

**Regulatory Flexibility Act**

It is hereby certified under section 605(b) of the Regulatory Flexibility Act, 5 U.S.C. 601, *et seq.,* that this Final Rule will not have a significant economic impact on a substantial number of small entities.

**Paperwork Reduction Act**

The estimated average burden associated with the collections of information contained in this Final Rule is a reporting burden of 100 hours per respondent (250 estimated annual responses per respondent times .40 hour estimated time per response) and a recordkeeping burden of 20 hours per recordkeeper. Comments concerning the accuracy of this burden should be directed to the Office of Financial Enforcement at the address noted above or to the Office of Management and Budget, Paperwork Reduction Project (1505–0063), Washington, DC 20503.

**Drafting Information**

The principal author of this document is the Office of the Assistant General Counsel (Enforcement). However, personnel from other offices participated in its development.

**List of Subjects in 31 CFR Part 103**

Authority delegations (Government agencies), Banks and banking, Currency, Foreign banking, Investigations, Law enforcement, Reporting and recordkeeping requirements, Taxes.

**Amendment**

For the reasons set forth below in the preamble, 31 CFR Part 103 is amended as set forth below:

**PART 103—FINANCIAL RECORDKEEPING AND REPORTING OF CURRENCY AND FOREIGN TRANSACTIONS**

1. The authority citation for Part 103 continues to read as follows:

Authority: Pub. L. 91–508, Title I, 84 Stat. 1114 (12 U.S.C. 1730d, 1829b and 1951–1959); and the Currency and Foreign Transactions Reporting Act, Pub. L. 91–508, Title II, 84 Stat. 1118, as amended (31 U.S.C. 5311–5326).

2. Part 103 is amended by redesignating §§ 103.26 and 103.27 as §§ 103.27 and 103.28 respectively, and by adding a new § 103.26 to read as follows:

## § 103.26  Reports of certain domestic coin and currency transactions.

(a) If the Secretary of the Treasury finds, upon the Secretary's own initiative or at the request of an appropriate Federal or State law enforcement official, that reasonable grounds exist for concluding that additional recordkeeping and/or reporting requirements are necessary to carry out the purposes of this Part and to prevent persons from evading the reporting/recordkeeping requirements of this Part, the Secretary may issue an order requiring any domestic financial institution or group of domestic financial institutions in a geographic area and any other person participating in the type of transaction to file a report in the manner and to the extent specified in such order. The order shall contain such information as the Secretary may describe concerning any transaction in which such financial institution is involved for the payment, receipt, or transfer of United States coins or currency (or such other monetary instruments as the Secretary may describe in such order) the total amounts or denominations of which are equal to or greater than an amount which the Secretary may prescribe.

(b) An order issued under paragraph (a) of this section shall be directed to the Chief Executive Officer of the financial institution and shall designate one or more of the following categories of information to be reported: Each deposit, withdrawal, exchange of currency or other payment or transfer, by, through or to such financial institution specified in the order, which involves all or any class of transactions in currency and/or monetary instruments equal to or exceeding an amount to be specified in the order.

(c) In issuing an order under paragraph (a) of this section, the Secretary will prescribe:

(1) The dollar amount of transactions subject to the reporting requirement in the order;

(2) The type of transaction or transactions subject to or exempt from a reporting requirement in the order;

(3) The appropriate form for reporting the transactions required in the order;

(4) The address to which reports required in the order are to be sent or from which they will be picked up;

(5) The starting and ending dates by which such transactions specified in the order are to be reported;

(6) The name of a Treasury official to be contacted for any additional information or questions;

(7) The amount of time the reports and records of reports generated in response to the order will have to be retained by the financial institution; and

(8) Any other information deemed necessary to carry out the purposes of the order.

(d)(1) No order issued pursuant to paragraph (a) of this section shall prescribe a reporting period of more than 60 days unless renewed pursuant to the requirements of paragraph (a).

(2) Any revisions to an order issued under this section will not be effective until made in writing by the Secretary.

(3) Unless otherwise specified in the order, a bank receiving an order under this section may continue to use the exemptions granted under section 103.22 of this Part prior to the receipt of the order, but may not grant additional exemptions.

(4) For purposes of this section, the term "geographic area" means any area in one or more States of the United States, the District of Columbia, the Commonwealth of Puerto Rico, the United States Virgin Islands, Guam, the Commonwealth of the Northern Mariana Islands, American Samoa, the Trust Territory of the Pacific Islands, the territories and possessions of the United States, and/or political subdivision or subdivisions thereof, as specified in an order issued pursuant to paragraph (a) of this section.

(Approved by the Office of Management and Budget under control number 1505–0063)

3. It is proposed to amend § 103.33 to add at the end a new paragraph (d) to read as follows:

## § 103.33  Records to be made and retained by financial institutions.

\*    \*    \*    \*    \*

(d) A record of such information for such period of time as the Secretary may require in an order issued under § 103.26(a), not to exceed five years.

\*    \*    \*    \*    \*

4. It is proposed to amend § 103.38 by adding in paragraph (d), after the first sentence, a new sentence to read as follows:

## § 103.38  Nature of records and retention period.

\*    \*    \*    \*    \*

(d) \* \* \* Records or reports required to be kept pursuant to an order issued under § 103.26 of this part shall be retained for the period of time specified in such order, not to exceed five years.\* \* \*

\*    \*    \*    \*    \*

Dated: August 8, 1989.

**Salvatore R. Martoche,**

*Assistant Secretary (Enforcement).*

[FR Doc. 89–19199 Filed 8–15–89; 8:45 am]

BILLING CODE 4810-25-M

## DEPARTMENT OF TRANSPORTATION

### Coast Guard

### 33 CFR Part 100

[CGD 09–89–04]

### Special Local Regulations: Fresh Water Kilo Trials, Buffalo Outer Harbor, Buffalo, NY

**AGENCY:** Coast Guard, DOT.

**ACTION:** Final rule.

**SUMMARY:** Special Local Regulations are being adopted for the Fresh Water Kilo Trials. This event will be held on the Buffalo Outer Harbor on 9 September 1989 from 11:00 a.m. e.d.s.t. to 3:00 p.m. e.d.s.t. The regulations are needed to provide for the safety of life and property on navigable waters during the event.

**EFFECTIVE DATES:** These regulations become effective and terminate on 9 September 1989.

**FOR FURTHER INFORMATION CONTACT:** Corey A. Bennett, Marine Science Technician First Class, U.S. Coast Guard, Office of Search and Rescue, Ninth Coast Guard District, 1240 E 9th St., Cleveland, OH 44199, (216) 522–4420.

**SUPPLEMENTARY INFORMATION:** On 16 May 1989, the Coast Guard published a notice of proposed rulemaking in the **Federal Register** for these regulations (54 FR 21074). Interested persons were requested to submit comments and no comments were received.

This event has not been held in the past, but is being held in conjunction with an event that has been conducted in the past and no objections were received from either cargo or passenger vessel operators during the public comment period.

### Drafting Information

The drafters of this regulation are Corey A. Bennett, Marine Science Technician First Class, U.S. Coast Guard, project officer, Office of Search and Rescue and M. Eric Reeves, Lieutenant Commander, U.S. Coast Guard, project attorney, Ninth Coast Guard District Legal Office.

### Economic Assessment and Certification

This regulation is considered to be non-major under Executive Order 12291 on Federal Regulation and nonsignificant under Department of Transportation regulatory policies and procedures (44 FR 11034; February 26, 1979). The economic impact has been found to be so minimal that a full regulatory evaluation is unecessary. This event will draw a large number of

A8