

June 16, 2026

**<u>Via Electronic Filing</u>**
Mr. Lyle W. Cayce, Clerk of Court
U.S. Court of Appeals for the Fifth Circuit
600 South Maestri Place
New Orleans, LA 70130

   RE: *Texas Association of Money Services Businesses v. Blanche*,
     No. 25-50481

Dear Mr. Cayce:

  I write to inform the Court of the preliminary injunction issued in *Kiosko Multiservicios LLC v. Financial Crimes Enforcement Network, et al.*, No. CV-26-02389, 2026 WL 1693761 (D. Ariz. June 11, 2026). In that case, a small money services business in Phoenix, Arizona, challenged FinCEN's latest iteration of the Southwest Border Geographic Targeting Order, which increases the number of businesses that must comply and enforces a $1,000, rather than a $200, reporting threshold. The *Kiosko* plaintiff sought a preliminary injunction on the same grounds as the challengers in this case.

  Like every other district court to have considered any version of the Border GTO, the *Kiosko* court issued a preliminary injunction, holding that there are "at least serious questions whether the [Border] GTO qualifies as a rule subject to notice-and-comment requirements," and, thus, that the Border GTO may be unlawful under the Administrative Procedure Act. *Id.* at *2. The court further found irreparable harm because the Border GTO "caused hundreds of additional labor hours, much longer transaction times, customer walkaways, lost business, and harm to goodwill." *Id.* at *4.

A R L I N G T O N  A U S T I N  C H I C A G O  M I A M I  P H O E N I X  S E A T T L E

901 N. Glebe Road, Suite 900 Arlington, VA 22203 P: (703) 682-9320 F: (703) 682-9321
general@ij.org  www.ij.org

A copy of *Kiosko* is attached. I thank the Court for its attention.

Respectfully submitted,

/s/ Robert E. Johnson
Robert E. Johnson
INSTITUTE FOR JUSTICE
*Counsel for Cross-Appellants Arnoldo
Gonzalez, Jr. and High Value, Inc.*

cc:     Counsel of Record (via ECF)

**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Kiosko Multiservicios LLC, | No. CV-26-02389-PHX-KML |
| Plaintiff, | **ORDER** |
| v. | |
| Financial Crimes Enforcement Network, et al., | |
| Defendants. | |

On May 8, 2026, the court granted a temporary restraining order preventing defendant FinCEN from enforcing its March 2026 Geographic Targeting Order ("GTO") that increased reporting requirements for plaintiff Kiosko Multiservicios LLC. Kiosko is a money services business ("MSB") that provides money transfers, money orders, and check-cashing services in Maricopa County. Kiosko has now moved for a preliminary injunction. Because FinCEN's response does not undercut any of the TRO's reasoning, the court grants injunctive relief to Kiosko on the same notice-and-comment theory as the TRO.

## I.    Background[1]

Kiosko is a small MSB with six retail locations in Phoenix. (Doc. 30-1 at 3.) It serves mostly local residents who do not use banks and rely on Kiosko to cash paychecks, pay rent, and send money to family. (Doc. 30-1 at 3–4, 6–7.)

In March 2026, FinCEN issued the GTO challenged here. Geographic Targeting Order Imposing Recordkeeping and Reporting Requirements on Certain Money Services

---

[1] The temporary restraining order also provides extensive background. (Doc. 29 at 1–3.)

Businesses Along the Southwest Border, 91 Fed. Reg. 11456–01 (Mar. 10, 2026). The GTO applies to covered MSBs in Maricopa, Pima, Santa Cruz, and Yuma counties in Arizona, along with specified counties or zip codes in Texas, New Mexico, and California. *Id.* The GTO requires covered MSBs to submit Currency Transaction Reports ("CTRs") for currency transactions involving $1,000 or more. *Id.* For context, MSBs are ordinarily required to file CTRs only for transactions over $10,000 and collect additional information only for transactions over $3,000. (Doc. 1 at 5–6.) FinCEN says the GTO is intended to combat cartel-related illicit finance, identify potential money mules, generate investigative leads, and provide a snapshot of cash transactions in the covered areas. (Doc. 1 at 9, 11–12.)

Before the GTO, only one or two of Kiosko's transactions each year required it to file a CTR. (Doc. 30-1 at 4.) The GTO has dramatically increased that number. In March 2026, about one-third of Kiosko's money transactions—more than 4,000 of them—were for $1,000 or more. (Doc. 30-1 at 5.) In April 2026, Kiosko completed 9,502 total money transactions, including 2,147 transactions of $1,000 or more. (Doc. 30-1 at 5.) Very few of these transactions would have otherwise required Kiosko to collect or report customer information (Doc. 30-1 at 5), which means before the GTO, those transactions could have been completed in one to two minutes (Doc. 30-1 at 6). Under the GTO, however, those transactions generally take 10 to 18 minutes. (Doc. 30-1 at 6.) Kiosko estimates the GTO required around 600 to 850 additional labor hours in March and 550 to 750 additional labor hours in April solely from CTR-related compliance work. (Doc. 30-1 at 9.)

On May 8, 2026, the court granted a TRO, but only as to Kiosko. (Doc. 29.) The parties then briefed a motion for preliminary injunction and the court held oral argument.

## II.    Legal Standard

Generally, a court analyzes a request for a preliminary injunction under two slightly-different tests. Under one test, the court evaluates whether there is a likelihood of success on the merits, whether there is a likelihood of irreparable harm, whether the balance of equities tips in the movant's favor, and whether an injunction would be in the public

interest. *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008). Under the second test, a court assesses whether "serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor" in addition to showing "a likelihood of irreparable injury and that the injunction is in the public interest."[2] *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011). Under the serious-questions standard, a district court cannot enter an injunction on a "merely plausible" claim or "forgo legal analysis just because it has not identified precedent that places the question beyond debate." *Where Do We Go Berkeley v. Cal. Dep't of Transp.*, 32 F.4th 852, 863 (9th Cir. 2022).

### III.  Analysis

Kiosko moves for a preliminary injunction, raising arguments under the Fourth Amendment and the Administrative Procedure Act ("APA"). The TRO was granted based on a finding that there were at least serious questions whether the GTO qualifies as a rule subject to notice-and-comment requirements, and its reasoning is fully incorporated here. Based on the present record and briefing, serious questions going to the merits remain on Kiosko's notice-and-comment claim.

---

[2] In 2024, a Ninth Circuit panel stated the serious-questions standard "requires serious *factual* questions that need to be resolved in the case." *Assurance Wireless USA, L.P. v. Reynolds*, 100 F.4th 1024, 1031 (emphasis added). But the case from which the panel derived that proposition, *Alliance for the Wild Rockies v. Petrick*, 68 F.4th 475, 497 (9th Cir. 2023), rejected application of the serious-questions standard because the district court's legal theory rested on a misreading of statutory text the Ninth Circuit found clear. The Ninth Circuit has otherwise recognized that serious *legal* questions may satisfy the standard. *See Manrique v. Kolc*, 65 F.4th 1037, 1041 (9th Cir. 2023) (requiring "serious legal questions" warranting "more deliberative investigation"); *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1184–85, 1195, 1202–03 (9th Cir. 2022) (affirming preliminary injunction under serious-questions standard where central merits dispute turned on statutory interpretation). Several other district courts have highlighted the doctrinal tension *Assurance Wireless* introduced. *See San Carlos Apache Tribe v. United States Forest Serv.*, 803 F. Supp. 3d 879, 903 n.2 (D. Ariz. 2025), *aff'd sub nom. Ariz. Mining Reform Coal. v. United States Forest Serv.*, 172 F.4th 641 (9th Cir. 2026); *Firestone v. Yellen*, No. 3:24-CV-1034-SI, 2024 WL 4250192, at *2 n.3 (D. Or. Sept. 20, 2024). The court understands *Assurance Wireless* as confirming that a district court cannot postpone resolving a clear legal issue by calling it "serious," not as displacing the longstanding recognition that substantial legal questions requiring more deliberative investigation may satisfy the serious-questions standard.

## A. Merits and Serious Questions

The TRO concluded Kiosko had raised serious questions whether the GTO is a rule under the APA, rather than an order. *Kiosko Multiservicios LLC v. Fin. Crimes Enf't Network*, No. CV-26-02389-PHX-KML, 2026 WL 1265981, at \*3–5 (D. Ariz. May 8, 2026). FinCEN does not squarely engage the TRO's notice-and-comment analysis, nor does it raise any additional evidence or arguments meaningfully undermining the court's reasoning. (*See* Doc. 36 at 20–21.) Only two new points need to be addressed: (1) whether FinCEN's internal memorandum supporting the GTO can be treated as an "adjudication" as the APA uses that term and (2) how prior, unrelated GTOs fit into the analysis.

First, FinCEN suggested in briefing and at oral argument that its internal memorandum can be understood as an "adjudication," thereby confirming the GTO is an order. (*See* Doc. 36 at 30.) "Adjudication" is the "agency process for the formulation of an order." 5 U.S.C. § 551(7). The APA defines an "order" as "the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making[.]" 5 U.S.C. § 551(6). FinCEN's internal memorandum does not appear to be a final disposition of any concrete matter. *See disposition*, *Black's Law Dictionary* (12th ed. 2024) ("The act of getting rid of or putting away something, esp. by way of authoritative or final decision; a final settlement or determination"); *see also Ruggieri v. Warner & Swasey Co.*, 938 F.2d 322, 324 (1st Cir. 1991) (citing multiple dictionaries to determine that "disposition" connotes "finality"). FinCEN's memorandum did not resolve a dispute involving Kiosko, grant or deny final relief to or adjudicate the rights or obligations of any particular MSB, or result from a proceeding in which any of the covered entities participated. It also did not make individualized findings about Kiosko or any other identified business.[3] That the memorandum identifies FinCEN's reasons for issuing the GTO does not make it an adjudication. At a minimum, serious questions remain whether the memorandum is an adjudication under the APA.

---

[3] The court does not decide whether FinCEN's reasoning for expanding the GTO to Maricopa County would satisfy the high standard of arbitrary-and-capricious review but notes FinCEN's memorandum offers thin support for that expansion. (*See* Doc. 41 at 20–21.)

Second, the parties identify prior GTOs, but those do not resolve the rule-order issue. (*See* Docs. 30 at 20–21; 36 at 33–34.) These GTOs have ranged from geographically-narrow orders aimed at multiple types of businesses in a single commercial district to broader ones covering a single industry across many major metropolitan markets. Two examples illustrate that range. A 2014 GTO covering the Los Angeles Fashion District swept broadly in terms of the types of businesses subject to the order, but the geography was limited to a confined commercial district covering a few dozen blocks. *See* Geographic Targeting Order (Sept. 26, 2014), https://www.fincen.gov/system/files/shared/LA_GTO_Order9-25-14.pdf [https://perma.cc/76FG-3QUJ]. In contrast, prior title-insurance GTOs reached broadly geographically but were directed at a narrow business type and a specific, rare transaction category involving residential real-estate purchases. *See* Geographic Targeting Order (Oct. 16, 2024), https://www.fincen.gov/system/files/shared/Phase-19-Order-FINAL-508.pdf [https://perma.cc/5MFF-NXFE]; *FinCEN Expands Reach of Real Estate "Geographic Targeting Orders" Beyond Manhattan and Miami*, FinCEN (July 27, 2016), https://www.fincen.gov/news/news-releases/fincen-expands-reach-real-estate-geographic-targeting-orders-beyond-manhattan [https://perma.cc/7S2L-VZL6]. Those GTOs were never challenged in court and their validity is not at issue here. But they show previous GTOs were limited in ways this one is not, either by tightly confining the geographic area or by targeting a narrower class of transactions when the geographical reach swept broadly, resulting either way in relatively few transactions being reported.

That understanding is consistent with Treasury's expectations when creating implementing regulations for § 5326. The Federal Register notice accompanying the rule estimated a GTO would lead to approximately 250 annual reports per respondent, resulting in about 100 additional work hours. *See* Amendment to the Bank Secrecy Act Regulations Relating to Geographic Reporting of Certain Domestic Currency Transactions, 54 Fed. Reg. 33675, 33676 (Aug. 16, 1989). By comparison, in March and April alone Kiosko required around 1,500 additional labor hours to submit thousands of CTRs across its six

locations. (*See* Doc. 30-1 at 9.)

At oral argument, FinCEN acknowledged some relationship between the scope of the covered group and the scope of the geographic area but declined to place any limitation on when a GTO might be too broad to qualify as an order. FinCEN also did not clearly rule out a near-nationwide GTO so long as it excluded some county, region, or zip code in each state so as to comply with the regulation defining a geographic area as "any area in one or more States." *See* 31 C.F.R. § 1010.370(d)(4). But if "group" can mean every business in a regulated industry and "geographic area" can mean almost any collection of counties or zip codes, § 5326 would eliminate any meaningful distinction between orders and rules.[4] As the court noted in the TRO, FinCEN's position appears to be that it can "circumvent the [statute's] requirement that reporting obligations be set by regulation entirely." *Kiosko*, 2026 WL 1265981, at *5. At some point, a GTO that combines an expansive geographic area, a broad covered group, and prospective reporting duties stops looking like a targeted order and starts looking like a rule of general applicability. *See Yesler Terrace Cmty. Council v. Cisneros*, 37 F.3d 442, 448 (9th Cir. 1994).

At present, the March 2026 GTO resembles a rule. It combines vast geographic coverage with a broad definition of covered businesses, capturing transactions that are very common in those businesses. It applies to all covered MSBs in twelve counties and eleven zip codes across several states. It reaches ordinary, everyday transactions at businesses like Kiosko. And the record reflects substantial burdens on Kiosko, including hundreds of additional labor hours, much longer customer transactions, customer walkaways, and lost goodwill. Those burdens do not independently decide whether the GTO is a rule or an order, but they show the rule-like effect of imposing new, prospective compliance obligations on a broad category of businesses across an extensive geographic area.

---

[4] FinCEN defines "group" as "a number of individuals assembled together or having some unifying relationship or action" and states the "unifying relationship" here is "doing business in a limited number of narrowly defined 'geographic area[s].'" (Doc. 36 at 33.) The court is skeptical FinCEN's interpretation provides any meaningful limitation. If merely operating in a selected geographic area (no matter how large) provides the required unifying relationship, then *every* disparate business in *any* defined geographic area can constitute a "group" for purposes of § 5326.

Ultimately, nothing at this stage eliminates the serious questions identified in the TRO. *Kiosko*, 2026 WL 1265981, at \*3–5. On the present record, Kiosko has raised serious questions whether this GTO is a rule rather than an order under the APA.

### B.  Likelihood of Irreparable Harm

The court concluded Kiosko had shown likely irreparable harm at the TRO stage because the GTO threatened to drive it out of business. *Kiosko*, 2026 WL 1265981, at \*5 (citing *hiQ Labs, Inc.*, 31 F.4th at 1188). The preliminary-injunction record confirms that conclusion. Kiosko has provided evidence the GTO has caused hundreds of additional labor hours, much longer transaction times, customer walkaways, lost business, and harm to goodwill, and attests that continued enforcement may force Kiosko to close most or all of its locations. (Docs. 30 at 7–8; 30-1 at 5–9, 14–16.) FinCEN argues Kiosko could reduce those burdens through automated-filing software but disclaims evidentiary challenges and provides no facts showing such software would eliminate Kiosko's collection and verification burden (or could be implemented quickly enough to prevent the harms Kiosko identifies). (Doc. 36 at 34–35.) On this record, Kiosko has shown likely irreparable harm absent preliminary relief.

### C.  Balance of Hardships and Public Interest

At the TRO stage, the court concluded the balance of equities and public interest favored narrow relief for Kiosko. *Kiosko*, 2026 WL 1265981, at \*6. Because Kiosko proceeds under the serious-questions standard, it also must show the balance of hardships tips sharply in its favor. *All. for the Wild Rockies*, 632 F.3d at 1134–35. When the government is a party, the balance of equities and public interest merge. *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 668 (9th Cir. 2021).

The present record supports the same conclusion as the TRO. The government has an important interest in combating money laundering, drug trafficking, and cartel-related finance, but the relief here remains limited to Kiosko and leaves the GTO in effect as to other covered MSBs while this case proceeds. By contrast, Kiosko has shown concrete and unrecoverable harms from enforcement of the GTO, including substantial labor burdens,

longer transaction times, customer walkaways, lost business, and harm to goodwill—all of which threaten Kiosko's ability to continue operating all six locations, if not the business as a whole. *See hiQ Labs, Inc.*, 31 F.4th at 1188 (threatened business destruction may constitute irreparable injury sufficient to grant injunctive relief); *adidas Am., Inc. v. Skechers USA, Inc.*, 890 F.3d 747, 761 (9th Cir. 2018) (harm to reputation and goodwill may also qualify as irreparable). Given the narrow scope of relief and Kiosko's showing of lasting, potentially business-crushing harm, the balance of hardships tips sharply in Kiosko's favor and the public interest supports preliminary relief, just as it did at the TRO stage.

## IV.  Relief Granted and Scope

Kiosko has raised serious questions going to the merits on its notice-and-comment claim, has shown likely irreparable harm, and has shown the balance of hardships and public interest favor injunctive relief. The court previously determined that relief limited to Kiosko was appropriate. *Kiosko*, 2026 WL 1265981, at *6 (citing *Trump v. CASA, Inc.*, 606 U.S. 831, 851–52 (2025)). Nevertheless, Kiosko again requests statewide relief. (Doc. 30 at 22 (citing 5 U.S.C. §§ 705, 706(2)).) Kiosko's reliance on those APA provisions does not change the result. The availability of broad APA relief remains uncertain post-*CASA*, *see Nat'l TPS All. v. Noem*, 166 F.4th 739, 767 (9th Cir. 2026), and § 705 authorizes interim relief only "to the extent necessary to prevent irreparable injury." Because the irreparable-harm showing is specific to Kiosko, broader preliminary relief is not warranted. Accordingly, defendants are enjoined from enforcing the March 2026 GTO as to Kiosko.

Finally, the court does not require a bond. Defendants have not identified any compensable monetary harm that would result from this narrow injunction.

**IT IS ORDERED** the Motion for Preliminary Injunction (Doc. 30) is **GRANTED**.

**IT IS FURTHER ORDERED** defendants are preliminarily enjoined from requiring Kiosko to file CTRs under the March 2026 GTO for transactions of $1,000 or more that would not otherwise be reportable under existing CTR regulations.

**IT IS FURTHER ORDERED as follows**:

The parties are directed to meet, confer, and develop a Rule 26(f) Joint Case Management Report, which must be filed **within 4 weeks of the date of this order**. It is the responsibility of plaintiff(s) to initiate the Rule 26(f) meeting and prepare the Joint Case Management Report. Defendant(s) shall promptly and cooperatively participate in the Rule 26(f) meeting and assist in preparation of the Joint Case Management Report.

The Joint Case Management Report shall contain the following information in separately-numbered paragraphs.

1. The parties who attended the Rule 26(f) meeting and assisted in developing the Joint Case Management Report;

2. A list of all parties in the case, including any parent corporations or entities (for recusal purposes);

3. Any parties that have not been served and an explanation of why they have not been served, and any parties that have been served but have not answered or otherwise appeared;

4. A statement of whether any party expects to add additional parties to the case or otherwise amend pleadings;

5. The names of any parties not subject to the court's personal (or *in rem*) jurisdiction;

6. A description of the basis for the court's subject matter jurisdiction, citing specific jurisdictional statutes. If jurisdiction is based on diversity of citizenship, the report shall include a statement of the citizenship of every party and a description of the amount in dispute. *See* 28 U.S.C. §1332;

7. A short statement of the nature of the case (no more than three pages), including a description of each claim, defense, and affirmative defense;

8. A listing of contemplated motions and a statement of the issues to be decided by those motions;

9. Whether the case is suitable for reassignment to a United States Magistrate

Judge for all purposes or suitable for referral to a United States Magistrate Judge for a settlement conference;

10. The status of any related cases pending before this or other courts;

11. A discussion of any issues relating to preservation, disclosure, or discovery of electronically stored information ("ESI"), including the parties' preservation of ESI and the form or forms in which it will be produced;

12. A discussion of any issues relating to claims of privilege or work product;

13. A discussion of necessary discovery, which should take into account the December 1, 2015 amendments to Rule 26(b)(1) and should include:

a. The extent, nature, and location of discovery anticipated by the parties and why it is proportional to the needs of the case;

b. Suggested changes, if any, to the discovery limitations imposed by the Federal Rules of Civil Procedure;

c. The number of hours permitted for each deposition. The parties also should consider whether a total number of deposition hours should be set in the case, such as twenty total hours for plaintiffs and twenty total hours for defendants. Such overall time limits have the advantage of providing an incentive for each side to be as efficient as possible in each deposition, while also allowing parties to allocate time among witnesses depending on the importance and complexity of subjects to be covered with the witnesses;

14. Proposed deadlines for each of the following events. In proposing deadlines, the parties should keep in mind the Case Management Order will contain deadlines to govern this case and once the dates have been set the court will vary them only upon a showing of good cause. A request by counsel for extension of discovery deadlines in any case that has been pending more than two years must be accompanied by a certification stating the client is aware of and approves of the requested extension. The court does not consider

settlement talks or the scheduling of mediations to constitute good cause for an extension. The parties must propose the following:

a. A deadline for the completion of fact discovery, which will also be the deadline for pretrial disclosures pursuant to Rule 26(a)(3). This deadline is the date by which all fact discovery must be *completed*. Discovery requests must be served and depositions noticed sufficiently in advance of this date to ensure reasonable completion by the deadline, including time to resolve discovery disputes. Absent extraordinary circumstances, the court will not entertain discovery disputes after this deadline;

b. Dates for full and complete expert disclosures and rebuttal expert disclosures, if any;

c. A deadline for completion of all expert depositions;

d. A date by which any Rule 35 physical or mental examination will be noticed if such an examination is required by any issues in the case;

e. A deadline for filing dispositive motions;

f. Case-specific deadlines and dates, such as the deadline to file a motion for class certification or a date on which the parties are available for a *Markman* (patent claim construction) hearing;

g. A date by which the parties shall have engaged in face-to-face good faith settlement talks;

h. Whether a jury trial has been requested and whether the request for a jury trial is contested, setting forth the reasons if the request is contested;

i. Any other matters that will aid the court and parties in resolving this case in a just, speedy, and inexpensive manner as required by Federal Rule of Civil Procedure 1;

15. A statement indicating whether the parties would prefer that the court hold a

- 11 -

case management conference before issuing a scheduling order—and, if so, an explanation of why the conference would be helpful.

**IT IS FURTHER ORDERED** the parties shall file a proposed Case Management Order containing all the proposed dates at the same time they file the Rule 26(f) Case Management Report. The proposed Case Management Order must also be emailed in Word format to Lanham_Chambers@azd.uscourts.gov.

Dated this 11th day of June, 2026.

Honorable Krissa M. Lanham
United States District Judge